Judge Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ABU KHALID ABDUL-LATIF, <br><br> Defendant. | NO. CR11-228JLR <br><br> GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS INDICTMENT BASED ON THE GOVERNMENT'S INTENTIONAL DESTRUCTION OF EVIDENCE |

## **INTRODUCTION**

The United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and Todd Greenberg and Michael Dion, Assistant United States Attorneys, files this Opposition to Defendant Abu Khalid Abdul-Latif's Motion to Dismiss Indictment Based on the Government's Intentional Destruction of Evidence (docket no. 141).

This motion involves the improper destruction of text messages. A Seattle Police Department ("SPD") Detective who was collaborating with federal investigators deleted hundreds of his text messages with the informant. The Government agrees with the defense that these texts should have been preserved. The failure to preserve Det. DeJesus's texts with the informant is a serious matter. The Government's goal in this Opposition is not to excuse the deletion of the texts or minimize the issue. Rather, the Government's goal is to address the legal consequences of the destruction of this material.

1    The defense asks the Court to dismiss the indictment, or, in the alternative, give
2 the jury an "adverse inference" instruction or impose some other sanction. Under well-
3 established Supreme Court and Ninth Circuit precedent, however, these remedies are not
4 warranted.
5    To obtain any remedy, the defense must meet two burdens. First, the defense must
6 show bad faith on the part of the federal government. Second, Abdul-Latif has the burden
7 to show that he cannot obtain comparable evidence from any other source. Neither
8 requirement is met here.
9    The evidence will not show bad faith that is imputable to the federal government.
10 As an initial matter, the text messages were destroyed by a Seattle Police Department
11 ("SPD") detective -- a local law enforcement officer who was not a member of a federal
12 task force, and was not under the control of federal agents or prosecutors. The detective
13 deleted the texts without the knowledge or participation of federal agents or attorneys.
14 Indeed, the evidence will show that federal prosecutors told the SPD detective to preserve
15 his text messages with the informant, and that the federal agents preserved their text
16 messages with the informant. Even assuming that the detective acted in bad faith when
17 he destroyed the texts, it is clear under well-Ninth Circuit precedent that his bad faith
18 should not be imputed to the federal government. *United States v. Loud Hawk,* 628 F.2d
19 1139, 1149 (9th Cir. 1979) (noting the historical "refusal of this court to impute to the
20 federal government the loss or destruction of evidence by other authorities over whom it
21 has no authority or control").
22   Furthermore, even if the federal government were responsible for the detective's
23 conduct, the circumstances do not suggest that he acted in bad faith. The Ninth Circuit
24 has made clear that the intentional destruction of discoverable evidence, standing alone,
25 does not establish bad faith. To establish bad faith, the defense must show that the
26 detective knew that the texts might be exculpatory, and destroyed them in order to deny
27 this helpful evidence to the defense. *United States v. Artero,* 121 F.3d 1256, 1259 (9th
28 Cir. 1997) (government acts in bad faith when it destroys evidence to "hide it from the

1 defense or prevent the jury from seeing [it]"). In short, the defense must show that the
2 detective acted out of "malicious intent." *United States v. Estrada,* 453 F.3d 1208, 1213
3 (9th Cir. 2006). The detective, however, deleted the texts pursuant to his standard
4 practice of deleting text messages with informants. This is a security precaution, meant to
5 ensure that sensitive information will not be exposed if the detective's phone is lost or
6 stolen. The detective will testify that he did not remember, or misunderstood, the
7 instructions to preserve the text messages. The evidence will not suggest that he deleted
8 the texts because he wanted to destroy evidence that might help the defense.

9 With respect to the availability of comparable evidence, this issue centers around
10 Abdul-Latif's defense that he was entrapped by the informant. According to Abdul-Latif,
11 the missing texts might have supported his defense in one of two ways. First, he argues
12 that they might have provided material that the defense could use to impeach the
13 informant by showing his motive to fabricate a case against Abdul-Latif, his unreliability,
14 or some similar matter. Second, Abdul-Latif argues that the missing texts might have
15 provided direct evidence that the informant was entrapping Abdul-Latif.

