EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
        v.                       ) No. CR11-228JLR
                                 )
ABU KHALID ABDUL-LATIF,          )
                                 )
            Defendant.           )

---

Interview

of

TODD L. GREENBERG

---

Taken at 700 Stewart Street

Seattle, Washington

DATE:  Thursday, October 25, 2012

REPORTED BY:  Kristin M. Vickery, CCR, 3125

Todd L. Greenberg                                    October 25, 2012

                                                          Page 2

     1                    A P P E A R A N C E S

     2

     3   For the Plaintiff:    ROBERT H. WESTINGHOUSE
                               US Department of Justice - Seattle
     4                         700 Stewart Street
                               Suite 5220
     5                         Seattle, Washington 98101
                               206.553.7970
     6                         robert.westinghouse@usdoj.gov

     7   For the Defendant:    JENNIFER E. WELLMAN
                               Federal Public Defender
     8                         1601 Fifth Avenue
                               Suite 700
     9                         Seattle, Washington 98101
                               206.553.1100
    10                         jennifer_wellman@fd.org

    11                         ERIK LEVIN
                               Federal Public Defender
    12                         1601 Fifth Avenue
                               Suite 700
    13                         Seattle, Washington 98101
                               206.553.1100
    14                         erik_levin@fd.org

    15
         Also Present:         DEBRA M. MALCOM, INVESTIGATOR
    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

Todd L. Greenberg                                    October 25, 2012

```
                                                        Page 3

 1                        I N D E X

 2   EXAMINATION BY:                                   PAGE

 3   Ms. Wellman                                          4
     Mr. Levin                                           13
 4   Ms. Wellman                                         16
     Mr. Levin                                           21
 5   Ms. Wellman                                         24
     Mr. Levin                                           25
 6   Ms. Wellman                                         25
     Mr. Levin                                           27
 7   Ms. Wellman                                         33
     Mr. Levin                                           37
 8   Ms. Wellman                                         47
     Mr. Levin                                           51
 9   Ms. Wellman                                         55
     Mr. Levin                                           62
10   Ms. Wellman                                         64
     Mr. Levin                                           77
11   Mr. Westinghouse                                    81
     Ms. Wellman                                         83
12   Mr. Levin                                           84
     Ms. Wellman                                         85
13   Mr. Levin                                           86

14                  No Exhibits Marked.

15

16

17

18

19

20

21

22

23

24

25
```

Todd L. Greenberg                                        October 25, 2012

                                                                Page 4

1           SEATTLE, WASHINGTON; THURSDAY, OCTOBER 25, 2012

2                            1:04 P.M.

3                            --o0o--

4

5                  E X A M I N A T I O N

6    BY MS. WELLMAN:

7         Q.   Why don't we start?  In your August 3 letter, you

8    had mentioned a reference to a June 6 meeting with respect

9    to this case.  What time was that meeting held?

10        A.   10 a.m.

11        Q.   Okay.  When did you first become involved in the

12   investigation?

13        A.   Probably at that meeting.  The first contact I had

14   about it was over the -- that was a Monday, June 6.  And

15   over the weekend I had a couple e-mails to set that meeting

16   up.  But that was -- that meeting was the very first meeting

17   between SPD and FBI on this case.

18        Q.   Okay.  And who were the -- who were the FBI

19   contacts in that -- for that meeting, setting it up?  When

20   you set -- how did it first come to your attention?

21        A.   Sean Moore who is the -- one of the supervisors at

22   the JTTF e-mailed me over the weekend asking if I was

23   available for a meeting Monday at ten.

24        Q.   (BY MS. WELLMAN)  Okay.  And did he tell you what

25   the meeting was about?

Todd L. Greenberg                                          October 25, 2012

Page 5

```
 1        A.   Very vaguely.   It had something to do with an SPD
 2   investigation into a Fort-Hood-style attack.
 3        Q.   Okay.
 4        A.   That was it.
 5        Q.   And was Mike Dion involved in that meeting as well
 6   or no?
 7        A.   No.
 8        Q.   Okay.
 9        A.   He was not there.
10        Q.   Okay.  And did you know who was going to be at
11   that meeting from SPD?
12        A.   Nope.
13        Q.   Did you know who was going to be in the meeting
14   from FBI?
15        A.   No.  I assumed Sean would.
16        Q.   Okay.
17        A.   But, no, I had no -- no idea.
18        Q.   Okay.  And is that meeting the same meeting where
19   Via and Tomlinson are -- and DeJesus are meeting with
20   Childs, or is it a different meeting on that same day?
21        A.   It was a different meeting.
22        Q.   Different meeting.
23             So had the meeting --
24        A.   I don't know if they met with -- I can't recall
25   right now if they met with Childs that same day.
```

Todd L. Greenberg                                        October 25, 2012

Page 6

1        Q.    Okay.

2        A.    Childs was not at this meeting.

3        Q.    Okay.  When did you first learn that Childs was

4    the informant in this case?

5        A.    I don't know what you mean by that.

6        Q.    Did you know at that meeting that they were

7    working with Childs?

8        A.    What his name was, or...?

9        Q.    Anything about the informant that they were

10   working with.

11       A.    There -- I believe there was some discussion about

12   the informant at this meeting.  But I don't recall what it

13   was.

14       Q.    Okay.

15       A.    I recall being told that this person was not an

16   informant before this investigation started.  In other

17   words, he came in kind of off the street, not as an

18   informant.  I don't remember what else was discussed about

19   him at that time, at that meeting, that first meeting.

20       Q.    Okay.  Okay.  And apologies if I already asked

21   this, DeJesus was at that meeting, at the -- on the June 6

22   meeting?

23       A.    June 6?

24             MR. WESTINGHOUSE:  Which meeting?

25             MS. WELLMAN:  June 6.

Todd L. Greenberg                                      October 25, 2012

                                                            Page 7

 1              MR. WESTINGHOUSE:  You're referring to the 10 a.m.

 2    meeting?

 3              THE WITNESS:  At 10 a.m.

 4              MS. WELLMAN:  The 10 a.m. meeting that Todd was

 5    at.

 6        A.   Yes.

 7        Q.   (BY MS. WELLMAN)  Okay.  So DeJesus was there?

 8        A.   Yes.

 9        Q.   And what did you understand DeJesus' role was in

10    that meeting -- or in the investigation so far?

11        A.   Well, can you ask those questions individually?

12        Q.   Sure.  So DeJesus was at the June 10, 10 a.m.

13    meeting.

14        A.   June 6, yes.

15        Q.   June 6 at 10 a.m.

16        A.   Yes.

17        Q.   Okay.  And so what was your understanding of

18    DeJesus' role at that point in the investigation?

19        A.   Well, at the meeting I came to learn that he had

20    been contacted by the informant a few days earlier about

21    what later became the investigation that we're here to talk

22    about, and that he had worked with the informant for a

23    couple days and was now bringing the case to present it,

24    essentially, to the FBI.

25        Q.   Okay.  Did DeJesus call Via to set up -- to bring

Todd L. Greenberg                                    October 25, 2012

Page 8

```
 1    it to the attention of the FBI or who did he -- who did

 2    he --

 3              MR. WESTINGHOUSE:  Do you have any knowledge about

 4    that.

 5         A.   I don't know.

 6         Q.   (BY MS. WELLMAN)  You don't know?

 7         A.   No.

 8         Q.   Okay.  Do you have any knowledge of who DeJesus

 9    contacted at the FBI, whether it was Via or someone else?

10         A.   I don't.

11         Q.   Okay.  Are there any rough notes from that meeting

12    with DeJesus that haven't already been produced?

13         A.   I didn't take notes at that meeting.

14         Q.   Okay.  This is more of a discovery issue in terms

15    of -- that I think we don't need to discuss today, but I was

16    going to -- in terms of witness logs, do you -- are either

17    you or Mike maintaining witness logs with respect to any

18    conversations or interviews of DeJesus?

19              MR. WESTINGHOUSE:  Well, Jennifer, if we could

20    simply put the discovery aside, perhaps we could discover

21    that at a different -- discuss that at a different point.

22              But let's, today, focus only on the issue of the

23    text messaging and what directions were given by

24    Mr. Greenberg, what directions were given by Mr. Dion.

25              MS. WELLMAN:  Okay.
```

Todd L. Greenberg                                    October 25, 2012

Page 9

```
 1        Q.   (BY MS. WELLMAN)  Did you ever talk to DeJesus

 2   directly about how Childs was performing as an informant?

 3        A.   I don't know what you mean by that.

 4        Q.   Did you ever talk to DeJesus about Childs?

 5        A.   Of course.

 6        Q.   How many times?

 7        A.   I have no idea.

 8        Q.   Throughout the investigation?

 9        A.   You mean from the day I met Sam DeJesus til

10   today --

11        Q.   Would you -- would you talk --

12        A.   -- have I ever talked to him about Robert Childs?

13        Q.   Mm-hmm.

14        A.   Of course.

15        Q.   And about what he was doing on the investigation

16   or how he was -- let's say -- let's take between June 6 and

17   June 22, did you ever debrief with DeJesus about how Childs

18   did or did not conduct himself during the sting operation?

19             MR. WESTINGHOUSE:  I'm going to, again, interrupt.

20   I'm sorry.  I want you to have the opportunity to talk with

21   both witnesses as much as you need to about the subject of

22   the texting.  But this isn't the time or the place to have a

23   more general discussion about this office's interaction with

24   the informant or Detective DeJesus and his relationship with

25   the informant.  That's not the purpose.
```

Todd L. Greenberg                                      October 25, 2012

1            MS. WELLMAN:  Well, I -- can I call you Bob even

2       though we are being recorded, or do you want me to call you

3       Mr. Westinghouse?

4            MR. WESTINGHOUSE:  Whatever.

5            MS. WELLMAN:  The problem is is the scope of the

6       motion is not as narrowly defined as in that Paragraph 4 of

7       the August letter that -- that I think you would like us to

8       limit this to.  The questions concern the control over the

9       investigation, what DeJesus' role was in the investigation,

10      and what knowledge Todd and Mike had with respect to the

11      text messaging.

12           So I'll try to -- you know, I've -- we've all

13      tried to keep in mind the scope of the issue before the --

14      before the Court as opposed to the trial.  But --

15           MR. WESTINGHOUSE:  I understand.  And you can

16      argue whatever you want, but in terms of the firsthand

17      knowledge of these witnesses, it needs to be limited to the

18      subject matter of the motion which is the text messaging and

19      their directions to Detective DeJesus.

20      Q.   (BY MS. WELLMAN)  Okay.  When did you first talk

21      to Detective DeJesus about this case?  Is that June 6?

22      A.   Yes.

23      Q.   Okay.  And have you worked on other cases with

24      him?

25      A.   I -- I have encountered him in other cases.  We

Todd L. Greenberg                                    October 25, 2012

 1   didn't work a case together like a detective or case agent

 2   and an AUSA.  But we've encountered each other in other

 3   cases prior to this, prior to June 6.

 4        Q.   Okay.  So by "encounterer," do you mean he was a

 5   witness in -- or a law enforcement officer in another case?

 6        A.   Yeah.  He's been a witness.  Although, I don't

 7   think he testified for me in a case.  I think he's had

 8   supporting roles in other investigations I've worked with,

 9   in terms of me doing surveillance or something like that.

10        Q.   Has he handled informants before for you?

11        A.   No, he's not.  No.

12        Q.   Okay.  Okay.  So there's a July 25 letter that I

13   believe you signed where you -- you recall telling DeJesus

14   and other law enforcement to preserve their texts.

15             Do you recall when you first gave Detective

16   DeJesus that directive?

17        A.   It was at the June 6 meeting.

18        Q.   Okay.

19        A.   10 a.m.

20        Q.   And what other times do you remember giving him

21   that directive?

22        A.   I don't recall.  I think, as we state in the

23   letter, I don't have a specific recollection of another time

24   where I said, Save text messages involving Robert Childs,

25   when DeJesus was present.  There may very well have been

Todd L. Greenberg                                    October 25, 2012

Page 12

1    other times where that happened because it was a topic that

2    came up from time to time with the investigative team.

3         Q.   Okay.  Okay.

4         A.   But I don't have a specific recollection of

5    another occasion.

6         Q.   Okay.

7         A.   I have a very specific recollection of the June 6

8    meeting.

9         Q.   Okay.  Do you recall who else you've given that

10   directive to on that law enforcement team?

11        A.   I know I've given that directive to Ethan Via and

12   Al Kelly, special agents with the FBI.

13        Q.   Okay.  Did you ever discuss directly with

14   Detective DeJesus how to handle or communicate with Childs?

15        A.   What do you mean how to?  Like methods of

16   communication?

17        Q.   Mm-hmm.

18        A.   Well, why don't you ask me what you mean?

19        Q.   That's exactly what I mean.  Did you ever talk to

20   Detective DeJesus about how -- by what means he should

21   communicate with Childs?