16 With respect to the first category – material to use to impeach the informant – the
17 defense already has a wealth of ammunition. This includes, but is not limited to, the fact
18 that the informant was paid over $90,000, that he has serious criminal history, that he
19 erased material from his cellphone to destroy evidence that he was violating his probation
20 by using his phone to transmit sexually explicit material, and that failed to inform the FBI
21 about his destruction of that material. Assuming there was more impeachment material in
22 the deleted texts, it would have very likely been cumulative.

23 With respect to direct evidence of entrapment, the defense has access to the critical
24 evidence that will either support or disprove their entrapment defense: hours and hours of
25 recorded conversations between Abdul-Latif and the informant. If Abdul-Latif was
26 entrapped, that can only have happened during communications (whether in person, on
27 the phone, or by text message) between him and the informant. With very limited
28 exceptions, all of those communications are recorded or preserved. The informant's text

conversations with the SPD detective would add little or nothing of value to the entrapment analysis.

Thus, bad faith is not established, and comparable evidence is available to the defense. The Motion should be denied.

## BACKGROUND

The Government expects that the evidence at the evidentiary hearing will show the following:

### I. Overview Of The Investigation

On or about May 30, 2011, the person who would become an informant had dinner with Abdul-Latif and his family. At that time, the person was not working for law enforcement. The person became an informant on June 3, 2011, when he met with Seattle Police Department ("SPD") Det. Sam DeJesus and reported that, during his recent dinner with Abdul-Latif, Abdul-Latif had invited him to join an ongoing conspiracy to murder soldiers. The FBI was not present at the June 3rd meeting between the informant and Det. DeJesus.

Pursuant to Det. DeJesus's instructions, the informant met with Abdul-Latif again on June 3rd to discuss the plot. This meeting was not recorded because, as a local law enforcement officer, Det. DeJesus did not have the legal authority to authorize a one-party consensual recording.

The May 30th meeting took place before the investigation had begun, and so, of course, it was not recorded by law enforcement. Thus, the June 3rd meeting is the only meeting between the informant and Abdul-Latif that was not recorded during the investigation. The only other unrecorded communications between the informant and

1 Abdul-Latif, during the period of the investigation[1], were four text messages and nine
2 phone calls. [2]

3 On June 6, 2011, the FBI became involved in the investigation. FBI agents met
4 with the informant, who became an FBI informant at that point. Although Det. DeJesus
5 was not a member of the Joint Terrorism Task Force or any other federal task force, he
6 continued to work with the FBI on the investigation, and helped to handle the informant.
7 Det. DeJesus remained involved in the investigation because the source was still an SPD
8 source (although he was also signed up as an informant as an FBI), and thus SPD wanted
9 to remain involved in the handling of its asset. Throughout the investigation, Det.
10 DeJesus acted as a local law enforcement officer, and answered only to his superiors at
11 SPD.

12 On June 10, 2012, the FBI gave the informant an FBI phone to use for all
13 communications with Abdul-Latif. Prior to that, the informant had used his personal
14 phone to communicate with Abdul-Latif. The FBI phone was equipped to record and
15 preserve all conversations and communications. The agents told the informant to use the
16 FBI phone, and the FBI phone only, to communicate with the conspirators. The
17 informant kept his personal phone, which he was to use for all personal matters.

18 Throughout the investigation, the informant was routinely debriefed after his
19 contacts with Abdul-Latif. Some of those debriefs were recorded, others were
20 documented in reports. All of those reports and recordings were produced to the defense.

21 The investigation continued until June 22, 2011, until the defendants were arrested
22 after taking delivery of machineguns.

---

[1] Any communications before the investigation began could not support an entrapment defense, because the informant did not become an informant – and hence a government agent – until the investigation began on June 3rd. The actions of a private person cannot be entrapment, because entrapment requires improper conduct by the government or its agents. *United States v. Spentz*, 653 F.3d 815, 819 (9th Cir. 2011).

[2] Five of the nine phone calls lasted a minute or less, making it likely that they were merely voicemail messages. All other phone contacts between the informant and Abdul-Latif were recorded.