22        A.   Not -- I did not give him advice in terms of how

23   he should communicate with Robert Childs, no.

24        Q.   Okay.  Did he -- did you know he was communicating

25   by text messaging or e-mail?

Todd L. Greenberg                                    October 25, 2012

Page 13

1        A.   I think -- yes.  I must have thought that it was
2    at least a very good possibility because it was consistently
3    on my mind to have all the texts between agents and
4    detectives and Childs saved, so...
5        Q.   Okay.
6        A.   Yeah.
7        Q.   Was there anyone else communicating with Childs by
8    text messaging or e-mail other than Detective DeJesus?
9        A.   Well, we've produced to you texts between FBI
10   agents and Robert Childs, so obviously they were
11   communicating with Robert Childs by text to some extent.
12       Q.   Okay.
13            MS. WELLMAN:  Do you have a question?
14            MR. LEVIN:  Yeah.
15
16                    E X A M I N A T I O N
17   BY MR. LEVIN:
18       Q.   In your letter -- let me just go back to who was
19   at the meeting.  I think in your letter you indicate that
20   Specific Agent Via, Special Agent Sean Moore, SPD Sergeant
21   Allen and Detective DeJesus were at that meeting along with
22   you; is that right?
23       A.   Correct.
24       Q.   And --
25       A.   And there were other people present as well.

Todd L. Greenberg                                    October 25, 2012

                                                          Page 14

 1      Q.   Well, you indicate that Special Agent Kelly may
 2   have been present, but you weren't sure at the time you
 3   wrote the letter.  Since that time have you determined
 4   whether he was there or not?
 5      A.   I have not determined that.  I haven't asked him
 6   or anyone else.  I'm going off of my independent
 7   recollection.  I just don't remember if he was there or not.
 8      Q.   Okay.  Who else was there?
 9      A.   Those are the people that I know for sure were
10   there.  I would estimate there were, a good, other five or
11   six people.  And I just don't remember who they were.
12      Q.   Do you have any idea where they were from, whether
13   they were associated with the FBI or the Seattle police?
14      A.   I don't.  I mean, I really don't know for sure.
15   My best recollection is that there were probably one or two
16   other people with FBI there.  There may have been, although
17   I don't remember specifically if anyone else was from SPD.
18   And there was someone who had -- was some sort of a criminal
19   investigator with one of the military branches.  I don't
20   remember who it was or what it was.  But I remember it being
21   someone of that ilk that was present.
22      Q.   You say that one of the issues that was discussed
23   was the preservation of texts and e-mail communications.
24   Was that the only thing that was discussed?
25      A.   No.  Well, I mean -- maybe can I take a couple

Todd L. Greenberg                                    October 25, 2012

Page 15

```
 1   minutes to describe the meeting for you so you --
 2        Q.   Sure.
 3        A.   This was about a 90-minute meeting.  And like I
 4   said, it was the first -- this was the first time SPD
 5   presented this situation to FBI and to me.  We were at a
 6   pretty big conference table.  This was at the FBI.  There
 7   were, like I said, maybe 12 people there, give or take.  And
 8   there were many things discussed at this meeting.
 9             It was essentially started out with the
10   SPD -- with Sam DeJesus and Erik Allen, sort of briefing the
11   rest of us about what had been going on in the last few days
12   in terms of their investigation.  And there was a lot of
13   discussion about Abdul-Latif and what was known about him
14   and what had been going on, you know, in the last few days
15   with him.  There was a lot of discussion about investigative
16   strategies and what could be done and that sort of thing.
17             During that meeting, it was -- well, it was
18   sort of an informal meeting in the sense that, you know,
19   people weren't standing up and addressing the group.  We
20   were all just seated at a table.  People would chime in here
21   or chime there.
22             And during that meeting I said a number of
23   things.  I'm sure some of which I can't recall, some of
24   which I can recall.  Only one of them had to do with the
25   text messages.  And that was, at some point during the
```

Todd L. Greenberg                                    October 25, 2012

                                                              Page 16

1    meeting, something -- and I don't remember what -- triggered

2    in my mind the realization or the likelihood that there were

3    texts going on both between the informant and Abdul-Latif

4    and Walli and between the informant and the detective.  I

5    don't remember why I came to believe that or what was said

6    that caused me to believe that.

7                    And at that point in the meeting, I

8    interjected and said something like, Look, make sure that

9    you save all the text messages, both between the informant

10   and the bad guys and the informant and you guys, the law

11   enforcement.  And that's essentially what I said.  Now, that

12   was one comment in a long meeting.

13

14                  E X A M I N A T I O N

15   BY MS. WELLMAN:

16        Q.   Did anyone object to that?

17        A.   No, I don't recall anyone objecting.  I think if

18   they did, I would recall that.  I don't recall any reaction

19   to it.

20        Q.   Nothing at all?

21        A.   You know, I don't have an independent recollection

22   of anyone saying anything in response or -- but, no, I don't

23   think anyone objected.

24        Q.   Okay.  Did anyone -- was there any discussion in

25   terms of how to preserve text messages?

Todd L. Greenberg                                    October 25, 2012

Page 17

1        A.   Not at that meeting, no.

2        Q.   Or e-mails?

3        A.   There was no discussion of how to do that at that

4   meeting.

5        Q.   Okay.  Was there a discussion of that nature at

6   any other meeting?

7        A.   Yes.

8             MR. WESTINGHOUSE:  Can I ask -- let me just

9   interrupt for a minute.

10                  (Pause in the proceedings.)

11       Q.   (BY MS. WELLMAN)  Tell us, what meeting was that

12   discussed at?

13       A.   I don't recall anything specific about it.  But I

14   do recall Ethan -- I mean, I don't recall where it was, who

15   else was present, any of those details.  I do recall Ethan

16   talking to me about how they saved their texts, something

17   about sending them to an e-mail account or printing them

18   out, something like that.  But that was information that was

19   just being told to me as opposed to me, you know, relaying

20   that to someone else.

21       Q.   And do you have any specific memory --

22       A.   I'm sorry.  Sam DeJesus was not present for that

23   particular discussion when Ethan was talking about how he

24   printed off his texts.

25       Q.   Did -- to your knowledge, did Ethan ever tell

Todd L. Greenberg                                    October 25, 2012

Page 18

```
 1   DeJesus how to save the texts?

 2              MR. WESTINGHOUSE:  In your presence?  Is that the

 3   question?

 4        Q.   (BY MS. WELLMAN)  In your presence or did Ethan

 5   ever say to you, I've told DeJesus to preserve the texts,

 6   how I'd like him to preserve the texts?

 7        A.   Ethan has never told me that.

 8        Q.   Have you ever talked to Detective DeJesus about

 9   how you would like him to save your texts?

10        A.   No.

11        Q.   Did he ever -- did he, being Detective DeJesus,

12   ever complain to you that it would be difficult to save his

13   texts?

14        A.   No.

15        Q.   Was there any discussion with Sergeant Allen or

16   Detective DeJesus or Detective Tomlinson or anyone from the

17   SPD about preserving their text messages in a particular

18   way?

19              Any protocol, I guess, is the question not --

20   obviously you talked to them about preserving it.  Did you

21   discuss any sort of protocol with them in terms of how you

22   would like them preserved?

23        A.   No.

24        Q.   Okay.  When did Detective DeJesus conduct the

25   factory swipe of his cellphone?
```

Todd L. Greenberg                                    October 25, 2012

1        A.    I have no idea.

2        Q.    Do you know when Childs reset his phone?

3        A.    Nothing beyond what we've produced to you in

4    discovery.

5        Q.    In an earlier letter you said that Childs couldn't

6    recall when he did it.  Is that the end of the story, or

7    have you revisited that with Childs?

8        A.    I don't have any -- any information about that

9    apart from what we've produced to you in the discovery in

10   this case.

11       Q.    Okay.  There was an interview of Childs on

12   July 24, and the report looks like it's signed by Via and

13   Randolf.  Are those the two agents that were at that

14   interview?

15       A.    Can I see that, please?

16       Q.    The July 24?  That's the one thing I don't know if

17   I have.  This is the 17th.  It's similar to this in that

18   it's -- the two names are down here, but...

19       A.    And this was an interview report of who?

20       Q.    Childs.  July 24.  Do you remember that meeting?

21       A.    Not off the top of my head.

22       Q.    Just give me a minute.  I don't know if we

23   included it.

24             MS. WELLMAN:  This is -- Bob, for your knowledge

25   it's Exhibit F -- I mean, I'm sorry -- V.  It's a July 25

Todd L. Greenberg                                    October 25, 2012

 1   letter.

 2       Q.   (BY MS. WELLMAN)  In the second page, you mention

 3   a July 24 meeting or interview of Childs.

 4            MR. WESTINGHOUSE:  I'm sorry.

 5       A.   I'm not finding it.

 6            MR. WESTINGHOUSE:  Childs?  I see a DeJesus.  I

 7   don't see a reference to Childs.

 8       Q.   (BY MS. WELLMAN)  Oh, sorry.  I have that wrong,

 9   then.  I have the wrong resource page.  Sorry.  Let's back

10   up.

11            So Childs, you knew -- when did you first

12   know he was working on the investigation?  You said you

13   weren't sure if his name was mentioned at the June 6,

14   10 a.m. meeting.  When did you -- when do you recall that

15   you knew it was Robert Childs?

16       A.   I don't recall the specific point in time that I

17   learned his name.  It was early on in the investigation,

18   most likely within a few days of June 6.

19       Q.   Okay.  Did you ask for a background check on

20   Childs?

21            MR. WESTINGHOUSE:  Well, hold on here.  Again, I'm

22   not certain where this is headed.  The focus, again, is on

23   the text messaging.  What the background is or what we knew

24   about the background about Mr. Childs I don't think is

25   directly related to that.

Todd L. Greenberg                                    October 25, 2012

 1          MS. WELLMAN:  Well, again, it's your choice

 2   whether to answer or not.  I think there are other issues in

 3   the case in terms of control over Childs and

 4   Detective DeJesus.  And one of the questions I have is:  As

 5   head of this investigation, did you either inquire of

 6   Detective DeJesus whether he did a background, or did you

 7   question whether Childs had any criminal history?

 8          MR. WESTINGHOUSE:  Let's move on.

 9

10                  E X A M I N A T I O N

11   BY MR. LEVIN:

12      Q.   I want to show what is marked as Bates Nos. 314

13   to 322.  These are the text messages between Detective

14   DeJesus and Robert Childs on June 4.

15              At the time you went in on the June 6

16   meeting, were you aware of these text messages?

17      A.   No.

18      Q.   And when did you become aware of those text

19   messages?

20      A.   I believe that --

21          MR. WESTINGHOUSE:  Can you just hold that answer.

22   I've got to sign something.

23                  (Pause in the proceedings.)

24      A.   My recollection is that I first saw these sometime

25   after the arrests in the case when we were collecting

Todd L. Greenberg                                    October 25, 2012

Page 22

1    discovery to disseminate it to you all.  And maybe -- I
2    won't get off on the tangent now, I would like to talk about
3    the later -- the discovery list that we provided to the
4    agents in terms of cataloging things to collect.  I believe
5    this was given to Mike Dion for us to produce in discovery,
6    you know, at that time, after we had made that request.
7        Q.   (BY MR. LEVIN)  And so you became aware of this
8    through Mike Dion after the arrest in the case?
9        A.   No.  I mean, I guess what I'm saying is at -- at
10   some point after the arrest, we started collecting discovery
11   materials.  And of course, we review those and we
12   disseminate those you.  And during that process is where I
13   recall first seeing this.
14       Q.   But you were aware at the June 6 meeting that
15   there were text communications going on between DeJesus and
16   Childs?
17       A.   Well, like I said, something was said at the
18   June 6 meeting -- during that meeting that caused me to say,
19   Hey, make sure you save all the texts between Childs and the
20   bad guys and Childs and you guys, meaning law enforcement.
21   So I don't remember what that was.
22            In other words, I don't know if I was
23   specifically told by, like, Sam DeJesus, I am texting
24   Childs, or whether there was a comment that led me to
25   suspect that might be going on, but enough that I said, Save

Todd L. Greenberg                                    October 25, 2012

Page 23

1    them.

2         Q.    Would it have been anyone else other than DeJesus

3    at that meeting who was texting with Childs?

4         A.    I don't think anyone was texting with him at that

5    meeting.

6         Q.    Well, what I'm saying is, you say something popped

7    in your mind that this may be an issue.  And I was just

8    wondering whether you had an idea or memory as to who it

9    would be an issue between.

10              In other words, who would have been the

11   texting parties?

12        A.    It would either have been, in my mind at that

13   time, either Sam DeJesus or Erik Allen because those were

14   the only two people at the meeting that, according to my

15   knowledge, had met with Childs at that time.

16        Q.    What was your understanding at that meeting

17   regarding what DeJesus' role was to be in that

18   investigation?