### III. Existing Impeachment Material On The Informant

There will be no dispute in this case that the informant sought, and received, ample benefits for his work during this investigation. He was ultimately paid over $90,000, and the SPD continues to pay his rent and phone bill.

There will also be no dispute that the informant has serious criminal history, and that he is vulnerable to impeachment in a variety of ways. The informant is a felon with multiple convictions. As discussed in another pending defense motion, the informant "reset" his phone before handing it over to the FBI to destroy evidence of the informant's violations of his conditions of state supervision. The informant failed to disclose this "reset" of his phone to the FBI. Additionally, state Department of Corrections ("DOC") records also reveal instances of recent dishonesty that are fair game for the defense on cross-examination.

### IV. Text Messages Between Det. DeJesus And The Informant

Det. DeJesus dealt with the informant regularly during the active period of the investigation from June 3, 2011, until June 22, 2011. During that time, Det. DeJesus exchanged several hundred text messages with the informant.

#### A. The Preserved Text Messages

Det. DeJesus preserved only nine of those text messages. The nine preserved messages were all exchanged on June 3rd – the first day of the investigation. Exhibit 1. At the beginning of the exchange, the informant asks Det. DeJesus how he should behave when he meets with Abdul-Latif later that day: "am I free to discuss this as if I intend to do it." Ex. 1 at bates 314. Det. DeJesus responds, "Yes," and gives the informant some general instructions, such as telling the informant to lead Abdul-Latif "to believe that you already have someone in mind who will provide you guns." Ex. 1 at 315-16.

The informant texted Det. DeJesus again after leaving the June 3rd meeting with Abdul-Latif. Ex. 1 at 317. The informant reported that Abdul-Latif wanted to "move" -- i.e., attack – "within the next 2 or 3 weeks." Ex. 1 at 319. The informant stated that

1  Abdul-Latif wanted prices for weapons: "3 aks, 1 rpg, and a dozen he gernades [sic]."
2  Ex. 1 at 321.  Det. DeJesus told the source that they would talk more the next day, and
3  added, "If it all goes as planned, this will be very beneficial to you and us."  Ex. 1 at 320.

4  **B.     Det. DeJesus' Deletion Of Text Messages**

5  The Government expects that, at the hearing, Det. DeJesus will testify that it is his
6  standard practice to delete texts with informants, and that he commonly does that at the
7  end of each day.  Det. DeJesus will explain that this is a security measure: if his phone is
8  lost or stolen, this practice will ensure that a criminal or other unauthorized person will
9  not see sensitive text messages that would identify his confidential informants and reveal
10 covert investigations.  For similar reasons, Det. DeJesus did a "security swipe" to erase
11 all data from his phone when the SPD issued him a new phone.

12 The Government expects that Det. DeJesus will testify that he followed his
13 standard practices in this case because he did not understand that he was supposed to
14 preserve his texts in this investigation.  The Government expects that Det. DeJesus will
15 testify that he does not remember being told to preserve his text messages.  Det. DeJesus
16 will testify that his text conversations with the informant largely dealt with logistical and
17 scheduling matters.  Once the FBI became involved in the investigation, substantive
18 conversations with the informant were done during in-person meetings.

19 The Government expects that Det. DeJesus will also testify that, if the informant
20 had said something exculpatory in a text message – such as a statement suggesting that he
21 was entrapping Abdul-Latif – Det. DeJesus would have promptly passed that information
22 on to the FBI agents.

23 Both of the Assistant United States Attorneys ("AUSAs") assigned to the case
24 remember telling Det. DeJesus, early in the investigation, that he needed to preserve his