19        A.    After the meeting or before the meeting?

20        Q.    During the meeting what was your understanding

21   about his role in the investigation?  Did you have a -- did

22   you have an idea of what role he was going to play in the

23   investigation?

24        A.    Moving forward?

25        Q.    Yeah.

Todd L. Greenberg                                              October 25, 2012

Page 24

1       A.   I don't think so.  I don't think I developed any

2  understanding of that at that time.

3       Q.   Did you have an idea of who was going to be

4  handling Childs, who was going to be dealing with Childs

5  during the investigation?

6       A.   At that meeting I don't think I formed that

7  understanding.

8

9                   E X A M I N A T I O N

10  BY MS. WELLMAN:

11       Q.   Did you ever form that understanding after that

12  meeting?

13       A.   Well, I was a participant in this investigation,

14  so I became aware of who was in contact with Robert Childs

15  after the meeting.

16       Q.   And who was that?

17       A.   Sam DeJesus, Ethan Via, Albert Kelly, primarily.

18       Q.   Okay.  Did Sergeant Allen ever text message or

19  communicate by text messaging with Childs?

20       A.   I have no idea.  But we don't have any of those

21  texts, so I'm led to believe, no.

22       Q.   Okay.

23            MS. WELLMAN:  Did you have more on that area?

24            MR. LEVIN:  Well, yeah.

25  ///

Todd L. Greenberg                                          October 25, 2012

Page 25

1                         E X A M I N A T I O N

2    BY MR. LEVIN:

3        Q.    Who were the representatives of the JTTF that were

4    at that meeting as best as you recall?

5        A.    I've told, Sean Moore, Ethan Via.

6        Q.    So you're saying that only two members of the JTTF

7    were at the meeting and both of them were FBI agents?

8        A.    No.   What I'm saying is that of the people I

9    recall being at the meeting, Sean and Ethan are on the JTTF.

10   Like I said, there were other people at that meeting.   I

11   don't recall who they were.   And thus I don't recall if they

12   were on the JTTF or not.

13       Q.    What about Erik Allen?   Do you know him to not be

14   a member of the JTTF?

15       A.    That is my understanding, that he is not on the

16   JTTF.   And similarly, Sam DeJesus is not on the JTTF, to my

17   understanding.

18

19                        E X A M I N A T I O N

20   BY MS. WELLMAN:

21       Q.    Can you clarify that, though?   Is -- when you say

22   "not on the JTTF," do you mean he's not a Joint Task

23   Terrorism officer, or do you mean he's not part of a

24   joint -- JTTF-led investigation?   Are those --

25       A.    Let me just --

Todd L. Greenberg                                    October 25, 2012

Page 26

1       Q.   Yeah.  If you could explain that.

2       A.   I won't choose either -- I won't choose either of

3   those options, but I'll tell you what I think.

4       Q.   That would be good.

5       A.   The JTTF is a task force.  It has identifiable

6   members of the task force.  And I work with that task force

7   quite a bit.  So I know a lot of the people on the task

8   force, and I know of others.

9            And so when I say someone is on the JTTF,

10  that means that they're either an FBI agent who sits on a

11  squad, a terrorism squad, or they're a local law enforcement

12  officer who is assigned to the JTTF and sits with the JTTF

13  and, for all intents and purposes, is a part of that group.

14  So that's what I mean.

15      Q.   Okay.

16      A.   So for example, I know Greg Tomlinson.  He's an

17  SPD detective.  He's not on the JTTF in my view.  And so

18  that's the best way I can answer your question.

19      Q.   Was there any SPD officer in this JTTF-led

20  investigation that is on the JTTF?

21      A.   I don't know what you mean by that.

22      Q.   Well, are there any Seattle police detectives

23  involved in this investigation that are also on the JTTF?

24      A.   Well, the -- I mean, the answer is essentially no,

25  with the caveat that, you know, the word "involved" in this

Todd L. Greenberg                                    October 25, 2012

1    investigation is pretty broad.  I don't recall right now if

2    an SPD officer who's assigned to the JTTF had some minor

3    role during this investigation, such as, you know, doing

4    surveillance or something like that.

5         Q.   Right.

6         A.   But Sam DeJesus, Ethan Via, and Al Kelly were the

7    primary investigators in this investigation.

8         Q.   Okay.

9         A.   And Ethan and Al are FBI agents.  They're on the

10   JTTF.  Sam DeJesus is an SPD detective who I do not believe

11   is on the JTTF and I've never been led to belief that he was

12   ever on the JTTF.

13

14                 E X A M I N A T I O N

15   BY MR. LEVIN:

16        Q.   Was the purpose of -- or one of the purposes of

17   the June 6 meeting to bring the feds into this

18   investigation?

19        A.   I would say that was the primary purpose of

20   setting up the meeting, to do that.  And then that was

21   accomplished during the meeting.  The meeting sort of

22   morphed into a "okay, where do we go from here."

23        Q.   And who made those decisions regarding where do we

24   go from here?

25        A.   Well, I don't think there were really specific

Todd L. Greenberg                                    October 25, 2012

Page 28

1   decisions that were made at the meeting other than sort of,

2   Okay, FBI will take this investigation and start moving

3   forward with it.

4        Q.   Okay.  So in other words, as a result of the

5   meeting, it was going to be an FBI-led investigation?

6        A.   I think that's correct.

7        Q.   And that decision was made at that meeting.

8        A.   Yes.

9        Q.   So as an FBI-led investigation that also involved

10  officers of the Seattle Police Department, what decisions

11  were made regarding how those parties would coordinate their

12  efforts?

13       A.   At the meeting?

14       Q.   Yeah.

15       A.   I don't think any decisions were made along those

16  lines.  To my recollection, the one decision that was made

17  in terms of steps to move forward was the FBI was going to

18  meet with the informant at some point, you know, shortly

19  thereafter and just kind of determine where to go from

20  there.

21       Q.   But there was -- but there wasn't any effort to

22  replace DeJesus as the informant's primary contact?

23       A.   I don't recall that being discussed in any way in

24  terms of -- certainly there was no discussion of replacing

25  Sam DeJesus in any way, but there was no discussion of who

Todd L. Greenberg                                        October 25, 2012

Page 29

1    would be the primary contact or -- none of that was

2    discussed at that meeting.

3              MS. WELLMAN:  Was it ever discussed other than at

4    that meeting?

5              THE WITNESS:  I was never part of a discussion

6    where a decision was made who would be a primary handler of

7    Robert Childs but -- so I don't know if anyone else --

8              MS. WELLMAN:  Well, to your knowledge, is

9    Detective DeJesus the primary handler of Childs?

10             THE WITNESS:  I think he had the most contact with

11   Robert Childs as compared to Ethan Via or Robert Kelly.  I

12   mean, they certainly had contact with him.  They certainly

13   gave Robert Childs instructions as well.  But I think Sam

14   DeJesus had the most direct contact with him.

15       Q.   (BY MR. LEVIN)  What about -- what about any --

16   was anything discussed during that meeting regarding how to

17   make sure all the parties are apprised of the direction of

18   the case, communication among the various investigators?

19       A.   I don't think so.  I mean, there were -- although

20   there were quite a few people at the meeting, it was more

21   because either they had, you know, background information to

22   lend or something like that.  But it was pretty clear,

23   moving forward, that it was going to be a very small group

24   of -- of investigators that would work the case.

25                   When I left the meeting, my sense was that

Todd L. Greenberg                                    October 25, 2012

                                                          Page 30

 1    Ethan Via was going to be the lead case agent at FBI and
 2    that Sam DeJesus, it appeared, would have some continued
 3    role in it.  And then -- that was as much as came out of
 4    that meeting.
 5         Q.   So one of those -- one of the responsibilities of
 6    the -- of the lead case agent would be to ensure that all of
 7    the documentation is gathered, that evidence is preserved,
 8    right?
 9         A.   Sure.  I think that's the role of a -- one of the
10    roles of a case agent in a case.
11         Q.   Did you have any discussions with Ethan Via about
12    how he was going to do that?
13              MR. WESTINGHOUSE:  At that meeting or at any
14    meeting?
15         Q.   (BY MR. LEVIN)  Well, let's start at that meeting
16    and then go forward.  At that meeting was there any
17    discussion with him about that?
18         A.   Well, there was -- not in general.  But there was
19    a discussion about some evidence and how that was going to
20    be handled.  A particular thing was discussed, but in
21    general, no, there was not discussion of how to preserve
22    evidence in that case.
23         Q.   And did that particular thing relate to text or
24    e-mail communications?
25         A.   No, it did not.

Todd L. Greenberg                                    October 25, 2012

Page 31

1    Q.   At some point you talked to Ethan Via about how

2  the FBI saves it e-mails.  I think you said that earlier.

3    A.   Texts.

4    Q.   Texts.  Right.  They log it somehow, right?

5    A.   Yes.

6    Q.   During that communication did Ethan Via ever

7  explain to you that he was aware that Childs and DeJesus had

8  also been texting?

9    A.   No.  I mean, it -- no.  That was not a topic of

10  conversation between me and Ethan at that time.

11    Q.   What about following the meeting, following the

12  June 6 meeting?

13    A.   Not to my recollection.  No.

14    Q.   Well, at the June 6 meeting when you -- when you

15  requested that the -- well, no.  Let me back up.

16          What is -- what is your normal practice

17  regarding the preservation of text and e-mail

18  communications?

19          MR. WESTINGHOUSE:  We're not going to talk about

20  our normal practice.

21    Q.   (BY MR. LEVIN)  What was your purpose in asking

22  them to save those things?  Why did you do that?

23    A.   Well, it so happened that not long before that

24  meeting, the case out of New Jersey -- I can't remember the

25  name of the case, but the text message case involving the

Todd L. Greenberg                                    October 25, 2012

Page 32

 1   FBI --

 2        Q.   Suarez?

 3        A.   Suarez.

 4             -- had come up.  And even closer in time to

 5   this June 6 meeting, coincidentally, we had had some sort of

 6   a training at the U.S. Attorney's Office.  And I really

 7   don't recall the specifics of it or even when it was.

 8             But it was recent enough that, in sitting

 9   there during the June 6 meeting, whatever it was that had

10   triggered me to say what I said about saving texts and

11   e-mails was sort of in the front of my mind because of the

12   case, because of the training.  And so I was more sensitive

13   to that issue than I may otherwise have been, so I recall

14   interjecting that at the time.

15        Q.   Was any of it motivated by a memo written by David

16   Ogden in January 4 of 2010 addressing line assistance

17   obligation with respect to --

18             MR. WESTINGHOUSE:  Again, I'm going to suggest we

19   move on because the important fact is why the -- what the

20   communication was, not the reasons that prompted that

21   communication.  We don't dispute that the text messages

22   needed to be preserved.  And that was the focus of the

23   statement.

24   ///

25   ///

Todd L. Greenberg                                    October 25, 2012

Page 33

1            E X A M I N A T I O N

2    BY MS. WELLMAN:

3        Q.   Can I go to a tangent because I found the -- the

4    report that I was referring to.  This is, it looks like, an

5    interview of Childs at your office.  And I just would like

6    some clarification of -- it just says interviewing agents,

7    and it doesn't make clear whether you or Mike were present

8    during that meeting.

9        A.   Okay.

10       Q.   So start with, who was at the meeting?

11       A.   I'm going to read it first.

12       Q.   Okay.

13       A.   I wasn't at this meeting.

14       Q.   You were or were not?

15       A.   I was not at this meeting.

16       Q.   Was Mike at the meeting?

17       A.   I do not believe so.  I do not believe this was at

18   the U.S. Attorney's Office.  I'm not sure what leads you to

19   believe that.

20       Q.   Note, the interview with the USAO took place in

21   the attorney's office.

22            Am I reading that -- the bottom paragraph, am

23   I reading that wrong?

24       A.   It says the -- it says, Note, the interview with

25   the U.S. Attorney's Office took place on July 17, 2012.

Todd L. Greenberg                                        October 25, 2012

1              MR. WESTINGHOUSE:   The previous sentence

2       references that.

3              Q.   (BY MS. WELLMAN)   July 9.  So you had an interview

4       with Childs on the 9th?  Is that what -- can you help

5       clarify what that -- did you meet with Childs regarding this

6       on July 9?  Can you clarify what this is saying, then,

7       because obviously I'm having trouble reading it.

8              A.   I didn't write this.  I wasn't at this meeting.

9              Q.   Okay.

10             A.   I will tell you, in an effort to try to clear this

11      up, what my understanding of this is.

12             MR. WESTINGHOUSE:   Let's just answer the question.

13             THE WITNESS:   Okay.

14             MR. WESTINGHOUSE:   Was there a meeting with

15      Mr. Childs on July 9.

16             A.   Not that -- I don't recall a date of any meetings

17      I had with Robert Childs, so I can't tell you that.  But

18      this says, On July 9, Childs sent the authoring agent, Ethan

19      Via --

20             Q.   (BY MS. WELLMAN)   Okay.

21             A.   -- a text message asking about the timing of an

22      interview at the U.S. Attorney's Office.