1  text messages with the informant.[3]  The Government expects that Det. DeJesus will testify
2  that he does not remember these instructions.
3        The Government produced the nine text messages turned over by Det. DeJesus in
4  discovery on July 25, 2011.  On August 19, 2011, one of the AUSAs emailed Det.
5  DeJesus and asked if those nine texts were "all" of the texts exchanged between Det.
6  DeJesus and the informant.  Det. DeJesus answered: "As for the text messages, you have
7  all of them as far as I know."
8        **C.**      **The Government's Attempts To Recover Text Messages**
9        On July 13, 2012, the defense told the Government that they believed that several
10 hundred text messages had not been produced.  The Government looked into the matter
11 and responded to the defense on July 25, 2012.  The Government reported that Det.
12 DeJesus had deleted the text messages.  Prior to this, the Government was not aware that
13 Det. DeJesus had deleted the text messages
14       The Government then looked into whether there was any way to recover any of the
15 missing text messages.  The Government was able to recover some text messages from
16 two sources: (1) a forensic analysis of the informant's phone; and (2) text messages
17 recovered from the informant's backup of his phone to internet "cloud" storage.
18       With respect to the texts recovered from the informant's phone, the FBI laboratory
19 in Quantico, Virginia examined the informant's cell phone in July 2012.  All of the text
20 messages recovered during this examination between the informant and Detective
21 DeJesus are listed on Exhibit 2.  These text messages were sent on June 30, 2012.  All of
22 the messages relate to the topics of: (1) Detective DeJesus arranging to meet with the
23 informant (along with an FBI agent) to collect the informant's cell phone for evidentiary
24 purposes; and (2) a discussion of the price of the new cell phone that law enforcement
25
26       [3] In its Motion, the defense stated that it planned to call the AUSAs as witnesses at the evidentiary hearing.  The government does not believe that it is necessary for the AUSAs to testify, and
27 has offered to submit a written stipulation.
28

would purchase for the informant to replace the one he was turning over.  The only conceivably relevant thing found in any of these text messages is Det. DeJesus' comment that the new cell phone would be "temporary anyway until you get you [sic] big payout." See Exhibit 2, row 7.

The texts recovered from the informant's Internet cloud storage are attached as Exhibit 3, and were obtained by the FBI from the informant in July 2012.  The informant reported that, for some period of time, he backed-up his cellular telephone through a "cloud" Internet storage system.  Although the informant was no longer able to access any data that previously may have been stored on the "cloud" system, he provided the FBI with one computer file stored on his computer that contained all of his text messages between the dates of approximately January 7, 2012, through March 3, 2012.

These text messages essentially fall into two general categories: (1) discussions about monetary payments to the informant (i.e., the informant requesting a payment directly, Detective DeJesus discussing the timing of when a payment would be made, the informant complaining about his financial and/or living situation, or setting up a meeting with the informant to deliver a payment); or (2) innocuous "small talk" discussions (i.e. comments about a snow storm, the informant's comments about his sale and purchase of a vehicle and boat, or comments about the informant's communications with the DOC). Other than the discussions about the payments being made to the informant -- a fact that is not in dispute -- none of the text messages appear to be relevant or helpful to the defense.

## DISCUSSION

**I.      The Defense Is Not Entitled To Any Relief Based On The Deleted Texts**

The defense argues that the deletion of the texts violated the Due Process clause and justifies the dismissal of the Indictment.  The Ninth Circuit applies different tests depending on whether the destroyed evidence had "apparent" or merely "potential"

1   exculpatory value.  *United States v. Estrada,* 453 F.3d 1208, 1212 (9th Cir. 2006).  The
2   defense does not and cannot argue that, at the time that Det. DeJesus deleted the texts, it
3   was "apparent" that the texts had exculpatory value.  Accordingly, the defense effectively
4   acknowledges that the legal standard governing the destruction of evidence that is
5   "potentially" useful governs.  Defense Motion at pp. 10-11.

6   Pursuant to that standard, to establish a Due Process violation, the defense must
7   show: (1) that the defendant "would be unable to obtain comparable evidence by other
8   reasonably available means;" and (2) that the evidence was destroyed in "bad faith."
9   *Estrada,* 453 F.3d at 1212; *United States v. Barton,* 995 F.2d 931, 934 (9th Cir. 1993).