23             Q.   Right.

24             A.   Then it says, Note, the interview with the U.S.

25      Attorney's Office took place on July 17.

Todd L. Greenberg                                    October 25, 2012

Page 35

1      Q.   So was there a meeting with you or Mike Dion on
2  July 17 and Childs?
3      A.   I don't recall the date of any meeting I had with
4  Robert Childs.  Any meeting would have been documented.  You
5  would have a report about it.  I don't remember the dates.
6           My understanding of this comment that you're
7  asking about is that Ethan Via was simply noting the fact
8  that he received a text message from Robert Childs asking
9  about a future planned meeting.
10     Q.   Okay.
11     A.   That was to be held.
12     Q.   And was there a future planned meeting, but you
13 don't recall the date of that future planned meeting?
14     A.   I recall one meeting with Robert Childs that took
15 place at the U.S. Attorney's Office.  I also recall that
16 there's a 302 that documents that.  I do not recall the date
17 of the meeting.
18     Q.   Is this that meeting?
19     A.   Yes.
20     Q.   Okay.
21     A.   This is a 302 of the meeting.
22     Q.   Okay.
23     A.   July 17, 2012.
24     Q.   Okay.  And Detective DeJesus was at that meeting
25 as well?

Todd L. Greenberg                                    October 25, 2012

Page 36

1        A.   I -- yes, I believe he was.

2        Q.   Okay.  With respect to this meeting -- you

3   produced notes from Kelly, I believe -- it does not include

4   notes regarding the discussion about resetting the

5   telephone.  Is there a reason for that?

6        A.   Are you asking me --

7        Q.   You produced notes --

8        A.   We produced you the notes --

9        Q.   -- that Kelly took.

10       A.   -- all the notes that were given to us, so...

11       Q.   Okay.  So let's put that in the discovery camp,

12  and you and I can talk about that letter.

13            Did you ever -- was this the first time that

14  you had talked or met with Childs directly?

15       A.   Yes.

16       Q.   Did you tell Childs, specifically, to preserve his

17  text messages?

18       A.   This was just a few months ago.

19       Q.   Yeah.

20       A.   I don't recall if the subject of his text messages

21  came up at that time.

22       Q.   Okay.  Did you -- to your knowledge, did anyone

23  tell Childs, specifically, to preserve his text

24  communications or his e-mail communications?

25       A.   This was the first time I ever met with Robert

Todd L. Greenberg                                          October 25, 2012

 1   Childs.  There was no discussion of text communications at

 2   that meeting that I recall.

 3        Q.   Did you understand that Via or Kelly or Sergeant

 4   Allen or Detective DeJesus, somebody, made it clear to

 5   Childs he should not be destroying text messages?

 6             MR. WESTINGHOUSE:  Do you mean that someone in the

 7   investigation tell --

 8             MS. WELLMAN:  On the law enforcement team.

 9             MR. WESTINGHOUSE:  -- tell Todd Greenberg that

10   they had given that direction to Mr. Childs?

11             MS. WELLMAN:  Sure.

12        A.   I don't recall that, no.

13        Q.   (BY MS. WELLMAN)  Did you believe that Childs was

14   preserving information in his cellphone?

15             MR. WESTINGHOUSE:  We're not going to answer that.

16

17                  E X A M I N A T I O N

18   BY MR. LEVIN:

19        Q.   Let me just go back to the June 6 meeting.  You

20   indicated earlier that you told them that e-mail and text

21   communications should be preserved.  Is that fair?

22        A.   I don't think I used the word "preserved," but I

23   think I said "save."

24        Q.   Okay.  And when you did that, you were referring

25   not only to communications between law enforcement and

Todd L. Greenberg                                    October 25, 2012

Page 38

1    Childs but also Childs and the targets of the investigation.

2        A.   Yes.  I recall being very clear to say both.  You

3    know, I said them both separately.  Because, again, this

4    Suarez issue, for lack of a better term, was in my head.

5    And I wanted to make sure that I was clear to save their --

6    you know, law enforcement's text with the informant as well

7    as the ones between the informant and the targets.

8        Q.   And at that point on June 6, you had not

9    personally seen any text messages between Childs and the

10   representative of law enforcement or Childs and any other

11   targets of the investigation.

12       A.   Correct.

13       Q.   Okay.  When was the first time that you saw

14   these -- either texts from Childs to law -- between -- texts

15   between Childs and law enforcement or between Childs and the

16   targets of the investigation?

17            MR. WESTINGHOUSE:  Erik, I'm sorry.  I think we've

18   covered that.  Jennifer asked, and I believe the response

19   from Mr. Greenberg was that none of the text messages came

20   to his attention until after the arrest.  So perhaps we

21   shouldn't go back and repeat again.

22       Q.   (BY MR. LEVIN)  I thought that was -- you were

23   referring earlier -- I had showed you some texts between

24   DeJesus and Childs, and you indicated that you saw those

25   after the arrest in this case.

Todd L. Greenberg                                        October 25, 2012

Page 39

1        A.    Correct.

2        Q.    There are other texts between Childs and law

3    enforcement as well as Childs and the targets of the

4    investigation.  Are -- those, you do not become aware of

5    until after the investigation had -- after an arrest had

6    been made?

7        A.    Well, let me take them one by one.

8        Q.    Yeah.

9        A.    First, texts between Childs and the FBI agents.  I

10   believe that I would not have seen those until after the

11   arrests.  That's my best recollection.  I also know that I

12   was told that there were some during the investigation.

13   Because we talked about -- you know, I talked with Ethan Via

14   and Al Kelly, just once in a while it would come up, You

15   need to save the texts.  And so I knew they had some.  I

16   don't think I reviewed them until afterwards, after the

17   arrest.

18            With respect to texts between Childs and

19   Abdul-Latif and Walli, I definitely saw some of those before

20   the arrests because they were on the consensual wiretap

21   system which I was reviewing once that started.  So I saw

22   those.  And there were others that were saved through

23   various means like Childs gave it to Sam DeJesus and he

24   forwarded it to the FBI and, you know, they printed it out.

25   There are some of those in the discovery.

Todd L. Greenberg                                    October 25, 2012

Page 40

1              And I was aware, at least of the contents of
2   some of those, because they were in the complaint that we
3   filed in the case.  I don't know if I saw the verbatim or
4   whether the agent, you know, typed it in the complaint, but
5   I knew of some of those at the time.
6        Q.   So let me just talk about these one by one.
7              So you were told that there were some texts
8   between the FBI and Childs; is that -- that's right?
9        A.   Correct.
10       Q.   And you were told that by whom?
11       A.   Ethan Via or Al Kelly or both.
12       Q.   Okay.  So I want to show you what's Bated as 113
13   to 114.  It's a -- it's a report by -- I believe it's filed
14   by Albert Kelly concerning some text communications.
15             Is this an example of one of the things that
16   you learned about, one of the text communications that you
17   learned about?
18       A.   Well, this -- I would describe this as being texts
19   between the informant and the targets of the investigation
20   as opposed to what you were just asking about, was texts
21   between the informant and FBI agents.
22       Q.   Okay.
23       A.   This, what you put in front of me, is an example
24   of what I was just talking about in terms of this is a
25   string of text messages between the informant and Walli

Todd L. Greenberg                                    October 25, 2012

Page 41

1   that -- this is what I was saying, I don't know if I read

2   these during the investigation, meaning pre-arrest, or if I

3   was just told about these or they were summarized for me in

4   the complaint by the agents.

5              But in some form or fashion, I was aware of

6   the general contents of these between the informant and the

7   targets.

8      Q.   Okay.  Well, between the targets and the

9   informants, you said that some of them came through the

10  electronic surveillance system and that's another way that

11  you became aware of --

12     A.   Well, let me clarify that so we're clear.

13              I think the date was June 10; Robert Childs

14  was provided a cellphone by the FBI.  He consented to that

15  phone being wiretapped.  And at that point on, we were privy

16  to all of his phone calls and his texts through a system;

17  it's a computer system.  And on a regular basis, I was

18  reviewing that evidence during the investigation.

19     Q.   Okay.  So you were privy to the communications

20  post starting on June 10 on?

21     A.   Correct.

22     Q.   His text communications?

23     A.   With the defendants.

24     Q.   With the targets?

25     A.   Yes.

Todd L. Greenberg                                    October 25, 2012

Page 42

1        Q.    But you also knew that prior to that, those text
2    communications were not being captured by this system
3    because it was -- predated the time that you had an FBI --
4    he had an FBI phone that he had consented to be wiretapped?
5        A.    Correct.
6              MS. WELLMAN:    Did you also know that he kept his
7    personal phone after the 10th?
8              THE WITNESS:    I don't think I had discussions
9    about the logistics of, like, giving him his phone, when the
10   phone was collected, any of those things.    I was not
11   involved in discussions about that.
12             MS. WELLMAN:    Okay.    So did you trust Via to take
13   care of that in terms of preserving the personal phone?
14             THE WITNESS:    Yeah.    I -- I did not micromanage
15   the collection of specific pieces of evidence.    So those
16   were not decisions that I was, you know -- discussions that
17   I was having.
18             MS. WELLMAN:    Okay.    Sorry I interrupted you.
19       Q.    (BY MR. LEVIN)    So I guess the question is:    With
20   respect to those communications between Childs and the
21   targets of the investigation that occurred prior to the time
22   that he had an FBI phone, what was your understanding as to
23   how they were being preserved?
24       A.    At the time?
25       Q.    Yeah.

Todd L. Greenberg                                    October 25, 2012

Page 43

1      A.    I don't think I had a specific -- I don't think I

2   knew how they were being preserved in terms of, like,

3   mechanically how they were being preserved.  I don't think I

4   knew.

5      Q.    What was your understanding about who was

6   preserving them?

7      A.    At that time I don't know if I formed one,

8   specifically.  I was told about -- like, these texts that

9   are in front of me here on this page, I remember generally

10  knowing about these at the time, you know, shortly

11  thereafter at least.  So I was led to believe they were

12  preserved, so I could be told about them.

13            But I don't recall knowing who preserved

14  them, how they were preserved, in terms of, like, were they

15  printed, were they saved on a computer.  Those details, I

16  don't think I had those details in my head at the time.

17  Obviously, when we collected these things from discovery,

18  you know, these reports make it pretty evident how,

19  mechanically, they were preserved.

20            MS. WELLMAN:  But at the time, so did you just

21  trust that they were being preserved?

22            THE WITNESS:  I did trust that because I was told

23  about them and we were including them in the complaint and

24  things like that.  So it was pretty clear to me that they

25  were being preserved.

Todd L. Greenberg                                    October 25, 2012

Page 44

1      Q.   (BY MR. LEVIN)  Was your expectation that Ethan
2   Via was handling this as lead case agent?
3      A.   Not necessarily, no.  Any number of investigators
4   might preserve a particular text for whatever reason, so I
5   didn't have that understanding.
6      Q.   So was there expectation on -- so among those law
7   enforcement agents that you had an expectation would be
8   preserving texts would be Sam DeJesus; he was one of the law
9   enforcement agents that you expected would be saving
10  communications?
11     A.   He was among the group that might end up being the
12  one to save them.  And in fact, he did save some, as we see
13  in discovery, the ones between the informant and the
14  targets.
15     Q.   In your letter you also talk about other instances
16  between June 6 and June 22 when the need to preserve text
17  messages was raised with the investigators.  What do you
18  recall about these instances?  In -- what form did they
19  take?  Were they face-to-face meetings, telephone calls?
20     A.   So that's between up to the arrest?  Is that
21  what --
22     Q.   Your letter gives a window of June 6 to June 22.
23     A.   Yeah.  Okay.  I think I answered this already.
24              I don't have specific recollections of those
25  conversations, you know, as compared to the June 6 meeting.

Todd L. Greenberg                                    October 25, 2012

Page 45

1   I have a vivid recollection of that entire meeting,

2   obviously not verbatim.  But it was a -- it was an important

3   meeting.  As it turned out, it lead to this case.  So I

4   remember that meeting.  I remember what I said there.

5              I don't recall the specifics of any of these

6   other conversations.  I do have a recollection that along

7   the way of this investigation, the topic of saving text

8   messages was discussed between me, Mike Dion, and

9   investigators.

10             I had much more contact during the

11  investigation with Ethan Via and Al Kelly than I did with

12  Sam DeJesus, so I have no idea whether Sam DeJesus was part

13  of any of those other conversation or not.  I know at least

14  Ethan was, because I remember him telling me at some point

15  how they were -- had to forward the texts to the e-mails and

16  print them or whatever.

17             So I guess that's a long way of saying it was

18  discussed on other occasions.  I don't remember the details

19  of those conversations.