10  The Ninth Circuit has also held that, even where the destruction of evidence does
11  not rise to the level of a Due Process violation, a court may order a remedy (such as
12  giving an "adverse inference" instruction) based on its supervisory powers.  *Flyer,* 633
13  F.3d at 916.  The Ninth Circuit has held that a defendant seeking such an instruction must
14  make essentially the same showing required to establish a Due Process violation, namely:
15  "(1) that the evidence was destroyed in bad faith, and (2) that he was prejudiced by its
16  destruction."  *United States v. Romo-Chavez,* 681 F.3d 955, 961 (9th Cir. 2012) (citing
17  cases).

18  In short, whether the defendant seeks the dismissal of the indictment, an adverse
19  inference instruction, or the suppression of evidence, the availability of relief turns on the
20  balancing of (1) the extent of the government's bad faith versus (2) the degree of
21  prejudice to the defendant.  *United States v. Flynn,* 633 F.3d 911, 916 (9th Cir. 2011).

22  The defendant has the burden of showing both bad faith and prejudice in the form
23  of a lack of comparable evidence.  *Romo-Chavez,* 681 F.3d at 961 ("defendant must
24  establish" bad faith and prejudice); *United States v. Flyer,* 633 F.3d 911, 916 (9th Cir.
25  2011) (defendant must show bad faith).

26
27
28

As discussed below, this case involves neither bad faith nor prejudice to the defense.[4]

### A.   The Evidence Does Not Show Bad Faith On The Part Of The Federal Government

The law is clear that, whether the remedy sought is dismissal or a jury instruction, bad faith is required. *Estrada,* 453 F.3d at 1212; *Romo-Chavez,* 681 F.3d at 961. In this case, evidence that should have been preserved was destroyed. That fact, by itself, does not establish bad faith. Rather, as discussed below, bad faith requires a showing (1) that the evidence was maliciously destroyed, and (2) that the destruction should be imputed to the federal government.

#### 1.   The Evidence Was Not Maliciously Destroyed

The Ninth Circuit and the Supreme Court have repeatedly held that bad faith exists only where the evidence suggests that law enforcement destroyed evidence for the specific purpose of depriving the defense of exculpatory evidence. In other words, as the Supreme Court has explained, there is only bad faith if law enforcement *knows* that it is destroying evidence that might help the defense: "The presence or absence of bad faith . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Arizona v. Youngblood,* 488 U.S. 51, 56-58 (1988). The Ninth Circuit has stated that the government acts in bad faith when it destroys evidence in order to "hide it from the defense or prevent the jury from seeing [it]." *United States v. Artero,* 121 F.3d 1256, 1259 (9th Cir. 1997); *see also Barton,* 995 F.2d at 935 (officer would have acted in bad faith if he "deliberately destroy[ed] impeaching evidence" in order to ensure that his statements "could not be challenged"); *Estrada,* 453 F.3d at 1213 (defendant must show that the government acted with "malicious intent"); *United States v. Heffington,* 952 F.2d 275, 281 (9th Cir. 1991) (bad faith shown where

---

[4] The Court's determination is reviewed for an abuse of discretion. *Jennell,* 749 F.2d at 1308-09.

1 law enforcement's "conduct" suggests that they destroyed evidence because it could
2 "exonerat[e]" the defendant); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996)
3 ("To establish bad faith, then, a defendant must prove 'official animus' or a 'conscious
4 effort to suppress exculpatory evidence."'); *United States v. Sanders*, 2006 U.S. App.
5 LEXIS 27280, at *5-6 (7th Cir. 2006) ("bad faith mean [s] a 'conscious effort to suppress
6 exculpatory evidence.'").

7       The cases cited by the defense where courts have granted relief based on the
8 destruction of evidence also illustrate this principle, as they involve situations where law
9 enforcement knew that evidence was likely to be exculpatory, but nevertheless chose to
10 destroy it.  *See, e.g., United States v. Cooper,* 983 F.2d 928, 932 (9th Cir. 1993) (agents
11 destroyed equipment even though it was central to the allegations and its "value as
12 potentially exculpatory evidence was repeatedly suggested" to them); *United States v.
13 Bohl,* 25 F.3d 904, 913 (10th Cir. 1994) (government destroyed steel "whose chemical
14 composition was the central issue in the criminal trial," despite the defendant's "repeated
15 requests" that it be preserved for their own testing, and evidence that the government's
16 tests might be flawed); *United States v. Elliott,* 83 F.Supp.2d 637, 643 (E.D. Va. 1999)
17 (government destroyed glassware despite its apparent and "substantial" exculpatory
18 value).  The common denominator of these decisions is that they involve the destruction
19 of evidence that is central to the case, and that is done in the fact of strong signs that the
20 evidence might be exculpatory.