20     Q.   And -- and when you and Ethan Via -- when Ethan

21  Via explained to you about how texts were being saved, was

22  he specifically referring to FBI/Childs texts or law

23  enforcement/Childs texts?

24             MR. WESTINGHOUSE:  If he said so.

25     A.   Yeah.  It was more of -- it was just sort of an

Todd L. Greenberg                                    October 25, 2012

Page 46

1    aside that he was just basically saying, you know, It's

2    really a pain to save these things.  We actually have to

3    forward this, print this, and do this.

4              And he was just kind of telling me.  It was

5    just a comment that he made to me.  And I remember it

6    because I hadn't really thought before about, you know, the

7    logistics of it.  So I just remember him explaining it to

8    me.

9         Q.   (BY MR. LEVIN)  Did he ever explain to you how he

10   was going about preserving texts between Childs and the

11   targets of the investigation?

12        A.   Well, those were primarily captured on that

13   wiretap system.

14        Q.   Predating -- predating the 10th of June, those

15   communications.

16        A.   There were only a few days there.  That is only

17   like a three- or four-days' window.  I don't remember that

18   we talked about how those were being preserved, no.

19        Q.   Well, three or four days, it's --

20        A.   Well, we --

21        Q.   -- actually a little bit longer than that, I

22   think.

23        A.   No.  Because we --

24             MR. WESTINGHOUSE:  June 6th through June 10th.

25        A.   June 6th -- you're talking about the 6th, 7th,

Todd L. Greenberg                                    October 25, 2012

Page 47

1   8th, and 9th, then.  Four days.

2        Q.   (BY MR. LEVIN)  So was it your position that the

3   period of time in which Childs was a -- working solely with

4   the SPD -- that would be June 2nd, 3rd, 4th, and 5th -- that

5   those did not need to be preserved?

6        A.   Well, first of all, my understanding is that

7   Childs began working for the SPD on June 3, not June 2.

8        Q.   Okay.

9        A.   And -- but, no.  That is not my position, that

10  those texts should not have been preserved.

11       Q.   Okay.  So --

12       A.   But your question to me was, did Ethan Via from

13  the FBI tell me how he was preserving texts prior to the

14  wiretap system.

15       Q.   Yeah.

16       A.   And I'm explaining to you that Ethan Via wouldn't

17  have gotten involved in the investigation until June 6.  So

18  there was a four-day window between that and the wiretap

19  system.  And as I said, he did not tell me how texts were

20  being preserved, the logistics of that.

21

22                    E X A M I N A T I O N

23  BY MS. WELLMAN:

24       Q.   But your understanding was they were being

25  preserved, to your knowledge.

Todd L. Greenberg                                    October 25, 2012

Page 48

```
 1        A.    I've answered that.

 2        Q.    Yeah.  All right.

 3        A.    All right.

 4        Q.    I have a question about -- you have a -- I

 5   highlighted it.  This is a July 20 letter that you sent and,

 6   the highlighted part, the first sentence, am I correct the

 7   report that -- the FBI report --

 8        A.    Can -- let me finish reading.

 9        Q.    Oh.  Sorry.

10        A.    Okay.

11        Q.    So is the report you were referred to the cart

12   report that was part of the original?

13        A.    I -- I identified it in this letter by Bates

14   number.

15        Q.    Well, that's not a report actually.  That's a --

16        A.    Is it a CD?

17        Q.    No.

18              MR. WESTINGHOUSE:  Again, I'm wondering, if this

19   is just discovery, if we could, perhaps, complete this.

20              MS. WELLMAN:  I'm trying to understand what he's

21   saying there.  Is probably a little discovery, a little

22   factual.

23        Q.    (BY MS. WELLMAN)  I guess the question is:  Based

24   on the information you had when you initially provided

25   discovery, did you know that the text communications had
```

Todd L. Greenberg                                    October 25, 2012

Page 49

1   been destroyed at that point?

2       A.   By who?  Which text communications are you

3   referring to?

4       Q.   By Childs or -- let's start with Childs.  Did you

5   know at that time in --

6           MR. WESTINGHOUSE:  Which time?

7       Q.   (BY MS. WELLMAN) -- August of 2011, that the text

8   messages between Childs and DeJesus had been destroyed by

9   Childs?

10      A.   I -- at some point that -- and I would have to

11  look back at the date of the FBI report, so it's going to

12  speak for itself, but at some point I learned through a

13  report that Robert Childs had reset, quote/unquote, his

14  cellphone.

15      Q.   Okay.  And so that's the first time that you knew

16  that there had been a reset?

17      A.   Yes.

18      Q.   Okay.

19      A.   Yes.

20      Q.   I think that answers it for me.  Can I see that?

21  I think -- so the report is Bates 1570.  And I apologize.  I

22  don't have it.  I thought I did.  Okay.  And the forensic

23  examination that I'm referencing is the cart report, that I

24  believe you produced with the initial discovery up to

25  Page 656.

Todd L. Greenberg                                    October 25, 2012

 1              So you're not suggesting by this, though,

 2     that I should have known from this forensic exam that the

 3     phone had been reset?

 4        A.    That who should have known?

 5        Q.    I should have known or Erik should have known.

 6              MR. WESTINGHOUSE:  I'm not certain I understand

 7     your question.

 8        Q.    (BY MS. WELLMAN)  This sentence reads that you've

 9     produced to us, by July 25, 2011, a forensic exam of the

10     telephone, of Child's telephone.  And if I understand what

11     your --

12              MR. WESTINGHOUSE:  And your question is?

13        Q.    (BY MS. WELLMAN)  The question is:  Did you know

14     from that examination that the phone had been reset?

15              And I think your answer is no, you only knew

16     by this FBI report; is that correct?

17              MR. WESTINGHOUSE:  You're asking whether --

18        Q.    (BY MS. WELLMAN)  When you knew --

19              MR. WESTINGHOUSE:  -- the witness knew --

20        Q.    (BY MS. WELLMAN)  -- from this forensic

21     examination that the phone had been reset.  And I'm

22     referring to that examination as a cart exam.

23              But your answer is, no, you knew it from the

24     FBI report, whether it's this page or something else that

25     says it was, in fact, reset.

Todd L. Greenberg                                      October 25, 2012

Page 51

1                 Or if it's too confusing, because I don't

2     have the cart in front of me, that's fine too.

3         A.    I'm pretty confused.  I'm not sure what you're

4     asking.  I'm sorry.

5         Q.    The most important is:  When did you know that the

6     evidence had been destroyed?

7                 MR. WESTINGHOUSE:  I think the answer was he

8     doesn't know for sure, but he learned it through the report.

9         A.    There is a report in the discovery.  It was an

10    interview of Robert Childs conducted by an FBI agent -- I

11    think it was Ethan Via -- during which it documents that

12    Robert Childs explained he did a reset of the phone.

13                By reviewing that report and discussing that

14    report with the agent, that's how I learned about the reset.

15        Q.    Okay.

16        A.    Whatever the date of that report is, would put a

17    date on that.

18        Q.    Okay.  That answers it for me.

19

20                  E X A M I N A T I O N

21    BY MR. LEVIN:

22        Q.    I did have a -- just a closeout, the June 6

23    meeting and then maybe this will relate to some other

24    meetings as well.

25                You had said that one of the reasons that

Todd L. Greenberg                                    October 25, 2012

                                                              Page 52

1    this was on your mind was because of the Suarez case and a

2    training you had received here at the U.S. Attorney's Office

3    and that those impressed upon you the need to ensure that

4    text messages were -- and e-mails were being preserved.

5              Is that fair?

6         A.   Yeah.  It had been highlighted as a pitfall in

7    other cases, including the New Jersey case.  And so we were

8    trained on it, in the new age of, you know, electronic

9    communications, to be aware of this issue.

10        Q.   During that June 6 meeting, did you ever convey

11   this knowledge that you had received to the members of the

12   investigative team?

13        A.   Did I -- I did not talk about the New Jersey case

14   or the fact that we had just had a training, no.  I did not

15   do any of that.

16        Q.   Okay.

17        A.   Later, at some point later, I remember talking to

18   the FBI agents about the New Jersey case.  They were

19   independently aware of it.  They had received training too.

20   This was Albert Kelly and Ethan Via.  But none of that was

21   discussed at this June 6 meeting.  I simply made the

22   comment, Save all texts and e-mails between the informant

23   and the bad guys and the informant and law enforcement.

24        Q.   So to the best of your recollection, as you give

25   out this direction to the team, what were their reactions?

Todd L. Greenberg                                    October 25, 2012

Page 53

1    What reactions did you get, if any?

2         A.   I do not recall any reaction whatsoever.  And to

3    explain that, I mean, this was -- like I said, this was a

4    long meeting.  There was a lot of things being discussed:

5    What had happened so far in the investigation; ways to move

6    it forward; to some extent, who was going to do what; who

7    was going to let other people know, you know, what was going

8    on.

9              There was -- I gave a couple of other pieces

10   of what I would call, you know, legal advice, here and

11   there, along the way, during the meeting.  It's kind of on

12   and off, on and off, people chiming in.  It didn't call for

13   a specific response.  And I don't recall anything.  I think

14   I told you earlier, if someone had objected to it or called

15   it into question, I think I would have -- I would recall

16   that.  So I don't think that happened.

17        Q.   During this meeting did you observe other people

18   taking notes of what you were saying, writing down the legal

19   advice you were giving?

20        A.   I have no recollection.  People were writing

21   things down.  I have no recollection of anyone wrote down

22   anything I said.

23        Q.   Was there any discussion about the importance of

24   preserving evidence in general, aside from texts and

25   e-mails?

Todd L. Greenberg                                    October 25, 2012

Page 54

 1     A.   No.  I mean, I think that goes without saying.  In
 2 any investigation we preserve evidence.
 3     Q.   Was there any discussion in general about the need
 4 to preserve evidence from the inception of these kinds of
 5 operations, in other words, the beginning of these sting
 6 operations?
 7     A.   I'm not sure what you're getting at there.
 8     Q.   Well, you were aware that -- that a very frequent
 9 defense in -- in these kinds of sting operations is
10 entrapment.
11          MR. WESTINGHOUSE:  Rather than answering that, I
12 think your question, as I understand it, was any other
13 discussion about the importance of preserving evidence from
14 the beginning.  And that's simply a variation of the
15 previous question, any discussion about the importance of
16 preserving evidence generally.  And I think the answer from
17 the witness was, There was no discussion.  That was assumed.
18     Q.   (BY MR. LEVIN)  During your conversations with
19 Special Agents Kelly and Via regarding Suarez and the need
20 to preserve evidence, was there ever discussed the fact that
21 more than just the FBI was involved in the investigation and
22 how to coordinate that?  This was after the June 6 meeting.
23     A.   The only thing I recall along these lines -- and
24 it's going to get into that discovery materials document
25 that discussion was after the arrests.  So I'll talk about

Todd L. Greenberg                                    October 25, 2012

Page 55

1    this now if you want, or we can come back to that.

2              MR. WESTINGHOUSE:  You're referring to the

3    June 27th list?

4              THE WITNESS:  Yes.

5              MS. WELLMAN:  Yeah.  It's marked 8253.

6                  E X A M I N A T I O N

7    BY MS. WELLMAN:

8         Q.   So before we go into the details on that, so if --

9         A.   Actually, let me answer that because I don't want

10   to forget to say this.

11        Q.   Okay.  Yeah.

12        A.   Do you mind handing me that for a second?

13        Q.   No.

14        A.   I think this is somewhat responsive.  I'm trying

15   to avoid getting into a long explanation of this at this --

16   document at this time.  But I met with Ethan Via and Albert

17   Kelly and Mike Dion, this is just a few days after the

18   arrests, to start the process of gathering discovery

19   materials.  And one of the requests that we got from the FBI

20   agents, and I noted it here in this document on the first

21   line, were I wrote -- I typed, Get from SPD directly.

22              The FBI agents thought it would be more

23   effective and efficient for us, meaning the prosecutors, to

24   get discovery materials from SPD directly ourselves rather

25   than have the FBI be the, you know, go-between.  And that's

Todd L. Greenberg                                    October 25, 2012

Page 56

1   a decision that we made, that we would directly, you know,

2   get reports and get e-mails or whatever it might be from

3   SPD, from Sam DeJesus primarily, as opposed to asking the

4   FBI agents to get that for us.

5               Now, that was -- again, this is discussions

6   after the arrests in terms of collecting the discovery

7   materials.

8               So since that's seemed to have some bearing

9   on your question, I wanted to point that out.

10      Q.   So over the course of the investigation, there

11  was -- SPD held on to their evidence; FBI held on to theirs.

12  And the idea being, at the end of the day, after the

13  arrests, then both entities can gather.  Or was there a

14  protocol of FBI, along the way, should be gathering anything

15  that SPD has?