21       The Government does not expect that there will be any evidence showing that Det.
22 DeJesus deleted the texts out of a "malicious" desire to "hide" evidence that would have
23 "exonerated" Abdul-Latif.  To the contrary, Det. DeJesus will testify that, if the informant
24 had sent him a text message with exculpatory information, he would have notified the rest
25 of the investigative team.  Det. DeJesus will testify that he did not save the texts because
26 he considered them trivial -- not because he thought they were exculpatory or important.

27
28

1       Furthermore, Det. DeJesus followed his standard practice when he deleted the
2  texts.  For security reasons, Det. DeJesus routinely deletes his text messages with
3  informants.  The fact that Det. DeJesus followed a standard practice shows that he was
4  not motivated by a desire to hide exculpatory evidence in this case.  The Ninth Circuit has
5  repeatedly recognized that the destruction of evidence pursuant to a standard practice or
6  policy weighs against a finding of bad faith.  *Mitchell v. Goldsmith,* 878 F.2d 319, 322
7  (9th Cir. 1989) (fact that police acted "in accord with their normal practices" suggested
8  no bad faith); *Heffington,* 952 F.2d at 281 (compliance with "departmental procedure
9  should be regarded as an indication" that evidence was not destroyed in bad faith);
10 *Barton,* 995 F.2d at 935.

       Thus, the evidence will show that Det. DeJesus did not act in bad faith.

**2.    The Federal Government Was Not Responsible For The Destruction Of The Evidence**

       The bad faith analysis centers on the conduct of the federal government.  In a series of decisions stretching back forty years, the Ninth Circuit has held that, for purposes of the bad faith analysis, the unilateral actions of local law enforcement should not be imputed to the federal government.  *United States v. Loud Hawk,* 628 F.2d 1139, 1149 (9th Cir. 1979) (noting the historical "refusal of this court to impute to the federal government the loss or destruction of evidence by other authorities over whom it has no authority or control") (citing cases including *United States v. Trenary,* 473 F.2d 680 (9th Cir. 1973)); *United States v. Higginbotham,* 539 F.2d 17, 21 (9th Cir. 1976) (refusing to impute to federal government the failure of local law enforcement to preserve photo array); *United States v. Jennell,* 749 F.2d 1032, 1308 (9th Cir. 1985) (no bad faith on part of federal government where local police failed to preserve evidence); *Artero,* 121 F.3d at 1259 (citing *Jennell*).

       In this case, the evidence was destroyed by a local law enforcement officer, SPD Det. DeJesus.  Although Det. DeJesus was federally cross-deputized years ago, he was

1 never actually assigned to any federal task force, and he was not a member of the federal
2 task force that ran this investigation, the JTTF. Det. DeJesus collaborated with the JTTF
3 investigation because an SPD asset – the informant – was involved in the investigation.
4 His collaboration was purely voluntary, and neither the FBI nor the federal prosecutors
5 had any control or authority over him. Det. DeJesus answered only to his superiors at the
6 SPD.

7     Furthermore, the federal agents and the federal prosecutors neither knew about nor
8 participated in the deletion of the texts by Det. DeJesus. To the contrary, the federal
9 prosecutors told Det. DeJesus to preserve his texts, and the federal agents preserved their
10 own texts with the informant. In fact, no federal agent or prosecutor knew that Det.
11 DeJesus had deleted the texts until July 2012. As the Ninth Circuit has acknowledged,
12 imputing Det. DeJesus' conduct to the federal government makes no sense under these
13 circumstances. Indeed, the Ninth Circuit has even refused to find bad faith on the part of
14 the federal government under much worse circumstances, namely a case where a federal
15 agent was present when local law enforcement destroyed evidence, and did nothing to
16 "encourage[] or discourage[] the destruction." *Loud Hawk,* 628 F.2d at 1143.