16              MR. WESTINGHOUSE:  I don't think that was the

17  context of the message -- of the testimony.  The statement

18  was that at this meeting a few days after the arrest --

19              MS. WELLMAN:  Oh, I understand that.  I'm just

20  trying to understand --

21              MR. WESTINGHOUSE:  -- US Attorney's office took

22  responsibility for obtaining documents.

23              If you want to ask what was Mr. Greenberg's

24  understanding about how it was being handled up until that

25  time, that's fine.

Todd L. Greenberg                                    October 25, 2012

Page 57

1        Q.   (BY MS. WELLMAN)   I guess -- so he said it much

2   more succinctly than I did.

3                So was there a protocol in place, or how was

4   it being handled --

5                MR. WESTINGHOUSE:   If he knows.

6        Q.   (BY MS. WELLMAN)   -- up until that time in terms

7   of making sure that Via and Kelly and you and Dion knew

8   where the evidence was?

9        A.   From what I observed during the investigation,

10  some of the evidence -- well, it appeared to me that FBI was

11  trying to get all the evidence from SPD and that SPD was

12  independently preserving their evidence.

13               So I'll give you an example.   There was --

14  you know, there were a few -- I think three -- recorded

15  interviews that SPD did with Robert Childs that predated --

16  well, at least most of them, at least, predated, you know,

17  federal involvement.   In any event, they had these on CD.

18  And I know, for example, the FBI acquired those, and I

19  listened to them.   And at the same time, that SPD maintained

20  those in their evidence.

21               In general that's what was happening based on

22  my observations.

23       Q.   Okay.

24       A.   That if SPD had collected a piece of evidence or a

25  recording or whatever, they were providing a copy of to it

Todd L. Greenberg                                    October 25, 2012

Page 58

1    the FBI.  When it came time, though, to gathering discovery
2    materials, part of the thought process behind wanting the
3    prosecutors to get everything directly from SPD as opposed
4    to relying on what FBI had gotten or would get, was that we
5    didn't want something to slip through the cracks.
6                 And so it was a -- you know, you can imagine
7    it was a very active three-week investigation.  We didn't
8    want to just rely on it being complete at FBI.  We wanted to
9    sort of -- so we ended up getting a lot of things twice,
10   some from the FBI, some from SPD.  But the decision that we
11   made at the FBI agents' direction, postarrest, was to just
12   get everything directly from SPD so we don't miss anything.
13        Q.   And who did you work with in terms of getting that
14   information from SPD?  Was it Sergeant Allen or detective --
15             MR. WESTINGHOUSE:  Todd Greenberg specifically or
16   the U.S. Attorney's Office?  Because I think it might not be
17   Mr. Greenberg's primary responsibility.
18        A.   For the most part, Mike Dion -- between the two of
19   us, Mike Dion was sort of -- I hate to say in charge of, but
20   we sort of divvied up responsibilities.  And he was the one
21   that was primary for gathering the materials from SPD.  And
22   I dealt more with the FBI, which was sort of higher volume
23   side of things.
24        Q.   (BY MS. WELLMAN)  Okay.
25        A.   So Mike Dion was the one that personally was

Todd L. Greenberg                                          October 25, 2012

Page 59

 1   involved in collecting materials from the SPD.

 2       Q.   And who, on the SPD end, helped get that material

 3   to Mike Dion?

 4       A.   From what I'm privy to, which are some e-mails and

 5   just discussions, Mike was dealing with Sam DeJesus and Erik

 6   Allen.

 7       Q.   Okay.  Was this discovery list discussed with

 8   Sergeant Allen and Detective DeJesus at any time?

 9       A.   That particular document?

10       Q.   Or any of the items on this document.

11       A.   Well, that document lists essentially every single

12   possible category of discovery material that we intended to

13   gather and produce in this case.  So of course, some of

14   those items were discussed with SPD because they had some of

15   them and they were part of our investigative team.

16       Q.   Okay.

17       A.   But that document, in the process of creating it,

18   was never discussed in my -- to my knowledge with Sam

19   DeJesus or Erik Allen or anyone at SPD.

20       Q.   Okay.  And this -- and this document includes text

21   messages between source, Childs, and SPD, right?

22       A.   Yeah.  Let me -- maybe I'll just tell you.

23       Q.   Sure.

24       A.   I just want to explain to you what this is.  And

25   there were e-mails that I'm going to reference -- I've got

Todd L. Greenberg                                    October 25, 2012

                                                         Page 60

 1  them -- that we produced to you along with those.  And these

 2  e-mails are Bates 8251 and 8252.

 3              So from the e-mails, you can see June 27 at

 4  1:55 a.m. -- so this is, I guess, four days after the

 5  arrest -- I sent an e-mail to Al Kelly and Ethan Via of the

 6  FBI with a CC to Mike Dion setting up a meeting where I

 7  explain, you know, I wanted to sit down, compile a list of

 8  all categories of discovery materials.  And I wrote in the

 9  e-mail, In advance of the meeting, I'll try to make a

10  preliminary list of the materials.

11      Q.   Right.

12      A.   So we arranged the meeting for that same day at

13  2 p.m.  I, then, in advance of that made a list which is

14  very similar to the one we produced, although it was a draft

15  of this -- it was a preliminary version of this, brought

16  this with me to the meeting.  We met with Ethan and Al and

17  went through that list, each category.

18              I added some categories.  I made some

19  annotations, whatever came out of the meeting with the FBI.

20  Came back to my office, revised the list, and then, that

21  same night, June 27 at 7:44 p.m., I e-mailed this list to

22  the two FBI agents and to Mike Dion saying here's the

23  updated list that we discussed.

24      Q.   Was the -- were the text messages on the draft

25  list, to your recollection?

Todd L. Greenberg                                    October 25, 2012

Page 61

1        A.    Yes.   They were.

2        Q.    And is that the same -- and by text messages, I

3    mean between Childs and SPD, and then the same here, text

4    messages identifying Childs/SPD, Childs/Walli,

5    Childs/Abdul-Latif, Childs/FBI, is that on the original

6    list, to your recollection?

7        A.    So in looking at this redacted list we gave you, I

8    am confident that everything not in italics was on the

9    original list.

10       Q.    Okay.

11       A.    I know that the first italics, Get from SPD

12   directly, I know I wrote that after the meeting.

13       Q.    And that's because you had decided that you or

14   Mr. Dion should get it directly from SPD.

15       A.    Correct.

16       Q.    Okay.

17       A.    And so I wrote that note for -- to basically

18   remind Mike and myself that we need to do that.

19       Q.    Okay.

20       A.    Then there's another italicized thing on Page 2.

21   It says, Will need to download source's phone for some of

22   these.

23              I don't recall whether that was on my

24   original list.  My best recollection, and using my common

25   sense, is that it was not.

Todd L. Greenberg                                    October 25, 2012

Page 62

 1        Q.    Okay.  Can you explain that entry?

 2        A.    The best I can do is that at some point, most

 3   likely during my meeting with Al and Ethan, they said, Oh,

 4   to make sure we get all of those, we're going to need to

 5   download Child's phone.

 6              And so since the point of this list was

 7   really to make an all-inclusive checklist for us to make

 8   sure we didn't overlook anything in discovery, I made a note

 9   of that to remind all of us.  So that's my best explanation

10   of that.

11

12                  E X A M I N A T I O N

13   BY MR. LEVIN:

14        Q.    Was that as a -- was that because the FBI didn't

15   have those things, or was it simply because -- as a backup

16   to whatever the FBI was going to be able to give you?

17        A.    I don't know.  I don't recall whether I had that

18   kind of detailed knowledge in terms of what they already

19   had, you know, printed out or what was saved electronically

20   somewhere.

21        Q.    What about with respect to go to the SPD for

22   certain documents?  Was that because it was your

23   understanding that the FBI didn't keep those things?  Was it

24   simply a way of --

25        A.    No.  It was -- like I said, I mean, although we

Todd L. Greenberg                                    October 25, 2012

Page 63

1    redacted a lot of this list, the things under the SPD
2    category were things that my belief and, frankly, knowledge
3    was that the FBI had almost all, if not all, of them.  But
4    we didn't want to rely on that because it was such a hectic
5    investigation.
6                    I didn't want to end up in a situation where
7    we say to you guys, Oh, we've given you all of X, and it
8    turns out, well, the FBI only got 19 out of 20 of X.  If I
9    had gone directly to the SPD, to the source, I would have
10   gotten all 20.
11                   So we just decided, Look, we don't -- we're
12   not going to mess with that.  Even though FBI already had
13   most of the stuff we were just going to go separately and
14   independently to SPD, tell them to give us everything.  That
15   way we didn't have any concerns.
16   Q.   So basically it was your -- it was your belief at
17   that point that the FBI had everything, but this was a way
18   of being doubly sure that nothing slipped through the
19   cracks.
20   A.   I think my belief was that they had either
21   everything or most everything, but I didn't really care
22   because I was going to get it myself to be a hundred percent
23   complete.
24   ///
25   ///

Todd L. Greenberg                                      October 25, 2012

Page 64

```
 1                   E X A M I N A T I O N

 2   BY MS. WELLMAN:

 3        Q.   This is a text you produced to us recently.  It's

 4   marked --

 5        A.   Well, let me make one --

 6                  I'm sorry.

 7        Q.   Okay.  Sure.

 8        A.   -- other thing clear because you asked this.

 9                  I never sat down with anyone at SPD to review

10   that list.  My understanding is that Mike Dion used that

11   list to guide his collection of discovery materials from

12   SPD.  But this was never e-mailed -- you know, like I said,

13   the e-mails are to the two FBI agents in the case and to

14   Mike Dion.  Sam DeJesus was not on this e-mail, and he had

15   no involvement in crafting that list.

16                  MR. WESTINGHOUSE:  All you're going to say is you

17   didn't e-mail it to SPD.

18                  THE WITNESS:  Right.  And I didn't -- he

19   wasn't part -- Sam DeJesus was not part of the discussions

20   that led to the creation of that list.

21        Q.   (BY MS. WELLMAN)  Okay.  And to your knowledge,

22   was -- gathering all of this information, did that happen

23   fairly quickly, or was there some delay in going directly to

24   SPD?

25        A.   The -- the process of gathering it was started
```

Todd L. Greenberg                                    October 25, 2012

Page 65

1   pretty quickly.  Things trickle in.  So, you know, I mean, I

2   don't know when it was completed.  But it's not like we -- I

3   mean, you could tell, the arrest was June 23.  By June 27, I

4   prepared a 3-page, single-spaced, itemized list.

5        Q.   Right.

6        A.   I mean, we were trying to be very proactive in

7   terms of collecting discovery.

8        Q.   Right.

9        A.   So shortly after June 27, we started the process

10  of collecting the items that were on that list.

11       Q.   Okay.  And do you recall Mike coming to you and

12  saying, Huh, SPD is saying they don't have text messages?

13            MR. WESTINGHOUSE:  The question is...?

14       Q.   (BY MS. WELLMAN)  Do you recall after June 27 Mike

15  Dion coming to you and saying, SPD is telling me they don't

16  have any text messages?

17            MR. WESTINGHOUSE:  Jennifer, what we're going to

18  do is ask you to focus on what Todd said, and then you can

19  ask Mike separately what he said, but not intraoffice

20  communications.  Okay?

21       Q.   (BY MS. WELLMAN)  To your knowledge, after July --

22  after the 27th, did you know that SPD did not have any text

23  messages other than the nine you've produced?

24       A.   What -- let me try to answer it this way, and then

25  you can follow-up.

Todd L. Greenberg                                    October 25, 2012

Page 66

1      Q.    Thank you.

2      A.    I typed that list of discovery materials.

3            If I could see it again?

4            On two separate places on the list, I wrote,

5      Text messages between source and SPD.

6      Q.    Right.

7      A.    The --

8            THE WITNESS:  Erik, you put in front of me a

9      series of text messages a few minutes ago between Sam

10     DeJesus and Robert Childs.  That is --

11           MR. LEVIN:  Those are -- those are Batesed 314 to

12     322, just for reference.

13           THE WITNESS:  Thank you.

14     A.    Those are the text messages that we received from

15     SPD in response to our request for text messages between

16     Childs and SPD.

17           So when I got those and we produced them to

18     you, my understanding -- and I put it in writing to you

19     guys, probably multiple times because you kept asking -- my

20     understanding, until much more recently, is that that was

21     it.  Those were all of the texts between Sam DeJesus and

22     Robert Childs.

23     Q.    (BY MS. WELLMAN)  Okay.  This e-mail on July 19

24     that you produced, it looks like you redacted whatever you

25     said to prompt a response from Detective DeJesus.

Todd L. Greenberg                                    October 25, 2012

Page 67

1              Am I correct -- so you asked Detective

2   DeJesus about the retention of text -- any policies for the

3   retention of text messages; is that right?

4        A.   There was a time, as you're well aware, that we

5   were kind of going back and forth with either e-mails or

6   letters in terms of your making discovery inquires regarding

7   the issue of text messages.  And during that time both of

8   the sides, both of us, were exploring avenues to see if we

9   could recover the texts that we learned were missing.