17     In an apparent attempt to circumvent the lack of federal involvement in the
18 deletion of the texts, the defense argues that the federal government should have done
19 more to ensure that the text messages were preserved. This argument is factually
20 dubious, and in any event, it is unavailing. Negligence is not bad faith. *Flyer,* 633 F.3d
21 at 916 ("Bad faith requires more than mere negligence or recklessness."); *United States*
22 *v. Bohl,* 25 F.3d 904, 912 (10th Cir. 1994).[5]

---

24     [5] In unpublished decisions, at least two District Courts in other Circuits have granted the adverse inference instruction based on the negligent destruction of evidence. Those courts, however, were
25 applying the Third Circuit's standard used in civil cases, which looks to the "degree of fault," but does not require bad faith. *Suarez,* 2010 WL 4226524 at *7-8; *United States v. Stoll*, 2011 WL 703875, *2
26 (S.D. Fla. Feb 21, 2011) (adopting the *Suarez* analysis and acknowledging that "negligence does not equate to bad faith"). Those decisions carry no weight in this Circuit, which held in *Romo-Chavez* that
27 bad faith is required for the adverse inference instruction.

1    **B.     The Defense Cannot Show Prejudice Because Comparable Evidence Is Available**

Anytime that evidence is lost, there is some theoretical possibility that it could have been helpful to the defense. That alone, however, is legally insufficient to justify relief. *United States v. Lindsey*, 482 F.3d 1285, 1293-94 (11th Cir. 2007) (speculation that destroyed fingerprint card would have been exculpatory is insufficient); *Jones v. McCaughtry*, 965 F.2d 473, 479 (7th Cir.1992); *United States v. Martinez*, 744 F.2d 76, 80 (10th Cir.1984). Rather, the law gives the defense the burden to show that it has been prejudiced -- meaning not only that potentially valuable evidence has been lost, but that there is no comparable evidence that could serve the function of the missing evidence. *Estrada,* 453 F.3d at 1212; *United States v. Barton,* 995 F.2d 931, 934 (9th Cir. 1993). As the defense argues in its Motion, the missing texts could, theoretically, be helpful to Abdul-Latif in one of two ways. First, they could provide additional impeachment material to use during the cross-examination of the informant. Second, they could contain direct evidence of entrapment.

As a matter of common sense, the likelihood that the texts would actually contain such helpful material is quite limited. It is hard to imagine that any informant would send a text to law enforcement suggesting that he was entrapping the target of an investigation. Furthermore, the dozens of text messages that were preserved have little, if any, useful information for the defense. There are a couple of references to financial rewards for the informant, which is hardly a shocking revelation considering that the government has acknowledged paying the informant over $90,000. The rest of the messages involve either mundane scheduling matters or harmless small talk. There is nothing at all that is relevant to entrapment.

Even if the Court were to assume that the missing texts contained some useful material, that would still not establish prejudice to the defense given the circumstances of this case. The law is clear that there is no prejudice where "comparable evidence" is

available. *Estrada,* 453 F.3d at 1212; *United States v. Barton,* 995 F.2d 931, 934 (9th Cir. 1993).

With respect to the possibility that the missing texts might have provided impeachment material on the informant, the defense already has an embarrassment of riches in that department. The informant is not only a felon, but a multiple felon. Not only was he a paid informant, he was a very well paid informant – over $90,000 to date, with some payments by SPD continuing. The informant violated his conditions of state supervision, and then destroyed evidence on his cell phone to hide those violations, and failed to disclose his destruction of that evidence to the FBI. The informant's DOC records, which have been produced to the defense, contain even more potential impeachment material. The defense has more than enough tools to conduct an effective cross-examination, even without the missing texts.

It is even less likely that the missing texts would have had irreplaceable evidence of entrapment. If there was any entrapment, it must have taken place during contacts between the informant and Abdul-Latif between June 3rd (the day the informant became a government agent) and June 22nd (the day the defendants were arrested). With the exception of one meeting, four text messages, and several (mostly short) phone calls, all of those contacts were recorded and produced to the defense. These numerous hours of recordings give the defense an almost perfectly preserved record of the informant's communications with their client – the communications during which any entrapment must have occurred. With the critical evidence in the defense's hands, it is hard to imagine what the text messages between the informant and Det. DeJesus could add.