10             I believe this e-mail that we produced was

11   sort of a by-product of our exchange, meaning yours and

12   mine, where I was following up on a question of, you know,

13   is there a retention policy, the carrier's policy, SPD's

14   policy.  This was all in that time frame where we were

15   trying to gather this information.  So that is what caused

16   this communication to take place.

17        Q.   Is -- did -- so it looks like you did ask

18   Detective DeJesus about a policy.  Did you ask anyone else

19   in his unit about a policy regarding the retention of

20   evidence?

21             MR. WESTINGHOUSE:  Just, did you ask anybody else?

22        A.   Yes.

23        Q.   (BY MS. WELLMAN)  Who else did you did?

24        A.   Erik Allen.

25        Q.   Okay.  And what did he say?

Todd L. Greenberg                                    October 25, 2012

Page 68

1          MR. WESTINGHOUSE:  Well, let's ask Mr. Allen what
2     he said.  But the issue is, we asked.
3          A.   In our -- you have, in our discovery letters, the
4     answer to that question.  We --
5          Q.   (BY MS. WELLMAN)  Yeah.  It's not clear where that
6     answer came from, so that it's Sergeant Allen, helps.
7               It looks like, also from this e-mail, that
8     Detective DeJesus did not write any reports about his phone
9     calls with Childs.  Am I reading that correctly?
10         A.   I'm not going to interpret what he meant by his
11    e-mail for you.  You'll have to ask him what he meant by his
12    e-mail.
13         Q.   To your knowledge, did he write any reports about
14    any telephone communications with Childs?
15              MR. WESTINGHOUSE:  Did Mr. DeJesus tell you
16    specifically that he prepared any such reports?
17         A.   We have asked, before, for all SPD reports
18    concerning this case.  My understanding is that we have them
19    all.  And then, you have them all.
20         Q.   (BY MS. WELLMAN)  So if we don't have any reports
21    on telephone communications between DeJesus and Childs, is
22    your position that the communication didn't happen?
23              MR. WESTINGHOUSE:  No.  I think that -- again,
24    we're going into discovery now.  I think the answer was, you
25    have everything that we have.  We're not going to speculate

Todd L. Greenberg                                    October 25, 2012

Page 69

1   on whether there were conversations that did not make it to

2   reports.

3        Q.   (BY MS. WELLMAN)  Okay.  It looks like you also

4   were going to meet with Detective DeJesus shortly after this

5   e-mail; is that correct?

6        A.   We did meet with him shortly after this e-mail.

7        Q.   Okay.  And did you do a 302 of that meeting, or

8   are we only going to expect your letter about that,

9   summarizing that meeting?  We have a letter.  We do not have

10  a 302.  Is there a 302 on that meeting?

11       A.   No.  There's not a 302 of a meeting between the

12  investigative team.

13       Q.   Okay.  Do you recall who else was at that meeting?

14       A.   Can you show me the letter that I wrote you?

15       Q.   I just have the --

16       A.   No, you have the letter.  It describes a July 24

17  meeting.  We looked at it earlier today.

18       Q.   Yeah.  Did I have it, or did Erik have it?

19       A.   Or I can try to find it.

20            MR. WESTINGHOUSE:  I think you had it out here

21  earlier.

22       A.   I'm pretty sure it's one of your exhibits that's

23  attached here.

24       Q.   (BY MS. WELLMAN)  Oh, this July 20?

25            MR. WESTINGHOUSE:  Twenty-fourth.

Todd L. Greenberg                                    October 25, 2012

Page 70

 1      Q.   (BY MS. WELLMAN)  It would have been when you --
 2      A.   Here it is.
 3      Q.   -- summarized --
 4      A.   I've got it.  It's Exhibit --
 5      Q.   Page 80?
 6      A.   -- V of your -- one of your briefs.  Page 80 of
 7   your exhibits.  It's a letter that I wrote -- I think I
 8   wrote it -- yeah.  I wrote this letter on July 25
 9   concerning, among other things, a meeting that we had with
10   Sam DeJesus on July 24, the day before.
11              So according to this letter it was myself,
12   Mike Dion, and Ethan Via and Sam DeJesus.
13              MR. WESTINGHOUSE:  What's the question?
14      A.   I don't --
15              THE WITNESS:  The question was who was there.
16      A.   And I don't recall off the top of my head anyone
17   else being there other than those people.
18      Q.   (BY MS. WELLMAN)  Okay.  So going back to this, I
19   underlined a part of this text message where he says --
20              MR. WESTINGHOUSE:  He, DeJesus?
21      Q.   (BY MS. WELLMAN)  He, being DeJesus.
22              -- the whole reason for giving Childs a
23   specific phone to communicate with Latif only was to
24   mitigate the whole texting issue.
25              What does that mean to you?

Todd L. Greenberg                                    October 25, 2012

Page 71

```
 1          MR. WESTINGHOUSE:  Well, what it means to
 2  Mr. Greenberg isn't important.  It's what Mr. DeJesus meant,
 3  and you can ask him.
 4      Q.  (BY MS. WELLMAN)  What -- did you follow-up with
 5  Detective DeJesus, at your meeting with him, about that?
 6      A.  Did I ask Sam DeJesus what he meant by these words
 7  in this e-mail?
 8      Q.  Yes.
 9      A.   No.  But we certainly had a lengthy discussion
10  about the text message issue during which he provided all
11  sorts of information about his thought process, which we
12  made sure to document for you in this letter that we were
13  just talking about it.  But I did not put this e-mail in
14  front of him and ask what he meant by those specific words.
15              For example, in the letter, this July 25
16  letter I wrote this sentence:  Detective DeJesus understood
17  only the need to preserve text messages betweens Childs and
18  the subjects of the investigation.
19              That's something that he told us during that
20  meeting and we documented in this letter.
21      Q.  And he didn't repeat this -- this claim in your
22  meeting, to your recollection?
23          MR. WESTINGHOUSE:  What is the claim you're
24  referencing?
25      Q.  (BY MS. WELLMAN)  That -- the same one I just
```

Todd L. Greenberg                                    October 25, 2012

                                                              Page 72

1   read.  The whole reason for giving -- what I believed at the
2   time, the whole reason for giving Child's a specific phone
3   to communicate with Latif only was to mitigate this whole
4   texting issue.
5        A.   I'm just reading this letter for a second.
6        Q.   Okay.  That's fine.
7        A.   Can I see that e-mail, please?
8        Q.   Sure.
9        A.   To me, the language that you underlined in his
10  e-mail that says, quote, The whole reason for giving Childs
11  a specific phone to communicate with Latif only was to
12  mitigate the whole -- this whole texting issue, is related
13  to the statements that Sam DeJesus made to us on July 24th,
14  specifically that he did not recall being told to save text
15  messages between himself and Childs but understood the need
16  to preserve text messages between Childs and subjects of the
17  investigation.  I think those are related to each other.
18            So I mean, this language in this mail was not
19  discussed during our meeting, but I believe his explanation
20  for what he understood to preserve is related to his e-mail.
21       Q.   Okay.  Okay.  Did you ever discuss with Detective
22  DeJesus what's considered logistical versus substantive?
23       A.   Yes.
24       Q.   And what did you say in that regard?
25       A.   Well, that would have taken place during the same

Todd L. Greenberg                                    October 25, 2012

Page 73

1   discussion that we had on July 24.

2        Q.   For the first time?  That would be a -- that was

3   the first time you've discussed whether something was

4   substantive or logistical?

5        A.   Yes.

6        Q.   And your meeting June 6 at 10 a.m., did you --

7   when you told everyone to preserve their text messages, did

8   you carve out an exception for logistical?

9        A.   No.

10       Q.   Okay.  Well, how would you define logistical?

11       A.   Okay.  Well, this is not --

12       Q.   Well, what do you consider logistical?

13       A.   Let me be clear.  I did not carve out, on June 6,

14   nor have I ever carved that out.

15       Q.   No.  I understand.  I didn't mean to suggest that.

16       A.   Okay.

17       Q.   I understand your answer.  I trust that I'm -- I

18   guess my question is -- well, let me ask it a different way.

19            Do you consider requests for rewards by

20   Childs a substantive communication?

21            MR. WESTINGHOUSE:  Are you -- if you're asking the

22   witness what he told Mr. Childs in terms of rewards, that's

23   fine.  If you're asking what he considers, it's not

24   relevant.

25            MS. WELLMAN:  I disagree, but -- no.  I'm asking,

Todd L. Greenberg                                    October 25, 2012

Page 74

 1    would you consider --

 2              MR. WESTINGHOUSE:  You can ask him what he told --

 3    no.  That's -- he's not going to tell you what he would

 4    consider, his mental impressions.  He can tell you what he

 5    told Mr. Childs.

 6         Q.   (BY MS. WELLMAN)  Did you tell Mr. Childs anything

 7    about...?

 8         A.   No.  I never had any conversations with Mr. Childs

 9    about text messages.

10         Q.   That's what I thought.

11              How about Detective DeJesus?  Did you ever

12    discuss with him -- I think, but you've already said --

13    other than the meeting that's summarized in your letter of

14    July 25, what you consider substantive versus logistical?

15         A.   The only time I've talked about that issue with

16    Sam DeJesus was on July 24.  And I think -- well, I'm

17    rereading this letter.  I think it accurately describes the

18    conversation.  I don't have a lot to add to it.

19         Q.   Okay.  So I think in the August 3 letter that's

20    the focus of this, you -- we've already touched on this, but

21    you mentioned that there were other instances that you had

22    to tell -- whether it was you or your agents or Mr. Dion, to

23    tell Detective DeJesus to preserve his communications.  I

24    think you gave the time period between June 6 and June 22.

25         A.   Jennifer, let me just -- I don't think you

Todd L. Greenberg                                    October 25, 2012

                                                         Page 75

 1   accurately characterized what I've said in the preface to

 2   your question.  So just -- you might want to start --

 3               MR. WESTINGHOUSE:  You referred to an August 3 --

 4        Q.   (BY MS. WELLMAN)  Your August 3 --

 5        A.   Okay.  The August 3 letter.

 6        Q.   Is the focus of this meeting today, right?  Your

 7   Paragraph 4.

 8        A.   I've got it.

 9        Q.   And you say, We believe there were other instances

10   during the time period of the investigation when the need to

11   preserve text messages was raised with the investigators,

12   correct?

13        A.   Yes.

14        Q.   Okay.  And you've already -- we've already kind of

15   asked you a ton of questions regarding that, in terms of how

16   many instances you recall and that nature.  And your clear

17   memory is that you definitely discussed it at the June 6,

18   10 a.m. meeting, right?

19        A.   Correct.  I made the comment that I've told you

20   about.

21        Q.   Right.

22        A.   It wasn't a discussion, a give or take on that

23   topic.  But I clearly made the comment that I've described

24   for you at that meeting.

25        Q.   Okay.  And when we -- when you and I and Mr. Levin

Todd L. Greenberg                                    October 25, 2012

Page 76

1    talked a while back, I asked you, Why did you have to tell

2    Detective DeJesus so many times?

3              And do you recall, you said you had an

4    answer, but you wanted to think about it?

5         A.   No.  What I -- I -- I don't agree with that.

6         Q.   Okay.

7         A.   I do recall --

8              MR. WESTINGHOUSE:  We're not going to be answering

9    why Mr. Greenberg thinks the detective needed to be told

10   many times.  It doesn't matter.  It's not relevant why he

11   thinks that.

12        A.   I recall the conversation you're referring to.

13        Q.   (BY MS. WELLMAN)  Yeah.

14        A.   And I -- my recollection is that you asked me why

15   did I make the comment?  Why did I tell the agents --

16        Q.   Okay.

17        A.   -- save your texts and e-mails?

18              And I told you that I had an answer to that,

19   and I -- but I didn't provide the answer to you at that

20   time.

21        Q.   Right.  Right.

22        A.   I have told you the answer today.

23        Q.   I agree.

24        A.   Which was that we had --

25              MR. WESTINGHOUSE:  Suarez.

Todd L. Greenberg                                        October 25, 2012

Page 77

 1      A.    -- the Suarez --

 2            MR. WESTINGHOUSE:  The training.

 3      A.    -- and the training.  So this was on my mind which

 4   prompted me to kind of have it in the front of my mind to

 5   make that comment.

 6      Q.    (BY MS. WELLMAN)  Okay.  So -- so I --

 7      A.    I never recall telling you that I, quote, had to

 8   tell the investigators so many times to save that.  That is

 9   not --

10      Q.    No.  My -- my question to you was, why did

11   Detective DeJesus have to be repeatedly told by a variety of

12   people to preserve his text messages?

13            MR. WESTINGHOUSE:  And we're not going to answer

14   that question.  It calls for speculation by the witness.  He

15   doesn't know.  He can't know why another person needed to be

16   told once or ten times, if he did.