In a recent analogous case, a defendant charged with a prison murder argued that his Due Process rights were violated when law enforcement destroyed bloody pants found on a different inmate after the murder. *United States v. Bingham,* 653 F.3d 983, 994 (9th Cir. 2011). The Ninth Circuit found that there was comparable evidence because a corrections officer testified that he had seen the other inmate wearing the bloody pants.

1  *Id.* Notably, the "comparable evidence" was not a perfect replacement for the missing
2  pants, as the pants had "additional exculpatory value in that they could be tested for
3  DNA." *Id.* Nevertheless, the Ninth Circuit found that the officer's testimony was
4  comparable. *Id.*

5  In this case, the comparable evidence is stronger than it was in *Bingham*. The
6  defense has abundant material for impeachment, and the best possible source of evidence
7  for entrapment (the actual recorded communications). Furthermore, both Det. DeJesus
8  and the informant are available to testify about the contents of the missing texts. *United*
9  *States v. Rivera-Relle*, 333 F.3d 914, 922 (9th Cir. 2003) (where recording of
10 conversation between two agents was destroyed, there was "clearly comparable evidence
11 available" to the defendant, because both agents "were available to testify, and did testify,
12 about whatever conversations were on the tape"). Any additional material in the texts
13 would most likely be cumulative.

14       **C.**    **The Proposed Adverse Inference Instruction Is Improper**

15 The defense asks the Court to instruct the jurors that they *must* infer that the texts
16 were deleted because they were exculpatory. As discussed above, under Ninth Circuit
17 law, the adverse inference instruction is proper only where there is bad faith and
18 prejudice, and those requirements are not met here for all of the reasons discussed above.
19 As one court has noted, "above all else an instruction must make sense in the context of
20 the evidence, and no adverse-inference instruction would make sense here." *United*
21 *States v. Laurent*, 607 F.3d 895, 903 (1st Cir. 2010). Furthermore, the defense's proposed
22 instruction is improper because it infringes on the function of the jury by ordering the
23 jurors to draw a particular inference from the evidence. *Byrd v. Maricopa County*
24 *Sheriff's Department,* 629 F.3d 1135, 1148 n. 10 (9th Cir. 2011) (defendant's suggested
25 adverse inference instruction "would have impermissibly directed the jury to reach a
26 conclusion about a matter of disputed fact"). The defense cites no Ninth Circuit authority
27 approving of such a mandatory instruction.
28

ABDUL-LATIF/OPPOSITION TO MOTION TO EXCLUDE EVIDENCE - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1     The Court should not give any instruction specific to this issue. The general
2 instructions about evidence and inferences are sufficient. Abdul-Latif is free to argue that
3 the jury should draw an adverse inference from the deletion of the texts, and he does not
4 need a specific instruction to make that argument. *Jennell,* 749 F.2d at 1308-09 (trial
5 court did not abuse discretion when it refused to give adverse inference instruction but
6 allowed defense to argue the issue to the jury); *Artero,* 121 F.3d at 1259.

## CONCLUSION

9     The caselaw is clear that, under the circumstances of this case, neither dismissal of
10 the Indictment nor an adverse inference instruction is warranted. The defense's remedy is
11 to make their case about the loss of the evidence to the jury that will decide Abdul-Latif's
12 fate. The Motion should be denied.

14     DATED this 1st day of October, 2012.

Respectfully submitted,

JENNY A. DURKAN
United States Attorney

*s/ Michael Dion*
MICHAEL DION
TODD GREENBERG
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-3903
Facsimile: 206-553-0755
Phone: 206-553-7729
E-mail: Michael.Dion@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney of record for the defendant.

s/Kiyomi Mathews
KIYOMI MATHEWS
Legal Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206/553-4228
FAX:   206/553-0755
E-mail: kiyomi.mathews@usdoj.gov