17            MS. WELLMAN:  Okay.

18

19                E X A M I N A T I O N

20   BY MR. LEVIN:

21      Q.    I have one other question.  You know, maybe I'm --

22   maybe I'm confusing Suarez with another case.

23            My reading of Suarez was that was a case in

24   which the FBI had failed to preserve the text messages

25   despite there being a litigation hold and despite the

Todd L. Greenberg                                    October 25, 2012

                                                          Page 78

 1   assistant on the case informing them that it had been

 2   requested by --

 3        A.   Yeah.  I think that's not an accurate description

 4   of Suarez.  But -- but I'll tell you what I was thinking

 5   because that seems to be the relevant point.  I don't want

 6   to get into a legal discussion on Suarez here.

 7        Q.   Yeah.

 8        A.   I didn't have all the details of that case in my

 9   mind at the time.  You know, I remember when that case came

10   out thinking, Wow, you know, text messages between agents

11   and informants.  What a nightmare.

12             We had training on it.  And we learned at

13   this training it wasn't just Suarez.  There were other

14   cases.  This was a new frontier in discovery.  It was a

15   pitfall that was being highlighted for us to be aware of.

16             So when I sat at the June 6 meeting, whatever

17   triggered in my mind that there were texts going on or

18   potentially going on caused me to say, Save them.

19        Q.   And were you worried at the point in which you

20   said that, that if you didn't say this, that they would

21   disappear?

22             MR. WESTINGHOUSE:  I'm not -- we're not going to

23   answer that.  It doesn't matter whether he was worried or

24   not.  He said it.

25        Q.   (BY MR. LEVIN)  Well, I guess, did that concern

Todd L. Greenberg                                        October 25, 2012

Page 79

1    inform the way in which you said it?  Would you -- would you

2    describe yourself as having been emphatic or passive or, I

3    mean, how was it that it was told?

4              MR. WESTINGHOUSE:  If you can characterize how --

5    your voice tone.

6         A.   I mean, honestly, it was -- it sticks in my mind

7    because I said it and because it was a legal issue that was

8    in the front of my mind at that time.  But there were so

9    many things being talked about at that meeting.  Everyone

10   else at that meeting, I think, was an agent or law

11   enforcement officer.  There were no other prosecutors there.

12             And with everything that was going on with

13   this case, with the plot that was being described, with

14   it -- the safety concerns that were raised in -- with a plot

15   like this, with the informant handling issues that would

16   have to be dealt with by the investigators, with how

17   fast-moving this was, I don't know that the way I said it or

18   what I said would have stood out in any particular way

19   vis-à-vis anything else that was said by anyone else.

20             MS. WELLMAN:  What do you mean by handling issues

21   with the informant?

22             THE WITNESS:  I -- just them talking about --

23   I'm -- he signed up as an SPD informant.  They were talking

24   about wanting to meet him with the FBI.  Just -- I guess

25   what I'm saying is the agents in the room had so much that

Todd L. Greenberg                                    October 25, 2012

                                                        Page 80

1    was being discussed and had so much that had suddenly fallen

2    on their plates in terms of an investigation, safety

3    concerns, mitigating against risks that were presented, that

4    the comment that I made in the context of that kind of

5    meeting, it was -- I mean, I said it.  I clearly spoke up

6    and, you know, I didn't whisper it.  But you're saying was

7    it emphatic?  I just said it in a normal voice.  People

8    seemed to be listening to me.  And then we moved on to a

9    variety of other topics.

10       Q.   (BY MR. LEVIN)  Why do you say that people seemed

11   to be listening to you?

12       A.   I just recall that when I was speaking, it wasn't

13   like all 12 other people in the room were talking over me.

14   You know, I can't tell you for sure whether -- at the moment

15   I said that comment, whether someone was whispering to their

16   guy next to them or whether someone was checking their

17   phone.

18            I mean, at a long meeting like that at the

19   time like that, that was undoubtedly going on throughout the

20   meeting.  But when I said what I said about the texts and

21   when I said other comments that I made in general, at that

22   moment, people were listening.

23            MS. WELLMAN:  Debra, do you have any additional

24   questions?

25            MS. MALCOLM:  No.

Todd L. Greenberg                                October 25, 2012

Page 81

1            MR. WESTINGHOUSE:  Would you mind if I ask a

2    couple of follow-up questions.

3            MS. WELLMAN:  Go ahead.

4

5                  E X A M I N A T I O N

6    BY MR. WESTINGHOUSE:

7        Q.   On June 6, I believe you stated that the meeting

8    length was approximately 90 minutes?

9        A.   Yes.

10       Q.   Approximately what term was spent talking about

11   the text messaging question by you?

12       A.   Probably 15, 20 seconds.  I mean, enough time for

13   me to say what I said.  And like I said, there wasn't a lot

14   of follow up or discussion following it.

15       Q.   Okay.  And you said that there were many people

16   around the table.  In the course of this meeting, did

17   everyone remain around the table constantly throughout the

18   90 minutes, or did people, from time to time, get up to,

19   perhaps, take care of some other matter briefly and step

20   back to the table.

21       A.   I don't have a specific recollection of that.  But

22   having been through many meetings of this ilk, I would

23   expect that people were in and out.

24            But let me -- and let me say one other thing.

25   You triggered something else in my mind which is where I was

Todd L. Greenberg                                          October 25, 2012

                                                              Page 82

 1   seated and where Sam DeJesus was seated and I can tell you

 2   where Ethan Via was seated.  I don't remember where everyone

 3   else was.

 4              We were at a long, rectangular conference

 5   table bigger than this one, but similar in shape.

 6       Q.   And for purposes of this discussion, this table is

 7   approximately 4 feet wide and 12 feet long.  Is that a rough

 8   approximation?

 9          MR. LEVIN:  Sure.

10       A.   And I was sitting in a position very similar to

11   where Jennifer is right now.  So I was not at the head of

12   the table.  I was on the -- one of the sides, but towards

13   one end of the table.

14              Ethan Via was sitting directly across from

15   me.  And Sam DeJesus was at the far head of the table.  He

16   was sitting at the head of the table on the other side -- on

17   the other end of the table from where I was sitting.

18       Q.   (BY MR. WESTINGHOUSE)  And with respect to

19   Mr. DeJesus specifically, do you know whether he was at that

20   seat when you made the statements about the text messaging?

21       A.   I believe he was seated there when I said that.

22       Q.   Do you know if he was listening to you; looking at

23   his BlackBerry, if he has a BlackBerry; taking care of some

24   other business; or any other thing he might have been doing?

25       A.   I have no recollection of that.

Todd L. Greenberg                                    October 25, 2012

                                                          Page 83

 1        Q.   Did either Mr. DeJesus or anyone else in the room
 2   verbally acknowledge your statement about preserving text
 3   messages?
 4        A.   I don't have a specific recollection of anyone
 5   saying something specific or doing anything specific,
 6   acknowledging what I said, but --
 7        Q.   You said earlier --
 8        A.   I mean, if I --
 9        Q.   -- there were no objections?
10        A.   If I -- yeah, there were no objections.
11             And if I had said something and it was
12   apparent to me that it fell on deaf ears because everyone
13   was, you know, looking at their BlackBerry or talking about
14   something else, I would have repeated it.  So I mean, my
15   impression is that most of the people there heard what I
16   said.  Whether any particular person was whispering to
17   someone or busy reading something else and missed it, I
18   don't know.
19             MR. WESTINGHOUSE:  That's all I have.
20
21                     E X A M I N A T I O N
22   BY MS. WELLMAN:
23        Q.   But it was an important enough issue to you that
24   if someone didn't hear it at the other end of the table, you
25   would have repeated it.

Todd L. Greenberg                                    October 25, 2012

Page 84

```
 1            MR. WESTINGHOUSE:   If it was obvious to you.
 2       A.   Well, no.   I mean, if I saw one person looking at
 3   their BlackBerry when I was speaking, I don't know that I
 4   would have repeated it.
 5       Q.   (BY MS. WELLMAN)  Right.
 6       A.   And I wasn't saying it to one particular person,
 7   so I wasn't -- you know, if I was addressing you, Jennifer,
 8   individually --
 9       Q.   Right.
10       A.   -- and I looked at you and you weren't listening
11   to me, I mean, I would repeat it to you.
12       Q.   Right.
13       A.   So like I said, if I -- if it had generally gone
14   unheard and that was apparent to me, I would have repeated
15   it.  But I wasn't scouring the table to make sure every
16   single individual there was listening to what I said.
17
18                 E X A M I N A T I O N
19   BY MR. LEVIN:
20       Q.   Well, I mean, I understand that you wanted
21   everyone to hear what you had to say, but when you're
22   talking -- when you're giving an instruction to preserve
23   text messages with the -- Robert Childs, as well as those
24   communications between Robert Childs and the targets of
25   investigation, isn't part of you thinking that you're really
```

Todd L. Greenberg                                    October 25, 2012

Page 85

1    talking to the guy who's handling Robert Childs, DeJesus,

2    and the guy at -- the lead investigator for the FBI, Ethan

3    Via?

4            MR. WESTINGHOUSE:  Well, if your question is, was

5    the question -- the text message statements directed to the

6    person handling Mr. Childs, you can ask that question, if

7    that's what your question was.

8        Q.   (BY MR. LEVIN)  I'm just wondering what you

9    were -- what you were thinking when you were giving that

10   instruction.

11           MR. WESTINGHOUSE:  Well, we've already talked

12   about the fact he was thinking about the Suarez opinion and

13   the training.

14       Q.   (BY MR. LEVIN)  No.  I mean, who were you thinking

15   about in terms of who was supposed to be -- who would be

16   preserving those text messages and communications?

17           MR. WESTINGHOUSE:  Not relevant.  We're going to

18   move on.

19

20                   E X A M I N A T I O N

21   BY MS. WELLMAN:

22       Q.   Well, is it -- is it -- all right.

23       A.   I've answered that for you already during this

24   interview.

25       Q.   You've answered who you thought he would have

Todd L. Greenberg                                    October 25, 2012

Page 86

1    communicated with text communications.

2        A.    I've answered that earlier in this interview, who

3    I was under the impression was communicating with Robert

4    Childs.  You asked me that.  I answered that.

5        Q.    And your understanding is that the people that

6    were communicating with Childs understood you expected them

7    to preserve evidence?

8              MR. WESTINGHOUSE:  I don't think he said that.  I

9    don't think that was his testimony.

10       Q.    Whether at the June 6 meeting or at another time,

11   did you expect that the law enforcement agents were

12   preserving their evidence?

13             MR. WESTINGHOUSE:  What he can answer is what he's

14   told.

15

16                    E X A M I N A T I O N

17   BY MR. LEVIN:

18       Q.    Well, maybe this is -- maybe this is what I'm

19   getting at.  Mr. Westinghouse asked you whether -- when you

20   were giving out the instruction about preserving text

21   messages and e-mails, he asked you whether at that time

22   Samuel DeJesus was checking his BlackBerry or was out of the

23   room or was not paying attention.  And you said, I believe,

24   that you don't recall any of that being the case.

25       A.    I don't have a specific recollection of what Sam

Todd L. Greenberg                                October 25, 2012

Page 87

1    DeJesus was doing at that moment, no.

2         Q.   Were you in any way focused on Sam DeJesus during

3    that moment?

4              MR. WESTINGHOUSE:  If you recall.

5         A.   Not exclusively, for sure.  I don't recall who I

6    was focused on at the moment I said that.  I think the

7    target audience for the comment were the investigators and

8    their supervisors, who were both present -- the SPD

9    supervisor and the FBI supervisor were there -- who would be

10   handling the investigation.

11             MR. LEVIN:  All right.

12             MR. WESTINGHOUSE:  Shall we take a break for a

13   couple minutes?

14             MR. LEVIN:  Sure.

15             MS. WELLMAN:  Sure.

16                  (Interview concluded at 3:04 P.M.)

17                           -o0o-

18

19

20

21

22

23

24

25

Todd L. Greenberg                                October 25, 2012

Page 88

1                    C E R T I F I C A T E

2

3

4

5          I, the undersigned officer of the Court and
   Washington Certified Court Reporter, hereby certify that the
   foregoing deposition upon oral examination was taken
6  stenographically before me and transcribed under my
   direction;

7

8          That the transcript of the interview is a full,
   true and correct transcript of the testimony, including
   questions and answers and all objections, motions, and
9  exceptions of counsel made and taken at the time of the
   foregoing examination;

10

11         That I am neither attorney for nor a relative
   or employee of any of the parties to the action; further,
   that I am not a relative or employee of any attorney or
12 counsel employed by the parties hereto, nor financially
   interested in its outcome.

13

14         IN WITNESS WHEREOF, I have hereunto set my hand
   and seal this  day of        , 2012.

15

16

17

18         _____
           Kristin M. Vickery
           Certified Court Reporter, 3125
19

20

21

22

23

24

25