JUDGE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.    CR 11-228 JLR |
| Plaintiff, | ) | |
| v. | ) | DEFENSE SENTENCING MEMORANDUM |
| ABU KHALID ABDUL-LATIF, | ) | |
| Defendant. | ) | |

## I.    Status of Case

This memorandum is submitted on behalf of Abu Khalid Abdul-Latif with respect to his March 25, 2013 sentencing before this Court following his guilty plea to conspiring with a paid Informant and co-defendant Walli Mujahidh to murder officers and employees of the Military Enrollment Processing Station (MEPS) in Seattle.   Plea Agreement (Dkt. No. 202).   Under the terms of  a written Rule 11(c)(1)(C) plea agreement, Abdul-Latif agreed to serve a substantial sentence – between 17 and 19 years. *Id.*[1] The defense does not anticipate the need for an evidentiary hearing at the time of sentencing.

## II.    Recommendation

The seriousness of the offense is not disputed.   Had the plot been real, lives could have been lost. But the offense did not involve any real threats or loss of  lives.   Rather, the plot was manufactured and

---

[1]    Abdul-Latif wrote separately to express his remorse for his "foolish, emotionally driven" decision to participate in the offense.   Letter by Abdul-Latif (Dkt. No. 204).

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington   98101
(206) 553-1100

orchestrated by a deceitful, manipulative, and generously paid government Informant who targeted a susceptible individual.[2]

As discussed at pages 3-6, *infra,* Abdul-Latif's bravado masked a childhood marked by physical and psychological abuse, neglect, abandonment, suicide attempts and psychiatric hospitalizations. That childhood trauma combined with his significant cognitive and memory impairments stemming from prenatal alcohol exposure, made Abdul-Latif particularly susceptible to the influence of others. In 2002, Abdul-Latif converted to Islam. Religion not only gave him the structure and community that he lacked and craved throughout his early life, it was also the pathway by which the Informant was able to insinuate himself into Abdul-Latif's life for his own personal gain.

The Informant, a five-time convicted sex offender, who has groomed and manipulated no less than a half dozen victims over the past 18 years, was well aware of Abdul-Latif's vulnerabilities. Capitalizing upon Abdul-Latif's distress over the documented abuses of Muslim women and children by the U.S. military abroad, the Informant turned what began as pure fantasy and bravado on Abdul-Latif's part, into a "plot" for action. The Informant not only manipulated Abdul-Latif, he and his law enforcement handlers manipulated the criminal justice system and deprived Abdul-Latif of critical evidence when they destroyed approximately 400 text messages between the Informant and the handler, and between the Informant and Abdul-Latif. *See* discussion at pages 8-20, *infra.* Rather than closely monitoring the Informant, the government blindly relied on his word and continues to rely on him for critical aspects of its case.

---

[2]  Abdul-Latif's life history is well documented in the Presentence Report and the respective reports of the defense experts. *See* Forensic Psychiatric Examination by Richard S. Adler, M.D. dated 8/30/2012 at 1; Supplemental Forensic Psychiatric Examination by Dr. Adler dated 3/1/2013 at 34; Report of Graphical Charting by Paul D. Connor, Ph.D., dated August 9, 2012 at 51; Supplemental Report of Graphical Charting by Dr. Connor dated 12/12/2012 based upon revised score sheet by Alan R. Breen, Ph.D., FACPN, because of error regarding Abdul-Latif's dominant hand at 54; Forensic Neuropsychological Forensic Examination by Dr. Breen, dated 12/18/2012 at 57; and Psychological Evaluation by Sheppard Salusky, Ph.D., PLLC dated 3/12/2013 at 78. Accordingly, that history will not be repeated in detail in this memorandum but rather summarized as it relates to the various sentencing factors.

These exhibits and all other exhibits are filed under seal, along with a disc containing the transcripts noted herein. If the Court would like a hard copy of the transcripts, it can be provided immediately upon request.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                    - 2 -

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington  98101
(206) 553-1100

Many of the Informant's manipulations are documented in the consensual recordings, as are Abdul-Latif's repeated attempts to delay the plans once they were set in motion. Those recordings also show Abdul-Latif's fanciful view of the phony plot. What has been lost – by the willful destruction of evidence, the failure to record early conversations between the Informant and Abdul-Latif, and the government's blind reliance upon the Informant's and his handler's words – is the full extent of the Informant's manipulations. The evidence that remains however makes clear that the government and the Informant not only provided the plot but the means and the opportunity for Abdul-Latif to engage in this fantasy.

Under the unique facts and circumstances of this case, no greater than 17 years' incarceration, coupled with five years of federal supervision, is "sufficient, but not greater than necessary" to provide just punishment, deterrence, protection of the public and rehabilitation of Abdul-Latif. 18 U.S.C. § 3553(a).[3]

## III.   Discussion[4]

### A.   No more than 17 years imprisonment, coupled with a five year term of federal supervision is in keeping with the history and characteristics of Abdul-Latif

The Presentence Report and the parties' commissioned mental health experts' reports paint a detailed picture of Abdul-Latif's impoverished upbringing. That upbringing was filled with traumatic events and significant medical and psychological impairments. Hundreds of pages of mental health and

---

[3]   Since *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has emphasized that the heart of a federal criminal sentence is the parsimony clause, i.e., the statutory directive to impose a term "sufficient, but not greater than necessary," to reflect the § 3553(a) factors or statutory purposes of sentencing set forth in subsection (a)(2) of § 3553. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

Further, the indispensable elements of just sentencing have always been reasoned judgment and individualized tailoring. *See Mistretta v. United States*, 488 U.S. 361, 390 (1989) ("For more than a century, federal judges have enjoyed wide discretion to determine the appropriate sentence in individual cases and have exercised special authority to determine the sentencing factors to be applied in any given case"). A district court should not determine the appropriate sentence by the mechanistic application of a given sentence to a given category of crime; rather, a sentencing court has the duty to ensure the sentence imposed is tailored to the individual before it. *Williams v. New York*, 337 U.S. 241, 247 (1949); *see also United States v. Lopez-Gonzales*, 688 F.2d 1275-77 (9th Cir. 1982).

[4]   Unless otherwise noted, the facts stated herein are based upon court records obtained by the defense, as well as discovery produced by the government.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                - 3 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

group home records and hours of interviews document Abdul-Latif's neglectful childhood, his suicide attempts, and hospitalizations.  Much of these events occurred while Abdul-Latif was still a teenager trying to survive group homes in California.  These life events have had a lasting negative impact upon Abdul-Latif's development and should inform the Court's sentencing decision.

As a child, Abdul-Latif was neglected and later abandoned by a depressed and emotionally-vacant mother. She often left him and his younger brother at home unattended, often to terrible results.[5]  At age 12, she permitted the State to remove him from her home and he was made a ward of the State. Much of Abdul-Latif's youth was spent either escaping from California group homes in to find his heroin-addicted, schizophrenic father or escaping from his father's neglect and abuse. Abdul-Latif was also small for his age, a fact that made him particularly vulnerable to bullying.  His only defense – his bravado – offered him no protection.  Abdul-Latif was continually victimized as a youth.[6]

The life records also reflect that, Abdul-Latif's mental health problems were largely ignored and untreated.  We now know, through cognitive testing, medical examination, review of hundreds of pages of life history documents and interviews that through no fault of his own, Abdul-Latif suffers the debilitating effects of Alcohol Related Neurological Disorder and related cognitive disorder.  *See* Forensic Psychiatric Report by Richard S. Adler, M.D., dated August 30, 2012, at 23 and Supplemental Forensic Psychiatric Examination by Dr. Adler dated March 1, 2013, at 44. Both diagnoses entail a cluster of neuro-behavioral impairments that make life, at the very least, difficult.[7]  These impairments include deficits in "executive functioning," defined to include:

/ / /

---

[5] *See* Dr. Adler's Supp. Report at 35-39; *see also* Dr. Breen's Report at 60-62

[6] *Id*.

[7] With respect to cognitive functioning, Dr. Adler relied on Dr. Connor's conclusion that "Abdul-Latif's pattern of neuropsychological functioning is consistent with the diagnostic guidelines for FASD." Dr. Adler's Supp. Report at 44.. In particular, Dr. Adler notes that Dr. Connor concluded that under 2004 Center for Disease Control and Prevention Guidelines, Abdul-Latif's neuropsychological testing reflect in impairment in four domains of functioning: (1) Academic Functioning – Arithmetic Calculation, (2) Verbal and Visual Spatial Learning and Memory, (3) Executive Functions, and (4) Social Cognition (particularly recognizing emotional content). *Id*.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)        - 4 -

deficient impulse control, poor social awareness including self- and other-awareness, poor emotion modulation, perseveration, poor judgment, faulty reasoning, deficient cause and effect reasoning, poor generalization skills, difficulty learning from experience, confusion under pressure, poor abstracting ability, difficulty distinguishing between fantasy and reality, slower cognitive processing, "concrete" thinking.

Dr. Adler's Supp. Report at.  He also has deficits in "social cognition," resulting in  "[i]ntrusiveness, inability to read nonverbal or social cues, 'chatty' but without substance, [and] poor boundary awareness." *Id.*

Beyond the effects attributable to ARND, Abdul-Latif has a dependent personality disorder.  *See* Psychological Evaluation by Sheppard Salusky, Ph.D., PLLC dated March 12, 2013 at 95.[8]  Before reaching that conclusion, Dr. Salusky  interviewed Abdul-Latif, reviewed  Abdul-Latif's life history documents, and administered various psychometric tests.  According to Dr. Salusky, Abdul-Latif's dependent personality disorder requires him to rely on "others to assume responsibility for most major areas of his life . . . [causes him] trouble initiating projects or doing things on his own . . . [and compels him]  to go[] to excessive lengths to obtain nurturance *and* support from others, to the point of volunteering to do things that are unpleasant." *Id.* at 95-97

Dr. Salusky explains that Abdul-Latif's disorder combined with the deficits attributed to his ARND, render him particularly susceptible to the influence of others:

> The seizure disorder, ARND and the related cognitive disorder impair Mr. Abdul-Latif's brain. Due to prenatal alcohol exposure, the impairment interferes with the association of cause and effect; the ability to learn from experience; the capacity to complete goal directed behavior in many situations; and other deficits. These disorders also increase vulnerability to outside influences. In particular, the cognitive impairments contribute to Mr. Abdul-Latif's dependence on others for validation and direction.

*Id.* at 99.[9]

---

[8]  Dr. Salusky's report is mistakenly marked as a "draft."  It is a final report.

[9]  The government's experts do not necessarily disagree with the defense.  Nor is an evidentiary hearing warranted.  For instance, although the government experts dispute Dr. Adler's conclusion that Abdul-Latif suffers from ARND, a medical condition, they conceded that developmental abnormalities are present, Abdul-Latif has a well documented history of grand mal seizures and significant impairment on neuropsychological issues.  *See* Dr. Adler's Supp. Report at 41.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)        - 5 -

Given his background, Abdul-Latif did not and could not develop the tools necessary to seek help to appropriately mature, either developmentally or emotionally.  Consequently, he acted out in his home, in his community, at school, and in the group homes.  Dr. Adler's Supp. Report at 45-46.  Abdul-Latif's debilitating cognitive and psychological limitations greatly contributed to his past choices, as well as his attempts to seek solace within the Islam faith.  As best described by Dr. Salusky, Islam offered Abdul-Latif a place to belong and structure.  Dr. Salusky Report at 86-87.

Abdul-Latif converted to Islam in 2002, when he was 25 years old, while undergoing a competency examination in a mental health hospital.  At the time, Abdul-Latif was facing a First Degree Robbery charge for robbing a convenience store with a toy gun.  He was homeless at the time of the offense and following his arrest, he claimed to hear voices.  The court referred Abdul-Latif for an evaluation at Western State Hospital where he was later found competent.  While at the hospital, another patient gave Abdul-Latif a portion of the Koran to read and Abdul-Latif decided to convert to Islam.  PSR at ¶ 64.  During the 31-month sentence that he served on the robbery conviction, Abdul-Latif devoted himself to Islam and found a community.  Guided by his faith in Islam, Abdul-Latif succeeded in the years following his 2004 release from prison – his only felony conviction.  He married, had a son, and was self-employed as a janitor.[10]

However, in contrast to the brotherhood he experienced among Muslims in jail, Abdul-Latif felt alienated from the Seattle Muslim community.    As described by Dr. Salusky, "[Abdul-Latif] found acceptance into the Muslim community very difficult.  And he found the community lacking in moral leadership and direction.  From his description, the community outside prison was much less structured. It was also more loosely knit.  As expected [given his psychological makeup and limitations], Abdul-Latif found this very distressing."  Dr. Salusky Report at 87.

---

Moreover, the opinion of Kenneth Muscatel, Ph.D., is generally consistent with Dr. Salusky's except that Dr. Muscatel finds the existence of "anti social traits" in Abdul-Latif without reason or justification.  *See* Dr. Adler's Supp. Report at 41-42; Dr. Salusky Report at 97-98.

[10]   His wife wrote a letter regarding her support of Abdul-Latif, the impact of his choice on the family and Abdul-Latif's remorse.  *See* Letter at 160.  Her parents have also written to the Court and their support letters are available at 162-63.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)            - 6 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

It is against this background that Abdul-Latif joined YouTube in 2009.  He began posting videos in November 2010.  He was the perfect target for someone like the Informant and the government to exploit his vulnerabilities.  *See* Dr. Salusky Report at 99-103.  While not an excuse for his choice to join the Informant in the offense conduct, all of the facts about Abdul-Latif and his formative years are important mitigating facts that should lessen the need for retribution greater than that urged by the defense.[11]

### B.   No more than 17 years imprisonment, coupled with a five term of federal supervision, is in keeping with the nature and circumstances of the offense

The defense does not dispute the seriousness of the offense.  The plot, however, was contrived.  The lone basis for the government's belief that the plot preceded the Informant comes from the Informant.  But as explained in this memorandum, the Informant is pathologically deceptive was motivated by the $100,000 payoff that awaited him for furthering this prosecution.  This fact should inform the Court's assessment of the nature and circumstances of the offense.

### 1.  The offense was a manufactured plot[12]

Over a period of approximately seven months, beginning in November, 2010, Abdul-Latif posted approximately 21 videos on YouTube covering a wide variety of issues relating to Islam and the Muslim

---

[11]   *See, e.g., Landrigan v. Schiriro*, 441 F.3d 638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse"); *United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) (in drug case, court affirms departure from guideline range of 30 years to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth – rendering him less culpable); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (evidence about a defendant's background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse.").

*See also* Debra Niehoff, *Ties that Bind: Family Relationships, Biology and the Law*, 56 DePaul L. Rev. 847, 849, 855, 861 (2007) (child abuse and neglect can cause chemical changes in the brain and nervous system; abuse "need not involve actual physical injury to do lasting damage to the developing brain."); Paul Krugman, *Poverty is Poison*, N.Y. Times, Feb. 18, 2008 (describing the devastating effects of poverty, particularly when an individual is poor during their early years).

[12]   The defense notes that the description of the offense conduct at paragraphs six through 18 of the Presentence Report omit some, if not all of the facts noted herein.  These facts are nevertheless important to understanding the nature and circumstances of the offense conduct, and should inform the Court's decision.  Defense counsel attest that these facts would be proven if an evidentiary hearing was held.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif;  CR11-228LR)                - 7 -

1   world, and expressed among other things, support for the Mujahideen, denounced American efforts to kill

2   Anwar al-Aawlaki and encouraged adherence to the Koran.[13]   Abdul-Latif however was not engaged in

3   terrorist activities nor was he a member of any terrorist organizations.

4        In February 2011, FBI Special Agent Ethan Via and other federal agents began surveilling Abdul-

5   Latif, despite the fact that he was described as someone with a "huge chip on his shoulder" and a

6   "follower of no one," and all they saw was Abdul-Latif working as a janitor and attending mosque with

7   his Nigerian wife, Binta Moussa Davis.   Despite these actions, before the Informant's involvement on

8   May 30, 2011, there is no evidence that Abdul-Latif plotted to attack Joint Base Fort Lewis/McChord.[14]

9   The consensual recordings confirm this.   "The call to jihad [during this time period] is just another

10  example of the bravado replete throughout his documented history.   As in other situations, he hoped

11  aggressive words would command the respect of others."   Dr. Salusky Report at 87.

12  / / /

13  / / /

14  / / /

15  ──────────────────

16      [13]   If the Court would like to view these videos, a copy will be provided to the Court.

17      [14]   In Walli Mujahidh's plea agreement, Walli and the government agreed,

18              . . .that the Court should consider the following:

19      a.      Beginning in or before May 30, 2011, Defendant Walli Mujahidh agreed with Abu
                Khalid Abdul-Latif to kill United States military personnel in retribution for perceived
20              wrongs committed by the United States military in the Middle East, and to prevent
                additional troops from going to the Middle East.   The specific object of the conspiracy
21              was to kill officers and employees of [the MEPS].

22  Dkt. No. 45 (Mujahidh Plea Agreement).   These facts – drafted by the government – are not inconsistent with
    Abdul-Latif's contention that the conspiracy began May 30, 2011, upon the Informant's arrival.

23

24      Moreover, Walli Mujahidh's agreement was entered only six months after he was charged when
    discovery was still incomplete, and is contrary to the evidence.   For instance, as revealed in the recordings,
    MEPS was first discussed on June 6, 2011.   *See* Transcript of Bates 581, p. 55Any statements to the contrary
25  by the Informant must be tempered by the fact that the Informant is incredible and exaggerates or lies for his
    own gain. *See* Section II(B)(2), *infra*.   Moreover, even if Walli and Abdul-Latif discussed the need to do
26  something about the real atrocities committed by American soldiers overseas, it too, was only heated dialogue.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 8 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington   98101**
**(206) 553-1100**

### 2.   The Incredible, Manipulative and Well-Paid Informant

#### (a) The Informant's Criminal History

The Informant has an extensive felony criminal history which includes: (1) a 1994 conviction for Rape in the Third Degree; (2) a 1997 conviction for Child Molestation in the Third Degree and for Failure to Register as a Sex Offender; (3) a 2001 conviction for Rape in the Third Degree; (4) a 2006 conviction for Failure to Register as a Sex Offender; and (5) a 2008 conviction for Failure to Register as a Sex Offender.[15]

As summarized below, his convictions reflect a pattern of manipulative and deceptive behavior spanning the past 18 years – a pattern that in many ways, foreshadows the manipulative tactics in this case. He is a diagnosed paraphilic (pedophilia, exhibitionism, and frotteurism) and has bipolar disorder (manic, severe and with psychotic features).  Sexual Deviancy Evaluation, dated February 17, 2000.   In group therapy, the Informant reported that "it didn't matter to him if the female wanted it or not he was going to 'take it' or rape her.  He reported that at times when raping, he felt like he was a 'God' and in control."  Washington State Department of Correction Treatment Summary.

His criminal history "includes forming relationships for the purpose of grooming the victims for sex as well as sexually assaulting strangers and family members." Offender Accountability Plan, January 6, 2003.[16] When persuasion failed, the Informant reverted to physical force. Further, nearly all of his sex offenses occurred while he is under court supervision, and in one case even while he was participating in sexual deviancy therapy.

---

[15]   The documentation referenced herein was previously filed with the Court as it related to earlier litigation.  Unless requested, these documents are not attached hereto because the facts, to counsel's knowledge, are not in dispute.

[16]   The Informant's criminal record only captures a fraction of his admitted criminal conduct.  The Informant also revealed the following uncharged sexual offenses: 1992 assault of a 30-year old female in California; 1992 repeated sexual assaults on his developmentally disabled 17-year-old sister; 1999 sexual assault on a female inmate; and a 2000 sexual assault of an adult female. Department of Corrections Sex Offender Release Bulletin. Additionally, he was acquitted of a 1994 Rape of a Child in the Second Degree, after the 13-year-old victim testified that she did not tell him her true age.  *Id.*

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 9 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

On February 3, 1995, the Informant was charged with Second Degree Rape for forcibly raping a 14-year-old girl (A.M.). The Informant, then an 18-year-old transient, befriended a group of high school students and began coming on sexually to sixteen-year-old T.B. The Informant convinced T.B.'s mother to let him stay temporarily at their residence. When T.B. rebuffed the Informant's sexual advances, he turned his attention to fourteen-year-old A.M., one of T.B.'s acquaintances. Information and Probable Cause Statement.

On October 6, 1994, A.M. and her two friends ran into the Informant while she was on her way to T.B.'s house for a visit. The Informant said he would accompany her, since he was staying there temporarily. When they found no one at home, the Informant said he had permission to enter and did so through a window. The Informant then let A.M. in and told her two friends that they should leave. He then locked the door and put a security stick in the window. The Informant started trying to kiss A.M. She backed away and he pushed her down onto a bed. A.M. protested and tried to push the Informant away. He grabbed both her wrists and pinned her arms above her head and forcibly raped her. *Id.*

Following the Informant's arrest, he admitted to the authorities that he had sex with the 14-year-old girl with full knowledge of her young age, but denied using force. *Id.* On February 3, 1995, the Informant entered an *Alford* plea,[17] to Third Degree Rape. Statement of Defendant on Plea of Guilty; and Judgment and Sentence.

Two years later, the Informant was convicted on March 14, 1997 of Third Degree Child Molestation and Failure to Register as a Sex Offender. *See* Information and Probable Cause Statement. The Probable Cause Statement alleges that the Informant moved to Woodinville, Washington in September 1996, but failed to register a change of address with the county. It also alleges that he met his 15-year-old victim at the Northgate Mall and knowing she was 15 years old, and over her protest, touched her under her clothes in her breast and vaginal area. Information and Probable Cause Statement.

The Informant entered an *Alford* plea to both counts on February 7, 1997 and was sentenced to

---

[17] *North Carolina v. Alford*, 400 U.S. 25 (1970).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

20 months' incarceration followed by 36 months' community custody on the charge of Third Degree Child Molestation. He was also sentenced to 12 months jail (suspended) and 24 months' supervised probation for failing to register. Under the terms of the plea agreement, the State agreed not to file charges relating to another victim, J.G.  Statement of Defendant on Plea of Guilty; and Minute Entry.

Shortly after his release from custody on the child molestation and failure to register charges, the Informant was again charged with Third Degree Rape based upon allegations that he had sexual intercourse with a minor without her consent.  *See* Information and Probable Cause Statement.  During an interview with law enforcement, the victim revealed that she had met the Informant earlier that evening when he offered her a ride. After he stopped the car – over her protest – the Informant forcibly kissed her, pulled up her shirt and bra and kissed and massaged her breasts. When she resisted, the Informant locked the door, reclined her seat and told her "Don't fight it." The Informant forcibly inserted two fingers into her vagina and told her "stop fighting me, we can do this the easy way or the hard way. Don't make me pull something on you." *Id.*  Fearful that he may have a weapon, the victim stopped fighting and the Informant placed his penis in her face and told her "I watched you lick that lollipop, now you can do that to me."  The Informant stopped when the headlight of the police cruiser illuminated his car.  *Id.*

During a post-*Miranda* statement, the Informant admitted to massaging and kissing the victim on the breasts and to placing his hands on her pants over her vagina, taking her pants down and placing his fingers inside her vagina. He also admitted to taking out his penis and placing it against her face. He admitted that he took all of these actions over her protest and against her will.  *Id.*

The Informant pled guilty on January 22, 2001 to Third Degree Rape.  On March 30, 2001, the court sentenced him to 54 months' incarceration, followed by 36 to 48 months' community custody.  *See* Statement of Defendant on Plea of Guilty and Judgment.

The Informant was again charged on November 5, 2005, with failing to register as a sex offender. Based on supervision records, it appears that he left his wife and absconded to Oregon to live with another woman and her two minor children. *See* 11/7/2005 Chronology.  He entered an *Alford* plea to the charge and was sentenced on February 3, 2006, to three months' incarceration and 12 months' community

custody. An additional condition of sentencing was "no contact with minors" for a period of five years. *See* Information; *see also* Statement of Defendant on Plea of Guilty and Judgment.

On July 25, 2007, he was again charged with failing to register.  In 2008, the Informant pled guilty and admitted he failed to notify the King County Sheriff within 10 days of beginning work in Turkey and was sentenced to 43 months' incarceration followed by 36 to 48 months' community custody.  As a special condition of this sentence, he was directed to have "no unsupervised contact with minors except his biological children" for five years.[18]  *See* Statement of Defendant on Plea of Guilty; and Judgment.

In addition to the above offense conduct, since 1995, the Informant has repeatedly violated the terms of his supervision.  In September 2011, he was sentenced to 150 days for possessing pornography, accessing the internet, sexting and accessing Facebook.  Most recently, in April 2012, he was violated for failing to report contact with children to his community custody officer and for working at an unauthorized workplace.  In other words,  the Informant continued to display dishonest and manipulative behavior, including grooming and manipulation while on supervision.

Supervision chronologies also reflect a concern over the Informant's dishonesty and manipulative behavior.  Recently, the Informant even referred to himself as a "pathological liar" although one who "doesn't try to lie anymore."  During Group Therapy, he attempted to "manipulate the therapist and group members" and when unsuccessful, "became angered and acted out aggressively." Treatment Summary, dated October 27, 2003.   Supervision Records describe him as "manipulative and prone to lying." Offender Accountability Plan.

The notations of multiple community custody officers paint a similar picture of the Informant as manipulative and deceptive:

- "It appears to his CCO that [Informant] was trying to push his way into the apartment and was not going to take 'no' for an answer and that *he was going to manipulate the situation until he got his way*." (emphasis added). September 12, 2011, Department of Corrections Supervision Notation.

---

[18]   To counsel's knowledge, the Informant was neither reprimanded nor violated for his contact with Abdul-Latif's young son on May 30, 2011.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 12 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington   98101**
**(206) 553-1100**

- Informant has five different AKAs and multiple Social Security Numbers. Legal Face Sheet date October 17, 2011.

- Informant "Showed no insight into his behavior and attempted to manipulate through meeting. Apparent that [Informant] was unable to internalize any concerns and has no ability to utilize internal controls" February 22, 2006 Corrections Supervision Notation.

- Informant provides false identification while absconding from supervision and living with a girlfriend as a childcare giver to her two young children. October 31, 2005, Corrections Supervision Notation.

- Informant "had done little to change his attitudes and continues to attempt to manipulate others in order to further his needs or desires. He has little empathy for his victims, his wife, or anyone else that has tried to help him." LSI-R Assessment, dated March 1, 2004.

- Informant's "participation on supervision [i]s abysmal to say the least. It is reported that he had 13 violations and committed a new offense. At this point I see no change in his attitude. He continues to try to 'con' his counselor, e.g., trying to use another counselor to get him computer classes when I told him no for an answer. He continues to appear having difficulty taking no for an answer." Supervision Notation, dated April 9, 2002.

- "This is not the first time [Informant] has tried to manipulate an issue. On intake I informed him that because of his use of pornography from the computer he would not be allowed to enroll in computer courses. Not willing to allow him to maintain skills which are part of his sexual deviance. While I was on rotation for 2 Months [Informant] went to another counselor[] ……. and got a referral. When reviewing …I discovered enrolled in computer classes.   Had him withdrawn immediately." April 10, 2002, Corrections Notation.

- "Court today; a usual strategy by [Informant] make me look bad. [Informant] lied, told the judge things I never said, pleaded that he did treatment as directed, when all records show his participation was minimal, if ever." January 1, 2001, Corrections Supervision Notation.

- Informant lied under oath to judge saying CCO said he could have contact with children while on an out-of-state trip.  December 9, 1999, Correction Supervision Notation.

This  pattern of lies and deceit not only informed his relationship with Abdul-Latif but also continued unabated throughout his employment with the government.

**(b)**    **The Informant's manipulation of Abdul-Latif and the Plot**

The Informant's manipulative relationship with Abdul-Latif began long before he became an informant for the government on June 3, 2011. In 2006, the Informant "sold" Abdul-Latif janitorial accounts that he claimed his janitorial business owned. At that time, the Informant was on his way to Turkey.  He convinced Abdul-Latif to quit his job and to purchase the accounts.  It was only after the

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

Informant left that Abdul-Latif learned that the Informant did not actually own the accounts, requiring him to pay the true owner more money.

Yet, when the Informant strapped for cash and having recently been released from prison and GPS monitoring, re-contacted Abdul-Latif in April 2011, Abdul-Latif desperate for companionship again placed his blind trust in the Informant. "It is clear his need for a strong, benevolent, and supportive male overpowered [Abdul-Latif's] ability to use even the most basic common sense in the situation." Dr. Salusky Report at 86.

Unbeknownst to Abdul-Latif, the Informant at that time was in constant telephone communication with a SPD informant being handled by SPD Detective Greg Tomlinson, a SPD Joint Task Force Officer. The involvement of this "friend (the Referring Source), in the Abdul-Latif investigation remains unclear, but apparently, he too was promised a share of the reward.[19]

Sometime after the Informant had dinner with Abdul-Latif on May 30, the Informant reportedly called the Referring Source who then his handler. According to Det. Tomlinson, the Referring Source simply said a "friend" "had told [the Referring Source] that a person had told him that he *wanted* to attack Fort Lewis."

On June 3, 2011, the Informant met with SPD Detective Samuel DeJesus, the Referring Source, Det. Tomlinson, and their sergeant, Sgt. Erik Allen, in a meeting "brokered" by the Referring Source.[20]

The two hour June 3rd meeting was not recorded. The only source for what happened at the May 30 meeting was the Informant, who told the police that Abdul-Latif "wanted" to attack Ft. Lewis/McChord with a "guy in LA," presumably Abdul-Latif's only other friend, Walli Mujahidh. Based on this representation, law enforcement instructed the Informant to meet with Abdul-Latif. They told the Informant to tell Abdul-Latif that he had a link to firearms and he was "free to discuss this as if [he]

---

[19] Interestingly, on or about July 5, 2011, the Referring Source was arrested for drinking and driving after he was celebrating at a DOJ award ceremony.

[20] Det. DeJesus was deputized by the U.S. Marshal's Service, at the FBI's request, in 2009 and assigned to the Criminal Intelligence Unit of the SPD. *See* Special Deputized Appointment at 111 *see also* Memorandum of Understanding at 112.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 14 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

intended to do it."[21]  Later that day, as instructed, the Informant sent Abdul-Latif a text that he had a

contact that could procure weapons, but did not want to discuss it over the telephone.  Their subsequent

meeting was also not recorded.

The evidence also reflects that the Informant was given approximately $100,000 for assisting the

government in the prosecution of Abdul-Latif.  The recording reflect that on June 3, 2011, police told the

Informant that he would be greatly rewarded.  "If it goes as planned, this will be very beneficial to you

and us.  **We will make very [sic] worth it to you**.  Thanks dude.  See you tomorrow."  Text at 131

(emphasis added).  After being told this, the Informant offered for the first time that Abdul-Latif wanted

"prices for 3 aks, 1 rpg, and a dozen he gernades [sic]."  Text at 132.

Promised that this "will be very beneficial to you," the Informant again met with Det. DeJesus and

Sgt. Allen on June 4, 2011.  In his recorded statement made that day, which was provided Joint Task

Force SA Via, a Joint Task Force agent, the Informant stated that Abdul-Latif told him, "Well, me and

this brother down in LA are putting. . . are wanting to hit Fort Lewis."  Transcript of Bates 516 at 5.

From that day forward, the Informant continued to act as prompted and instructed by law

enforcement.  The recordings evidence that the Informant was the instigator, the orchestrator and the

manipulator of the plot.  In fact, much of the plot's details were formed only with the Informant's constant

prompting, encouragement and approval.[22]  The Informant picked the date of the attack:

> CS:  What is your head. What is your head for that ok this is the day.
>
> AL:  Well, I like . . . Well, the day, the day  that you said before was pretty good.
> Like          the -- what's that holiday called here?
>
> CS:  Oh, you mean Independence (inaudible)?
>
> AL:  The day right after that.
>
> CS:   Oh, the 5th?

---

[21]  Texts at 129-130.

[22]  Interestingly, the Informant selected the Turkish word for barracuda, a predatory fish, as his confidential informant handle.  *See* Transcript of Bates 523 at page 7.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 15 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

AL:     Yeah, the day right after Independence

*See* Transcript of Bates 518 at page 7.  He also suggested he knew a "brother" who could be their driver. Transcript of Bates 522 at page 8.  Although chastised by Det. DeJesus that he had just blown their "trump card" by introducing a third person, the Informant said Abdul-Latif's trust is "so strong" that he would "trust anyone" the Informant brought into the scheme.

When Abdul-Latif wavered, the Informant encouraged him.  It is the Informant, not Abdul-Latif, who established their respective roles.  The Informant insisted Abdul-Latif should be the "emir," even when Abdul-Latif tells the Informant he should be the leader.  Transcript of Bates 518 at page 6; *id.* at page 39.  Even after he was anointed emir, Abdul-Latif did not consider himself to be the leader and deferred to the Informant on every detail of the plot.  *See, e.g,*. Transcript of Bates 524 at page 57-58.[23]

Abdul-Latif did little to further the plot.  The Informant did nearly everything including teaching Abdul-Latif how to use the internet to find Fort Lewis, paying for Walli Mujahidh's ticket, mapping the MEPS, subsidizing and procuring weapons and guiding Abdul-Latif to keep the plan moving forward. It is also the Informant who comes up with the weapons.  The government instructed the Informant to "keep him talking about grenades" and he was the one to introduce the M-16.  Abdul-Latif knows nothing about guns.  When the Informant first shows Abdul-Latif a grenade, Abdul-Latif asks, "for real, if you throw it it will blow up?"  Abdul-Latif had never held a firearm before and when the Informant asked what he thought of the weapons, Abdul-Latif replied, "they're heavy."

What is apparent from the recordings is that Abdul-Latif was not a mastermind of anything. Rather he liked and craved the attention the Informant gave him. The Informant was someone who was willing to listen and take seriously his fantasies, his boasting and his philosophizing.

When Abdul-Latif makes one excuse after another, attempting to delay the attack, the Informant encouraged and redirected him to refocus on their plans. For instance, on June 6, 2011 Abdul-Latif

---

[23]   In a debriefing with the Informant, Det. DeJesus cautioned the Informant to stop exercising so much influence over Abdul-Latif when he warned him to not "lead the attack."  *See* Transcript of Bates 523 at page 33; *see also id.* ("The more you talk. . . the less he can't [sic] talk.").

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 16 -

suggested that they could go anywhere in the world.  The Informant tells Abdul-Latif to not lose focus: "they had a place picked out and it was probably best to stick with their choice." The Informant then described a number of reasons "why their current target was a good one."  Transcript of Bates 520 at page 10.  *See also, e.g.,* Dr. Salusky Report at 102.

The Informant did this despite the fact that there should have been "multiple offers to backout." *See* Trevor Aaronson, "*The Informants: the FBI has built a massive network of spies to prevent another domestic attack.  But are they busting terrorist plots or leading them?*,"  Mother Jones, p. 33 attached hereto at 136 (a retired FBI Special Agent who directed the Western New York Joint Terrorism Task Force and oversaw the investigation of an alleged terror cell near Buffalo, New York, remarked, "If you're doing a sting right, you're offering the target multiple chances to back out").

On June 16 and June 17, 2011, Abdul-Latif succumbs to pressure by the Informant to pay $800 to the "arms dealer."  As Abdul-Latif complained to the Informant:

> AL:   Well, I mean, this guy, he's harassing us for money and stuff like that.  It just seems like --
>
> CS:   Well, that's why I'm saying, he's not harassing.  It's more, like I said, just good faith.  Because he exposed himself (inaudible). . . .

Transcript of Bates 527 at 12-13.  At this point, he felt  "trapped."  Dr. Salusky Report at 102.  Abdul-Latif's "psychological condition left him vulnerable to pressure from the others to remain part of the plot." *Id.* at 103.

### 3.    The intentional destruction of evidence deprived the defense of critical evidence and demonstrates the ill-advised discretion given the Informant

The government in this case exercised a stunning lack of oversight by blindly trusting Informant, and thereafter, entrusting him and his handler with critical evidence to defense.

Abdul-Latif was arrested June 22, 2011.  The Informant was not required to turn over his cellular telephone until July 1, 2011.  At that time, the Informant assured the government that all evidence was in tact.  Contrary to that assertion, the Informant had intentionally destroyed evidence in this case by resetting his T-mobile cellular telephone, thereby destroying all text messages, images, phone recordings

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                - 17 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

1   and history of internet activity.  The government waited eight months however, to first ask the Informant

2   about the destroyed evidence.

3       When confronted, the Informant offered that he destroyed the evidence because he had sent

4   sexually explicit messages and did not want to be in violation of his supervision.  (Dkt. No. 96).  That

5   excuse however, contradicts his sworn testimony at his September 22, 2011 hearing for community

6   custody violation hearing (for possessing pornography, sexting and accessing the internet, including social

7   networking sites). At the hearing, the probation officer was fully aware of the images and content in his

8   telephone, which were discussed in some detail.  DOC Hearing Transcript at pages 1-23.

9       The government's decision to entrust the Informant with preserving critical evidence of his text

10  communications with Abdul-Latif was not only ill-advised but also reflects the degree of discretion it gave

11  the five-time convicted sex offender and willingness to blindly utilize an incredible witness in these types

12  of cases.  Neither the state nor the federal authorities sought the permission from the Informant's assigned

13  DOC probation officer to use the Informant as an informant. As the DOC Officer later described, the

14  Informant is a person with "total disregard for his community of peers."   DOC Hearing Transcript at

15  pages 15-16.

16      Nor did the SPD or FBI complete a suitability assessment prior to utilizing the Informant as an

17  informant.  And when pressed by the grand jury, SA Kelly testified that the Informant was a "a registered

18  sex offender" but  "as far as [he] knew" the Informant did not have any "convictions for crimes of

19  dishonesty like fraud, forgery or perjury." Grand Jury Transcript at 4 & 42.[24]

20      The most stunning lack of oversight of the Informant and the investigation was the government's

21  decision to rely upon the representations of the Informant's handler, Det. DeJesus, who had produced only

22  nine text messages but in reality had exchanged nearly 400 text communications with the Informant

23  during the sting operation. Over the course of an entire year, the government repeatedly represented that

24  no other electronic communications existed other than the nine text messages based on an exchange on

25

26      [24]  SA Kelly also told the grand jury that "there was no money involved at the beginning."  However,
    payments to the Informant began as early as June 6, 2011, and reached over $100,000.

**FEDERAL PUBLIC DEFENDER**
DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)            - 18 -
**1601 Fifth Avenue, Suite 700
Seattle, Washington  98101
(206) 553-1100**

1   August 19, 2011 when AUSA Dion asked Det. DeJesus if the nine text messages produced were "all of

2   the texts between [Det. DeJesus] and the [Informant]."   Det. DeJesus responded, "As for the text

3   messages, you have all of them as far as I know."   The federal authorities took no other affirmative steps

4   to ensure the evidence critical to the defense was indeed preserved. *See* Cole Memorandum at 148.

5          Nor was the government forthcoming about Det. DeJesus's prior pattern of misconduct. It assured

6   the defense that it had no information that reflected "adversely upon" Det. DeJesus. *See* Letter in response

7   to *Henthorn* request at 158.   An independent defense investigation revealed however, that Det. DeJesus

8   has been disciplined.   His personnel file reflects not only a couple of vehicle accidents and a 2003

9   domestic violence investigation, but most important to his actions in this case, a reprimand for failing to

10  safeguard evidence and mishandling evidence. *See* SPD Memorandum at 159.   According to the letter

11  of reprimand, he recovered a suspect's wallet and instead of putting it into evidence, he kept it in his

12  patrol car during the remainder of his shift.   At the end of his shift, Det. DeJesus offered that he must have

13  left it behind in his patrol car.[25]   The evidence was never recovered.   Thus, not only has Det. DeJesus

14  previously mishandled and lost evidence, but the government's agents affirmatively lied about the veracity

15  of one of the government's key witnesses.

16          In sum, given all the facts and evidence, including Abdul-Latif's mental well-being, what cannot

17  be answered is whether Abdul-Latif would have taken the step from talk to action, were it not for the

18  Informant.   That Abdul-Latif pled guilty does not defeat that reality, or the importance of the Informant's

19  malfeasance with the government's blessings.   Without question there was an "aggressive encouragement

20  of wrongdoing"[26] and government conduct that should mitigate against a sentence any greater than that

21  urged by the defense. *Accord United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994) ( entitled to

22  downward departure for sentencing entrapment: "government abuse can be discouraged and corrected

23  only if courts are able to ensure that the government has some reason to believe that defendants are

---

24
25      [25]   This stated account is suspect given all officers are required to check their vehicle at the beginning and/or end of their shifts for contraband and other items that might have been left behind by another officer or detained person. *See, e.g.,* SPD Manual, 6.071.

26      [26]   *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993).

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                - 19 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington   98101**
**(206) 553-1100**

predisposed to engage in a drug deal of the *magnitude* for which they are prosecuted.").

### C. No more than 17 years is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Promoting respect for the law requires punishment to reflect not only the seriousness of the offense, but also what is just.  18 U.S.C. 3553(a)(2)(A); *see also* Richard A. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*," 89 Minn. L. Rev. 571, 590 (Feb. 2005) (defining just punishment  and retribution).  It demands that "an offender's conduct must not drive us to forget that it is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 531 (3d Cir. 2009) (emphasis added).  In making the determination, the Court must view the offense in context, a context that includes not only the offense itself, but also the history and characteristics of the offender.

Mr. Abdul-Latif's history as an individual vulnerable to the influence of others warrants this Court careful consideration. The Informant's history and his acumen for manipulating others, including  Abdul-Latif, also merits consideration, particularly where the offense was the result of a government-sting operation. Due consideration of those facts support that the defense's proposed sentence is sufficient, but not greater than necessary to promote respect for the law.

Moreover, as noted above, evidence about a defendant's background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. at 319.  For this reason, the defense agrees with Probation's view that the Court should consider Abdul-Latif's history and character when it renders its sentence.  The defense disagrees, however, with Probation's conclusion that 19 years is an appropriate sentence.

Mr. Abdul-Latif has already suffered significant punishment.  He has spent nearly two years in solitary confinement.  While in solitary, Abdul-Latif is confined to his small cell for 23 hours a day, segregated from the rest of the inmate population. Monday through Thursday, he is taken to a slightly

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 20 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

larger room with a frosted glass skylight, called "the yard," where he gets one hour of "yard time." Between Friday and Sunday,  Abdul-Latif is not permitted "yard time" and remains alone in his cell for at least 72 hours straight. During the past two years, he has had only two social contact visits with his wife and young son, and otherwise, only monthly visits by closed circuit television.

That the FDC has decided to impose these onerous conditions on Abdul-Latif is psychologically stressful and threatens  Abdul-Latif's mental well being. *See McClary v. Kelly*, 4 F. Supp.2d 195, 207 (W.D.N.Y. 1998) ("a conclusion however, that prolonged isolation from social and environmental stimulation increase the risk of developing mental illness does not strike this court as rocket science. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally in some cases develop psychiatric disturbances"); *United States v. Noriega*, 40 F. Supp.2d 1378,1379-80 (S.D. Fla. 1999) ("There is little question that [segregated confinement] is more difficult type of confinement than in general population.  For some, the consequences of such deprivation can be serious.") (citations omitted). "The Eighth Amendment and Psychological Implications of Solitary Confinement," 21 Law and Psychology Review, Spring 1997, p. 271; "Solitary Confinement, Legal and Psychological Considerations," 15 New England Journal on Criminal and Civil Confinement, 301 (Summer 1989).

In addition, Abdul-Latif will spend years on federal supervision, subject to rigorous conditions which will substantially restrict his liberty. *See Gall v. United States*, 552 U.S. 38 (2007) (noting that supervision "substantially restrict . . . liberty")

Under all these circumstances, no more than 17 years imprisonment is enough punishment, it is in keeping with principles of justice and fairness, and will promote respect for the law.

**D.    No more than 17 years imprisonment is necessary to deter "this kind of conduct by others."[27]**

A greater term of imprisonment than that suggested by the defense is not necessary to deter others from committing similar crimes.  United States Sentencing Commission, *Staff Discussion Paper*,

---

[27]   12/6/2012 Plea Colloquy Transcript at 10;  *See* 18 U.S.C. § 3553(a)(6).

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                    - 21 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

1   *Sentencing Options Under the Guidelines*.  Studies uniformly show that there is no evidence that increases

2   in sentence length reduce crime through general deterrence.  "Three National Academy of Science panels,

3   all appointed by Republic presidents, reached that conclusion, as has every major survey of the evidence."

4   Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-

5   29 (2006).  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative

6   Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of

7   punishment is empirically known to be a far better deterrent than its severity.").

8        Typical of the findings on general deterrence are those of the Institute of Criminology at

9   Cambridge University.  *See* Andrew von Hirsch *et al*., *Criminal Deterrence and Sentence Severity: An

10  Analysis of Recent Research* (1999).  The report, commissioned by the British Home Office, examined

11  penalties in the United States as well as several European Countries.  *Id.* at 1.  It examined the effects of

12  changes to both the certainty and severity of punishment.  While significant correlations were found

13  between the certainty of punishment and crime rates, the "correlations between sentence severity and

14  crime rates. . . were not sufficient to achieve statistical significance."  *Id.* at 2.  The report concluded that

15  "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is

16  capable of enhancing deterrent effects."  *Id.* at 1.

17       Moreover, although this case is unique from other sting operations in that the government did not

18  send a paid, untrained informant into Abdul-Latif's mosque and Muslim community to him, it was

19  nevertheless orchestrated by the government and the Informant, both of whom played a critical role in

20  instigating and constructing the plot, as well as manipulating Abdul-Latif to "stay the course."  *See infra*.,

21  § III(B).  What is more, both the government and the Informant destroyed evidence critical to the defense

22  of entrapment and a fair trial.  *Id.*  And yet, Abdul-Latif has spent the last 21 months in solitary

23  confinement and will spend the next (approximately) 13 years behind bars followed by federal

24  supervision, if the defense recommendation is followed.   Abdul-Latif is not alone in having to serve

25  significant terms for a crime orchestrated by the government.  *See, e.g.,* Trevor Aaronson, "*The

26

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 22 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

*Informants: . . .,"* *supra*, Mother Jones, Sept./Oct. 2011, at 30.[28]  The "certainty" of punishment is well known.  But the government should be hard pressed to convince this Court that under these circumstances, more than 17 years imprisonment is necessary to deter the public at large from engaging in such plots.

### E.       No more than 17 years imprisonment is necessary to protect the public from  Abdul-Latif

For several reasons Abdul-Latif's risk of recidivism is low.[29]  First, the issues giving rise to his choice to engage in the offense conduct have been identified by the defense experts and can be addressed in treatment.  *See, e.g.,* Dr. Salusky Report at 103.  Abdul-Latif's choice to engage in that process, and ultimately resolve this case, reflects his desire to change the course of his life.

Second, if the recommendation of the defense is followed, Abdul-Latif will be at least 50 years old when he is released from custody, well beyond the highest risk years of his life.  The United States Sentencing Commission's Fifteen-year Report on recidivism trends of federal guidelines offenders confirms that age has a negative correlation with recidivism. The Report found that offenders under the age of 21 have a 35.5% chance of recidivism.  That number drops to 12.7% for people between 41 and 50 years old and 9.5% for those over the age of 50.  *See id.* at 28. *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* ("*Measuring Recidivism*") (May 2004) at 2, available at http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_ Recidivism_Criminal_Hstory.pdf.[30]  In addition, he will be subject to a substantial period of federal supervision following his release from prison.

Additionally, Abdul-Latif has made every effort from the confines of his cell to accept

---

[28] The Mother Jones article is attached, along with the other sealed documents and available at page 133 of the sealed exhibits.  It is also available at:
http://www.motherjones.com/politics/2011/08/fbi-terrorist-informants

[29] Notably the guidelines offense level has no correlation with recidivism.

[30] *Measuring Recidivism* relied on empirical data gleaned from a random sample of 6,062 U.S. citizens (out of the 28,519) who were sentenced under the federal sentencing guidelines in fiscal year 1992.  These individuals were studied until 2001 to determine whether they had re-offended within two years of being in the community.  Re-offending included conviction for a new offense, an arrest with no conviction disposition information, or a supervision revocation). *Measuring Recidivism* at 3-4.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington   98101**
**(206) 553-1100**

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)              - 23 -

responsibility for his choice to engage in the offense conduct, including meeting with the defense experts *and* the government experts.  He now sees the destruction caused by his blind loyalty to a "friend" who was never a positive role model in his life, but he also blames himself for his choice to follow the Informant's lead.  *See* Abdul-Latif Letter (Dkt. No. 204).   Abdul-Latif intends to pro-actively engage in treatment and benefit from resources while in custody and later on supervision, so as not to repeat the mistakes of his past.  *Id.*  The past two years have impressed upon Abdul-Latif the need to change.  And there is no reason to predict that he will re-offend unless imprisoned for more than 17 years – far more than the three years he has previously spent behind bars.  *Accord  United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

What Abdul-Latif does need is support and treatment.  Dr. Salusky Report at 103.   In contrast with community supervision, prison will not provide Abdul-Latif with any "needed educational or vocational training, medical care or other correctional treatment in a more effective manner" than that received once on supervision. *See, e.g.,* U.S.S.G. § 5H1.4 (in case of seriously infirm defendant, "home detention may be as efficient as, and less costly than, imprisonment").  In any given case, prison does not further rehabilitation.  On this point, Congress was clear:

> [T]he court, in determining *whether* to impose a term of imprisonment and, *if* a term of imprisonment is to be imposed, in determining the length of the term, shall consider the facts set forth in § 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582  (emphasis added).

The Sentencing Commission itself acknowledges that non-prison sentences are associated with less recidivism than prison sentences and that "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."  U.S. Sentencing Commission, *Staff Discussion Paper, Sentencing Options Under the Guidelines* (Nov. 1996), at p. 18; *see also* Andres F. Rengifo, Vera Institute of Justice, Center

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

on Sentencing and Corrections, *Assessing the Effectiveness of Intermediate Sanctions*, Multnomah County, Oregon (July 2008) ("the use of jail as an intermediate sanction was correlated with higher rates of recidivism"); *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* (May 2004) at p. 13 ("Offenders are most likely to recidivate when their sentence is straight prison, as opposed to probation or split sentences").

To date, the "support" rendered by FDC SeaTac has consisted of medication – after a seizure in November 2012 – and isolation.  And yet, despite the onerous conditions endured by virtue of that isolation, Abdul-Latif has not violated any rules or regulations.  This is a man who has no intentions of repeating the mistakes of his past, and is remorseful for his decision to engage in the offense conduct.

For all these reasons, the sentencing goal of deterrence does not support a term of imprisonment greater than 17 years. A sentence of no more than 17 years imprisonment coupled with the support of the Probation Department and treatment best serves the public's interests in deterring crime and rehabilitating Abdul-Latif.

### F.   No more than 17 years imprisonment is in keeping with the kinds of sentences available and avoids unwarranted disparities

#### 1. The advisory guidelines are flawed and should be given little weight

The guidelines yield a range of life in prison, a sentence all the parties reject as greater than necessary under the facts of this case.

Since rendering the Guidelines advisory in *Booker*, *supra*, the Supreme Court has continually reaffirmed that a sentencing court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50.  The guidelines applicable in this case deserve little deference because the mechanical application of that range as a "starting point" or "touch stone"[31] for  Abdul-Latif only invites unwarranted disparities, an "evil" the Supreme Court in *Booker* intended to avoid in post-*Booker* sentencing by rendering the guidelines advisory:

---

[31]  *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

> [T]he Act without its "mandatory" provision and related language remains consistent with Congress' initial and basic sentencing intent. Congress sought to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities. . . [and] maintaining sufficient flexibility to permit individualized sentences when warranted." 28 U.S.C. § 991(b)(1)(B); *see also* U.S.S.G. § 1A1.1.

*Booker*, 543 U.S. at 264.

The guidelines are flawed because they lack any empirical basis and "do not exemplify the Commission's exercise of its characteristic institutional role." *Gall*, 552 U.S. at 46 n. 2; *Kimbrough*, 552 U.S. at 109. *See also Pepper v. United States*, 562 U.S. – , 131 S.Ct. 1229, 1247 (2011) ("our post-*Booker* decisions make clear that a district may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views. That is particularly true where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted").

The guidelines also fail to differentiate conduct, i.e., a government run sting operation from an actual terrorist activity. Compounding that inequity, the advisory guidelines fail to differentiate defendants based on their personal characteristics that are relevant to the sentencing decision pursuant to 18 U.S.C. § 3553(a). *See also, e.g.,* § 5H1.6 (family ties and responsibilities); § 5H1.10 (race and socio-economic status); § 5H1.5 (employment); and § 5H1.12 (lack of guidance as a youth).

### 2. No more than 17 years imprisonment is in keeping with others similarly situated.

Despite advisory guideline ranges of life imprisonment, many defendants convicted of conduct similar to Abdul-Latif are sentenced commensurate with a sentence no greater than 17 years. In fact, sentences resulting from sting operations are often far shorter with stiffer sentences reserved for defendants who committed unsolicited acts of terrorism and for those who go to trial. As a result of the near uniform departure from the Guidelines, imposition of a Guideline range sentence here would violate the statutory directive to avoid unwarranted sentencing disparities.[32] The defense recommendation is

---

[32] The government's agreement to forego a 30-year mandatory minimum count does not change the disparity analysis. Dkt. No. 202 at ¶11. Mandatory minimums are not a benchmark of reasonableness. *Harris*

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)          - 26 -

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington  98101
(206) 553-1100

1  informed by these facts and thereby, avoids unwarranted disparities.

2      In *United States v. Abdi*, CR 04-88 (S.D. Ohio), the defendants conspired with a paid government

3  informant to destroy the Brooklyn Bridge and to blow up an Ohio shopping mall.  One defendant pled

4  guilty to material support for terrorists and admitted to attending terrorist training camps and having ties

5  with Somali Islamists.  He was sentenced to 10 years in prison under an 11(c)(1)© agreement.[33]

6      Similarly, in *United States v. Ahmed*, CR 07-647 (N.D. Ohio), Khaleel Ahmed and his cousin,

7  Zubair Ahmed, were charged with planning attacks against the United States.  After a failed attempt to

8  join jihadists in Egypt, the cousins were recruited into Marwan el-Hindi's cell.  He introduced them to

9  Darren Griffin, an informant known as "the Trainer."  Their training included weapons training, body

10  building, and taking steroids. *See* Indictment, Dkt. No. 1

11      Khaleel and Zubair pled guilty pursuant to an 11(c)(1)(C) agreement to providing material support

12  to a terrorist by providing themselves as personnel for the purpose of killing and maiming members of

13  the U.S. military serving in Iraq and Afghanistan. *Id.* at Dkt. No. 129 (Superseding Information). When

14  asked by the court during the plea colloquy, both defendants responded in the affirmative that they

15  intended to engage in violent and hostile activities against U.S. military personnel.  As the government's

16  sentencing memorandum made clear, "[t]he conduct in this case is especially serious and evinces a

17  committed, long term plan by both defendants to engage in violent jihad on the battlefield against

18  members of the United States military." *Id.* at Dkt. No. 189, p. 4 (Govt. Sent. Memo).  Khaleel was

19  sentenced to only eight years and four months in prison and Zubair was sentenced to 10 years. *Id.* at Dkt.

20  Nos. 195 & 196 (Judgments).

21

22  *v. United States*, 536 U.S. 545, 570-71 (2002) (Breyer, J., concurring in part and concurring in judgment) (citations omitted). *See also Apprendi v. New Jersey*, 530 U.S. 466, 564 (Breyer, J., dissenting) (emphasizing

23  mistake in leaving mandatory minimums in place). *Accord Booker*, 543 U.S at 256-57 (in interpreting Sixth Amendment noted its fear of sentencing scheme that handed too much power to prosecutors and described how its holding limited prosecutor's ability to usurp power of judges in sentencing).

24

25  [33]   Although the co-defendant's in this case received sentences of 20 years incarceration, neither are similarly situated to Abdul-Latif. While all the submissions in co-defendant Paul's case are sealed, and thus it is impossible to determine what occurred, in co-defendant Faris's case, in a written opinion, Judge Brinkema

26  summarized Faris's activities researching ultralight airplanes and running errands for members of Al Qaeda and buying supplies for Al Qaeda camps. *United States v. Faris*, 03 Cr. 189 (E.D.Va.), Dkt. 66.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                    - 27 -

*United States v. Battle,* CR 03-399 (D.Or.), is also informative.  In *Battle*, Jeffrey Leon Battle,

Ahmed Ibrahim Bilal, Muhammad Ibrahim Bilal Patrice Lumamba Ford, Maer Mofeid Hawash, and

October Martinique Lewis, comprised the Portland Seven, a homegrown cell.  The Federal Bureau of

Prisons put them under investigation after a sheriff's deputy found several of them holding target practice.

The group flew to China in an unsuccessful attempt to enter Afghanistan and join Al Qaeda.  Each

defendant pled guilty to conspiracy to levy war against the United States, a violation of 18 U.S.C.

§ 2384. In court, Battle said that he had joined the U.S. Army Reserve to learn tactics to use against the

United States.  Battle and Forde were sentenced to 18 years in prison.  Bilal was sentenced to 10 years.

Howash received a sentence of only seven years and Lewis, who agreed to cooperate, received a three year

term of incarceration.

More substantial sentences are generally reserved for those who engage in actual and unsolicited

acts of terrorism.  For example, the defendant in *United States v. Al Delaema*, CR 05-337 (D. DC.), was

sentenced to 25 years pursuant to the terms of an 11(c)(1)(C) agreement.  DeLaema traveled to Iraq where

he planted roadside bombs (which he videotaped) targeting American troops. As part of the plea

agreement, the government agreed to not oppose an application to serve the sentence in the Netherlands.

More substantial sentences are also reserved for individuals who are found guilty after trial. For

example, in *United States v. Amawi*, CR 06-719 (N.D. Ohio), Mohammad Zaki Amawi, Marwan el-Hindi,

and Wassim Mazloum were found guilty of conspiring to kill, maim or injure another person outside the

United States, 18 U.S.C. § 956(a)(1), and conspiring to provide material support to terrorists, 18 U.S.C

§ 2339A. The jury also held Amawi accountable for distribution of information relating to explosives,

destruction devices, and weapons of mass destruction, 18 U.S.C. § 842(p)(2)(A).  In its sentencing

memorandum, the government urged the Court to impose a life sentence.  Amawi was sentenced to 20

years imprisonment.  Judgment, Dkt. 996. El-Hindi is serving a 13.5 year sentence and Mazloum is

serving eight years, four months imprisonment. Judgment, Dkt 997, 995.

Most closely related to the instant case is *United States v. Ferdaus*, CR 11–10331 (D. Mass.).

Ferdaus conspired to wage violent Jihad against the United States by attacking the Pentagon and U.S.

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif; CR11-228LR)                - 28 -

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington   98101
(206) 553-1100

1   Capitol Building with large remote controlled aircraft filled with plastic C-4 explosive. He conducted

2   surveillance of the targets in Washington, D.C., acquired the remote controlled airplane, 25 pounds of C-4

3   explosives, six fully-automatic AK -47 assault rifles, and grenades.

4          Ferdaus suffered from mental illness and, at times, attempted to cut off communications with the

5   FBI informant. *See* Janelle Lawrence & Don Jeffrey, *Accused D.C. Bomb Plotter Ferdaus Denied Bail*

6   *by Judge in Massachusetts*, Bloomberg News (Nov. 28, 2011), *available at*

7   http://www.bloomberg.com/news/2011-11-28/accused-d-c-bomb-plotter-ferdaus-denied-bail-by-judge

8   -in-massachusetts.html. He pled guilty pursuant to a Rule 11(c)(1)(C) agreement for attempting to damage

9   and destroy a federal building, 18 U.S.C. § 844(f), and attempting to provide material support to terrorist,

10  18 U.S.C. § 2339A, and was sentenced to 17 years' imprisonment.

11  **IV.    Conclusion**

12         The offense before the Court is unquestionably serious.  A reasonable sentence should nevertheless

13  reflect that it was an orchestrated plot by a deceitful, manipulative and heavily paid Informant backed by

14  a willing and able government, against a susceptible target.  It should reflect all facts about Abdul-Latif's

15  life history and his sincere remorse for his decision to engage in the conspiracy.  For all the reasons

16  discussed herein, no more than 17 years in prison, coupled with five years of supervised release, as

17  recommended by the Probation Department is necessary to achieve any legitimate goal of sentencing.

18         In addition, Abdul-Latif respectfully requests that the Court recommend to the Bureau of Prisons

19  that he be designated to serve his sentence in a Washington State Correction Facility at either Monroe or

20  Shelton. In the alternative, he requests the Court recommend he serve his sentence at FCI Oxford in

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif;  CR11-228LR)          - 29 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**

1  Oxford, Wisconsin, or FCI Beckley in Beaver, West Virginia, or at FCI Manchester in Manchester,

2  Kentucky, for reasons that will be articulated at the hearing but stem from his hope to remain near his

3  family, as well as the vocational and other programs available within these institutions.

4      Respectfully submitted this 19th day of March, 2013.

5      *Jennifer E. Wellman*              *Erik B. Levin*

    Jennifer E. Wellman             Erik B. Levin

6      WSBA No. 29193               NY Bar No. 4049268

    Assistant Federal Public Defender     Assistant Federal Public Defender

7

    *Vicki W.W. Lai*

8      Vicki W.W. Lai

    WSBA No. 23935

9      Research and Writing Attorney

10      Attorneys for Abdul-Latif

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif;  CR11-228LR)     - 30 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington   98101**
**(206) 553-1100**

1

## CERTIFICATE OF SERVICE

2

3

   I hereby certify that on March 19, 2013,  I electronically filed the foregoing with the Clerk

4

of the Court using the CM/ECF system which will send notification of such filing to Assistant

5

U.S. Attorneys Michael Dion and Todd Greenberg.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*/s/   Barbara Hughes*
Barbara Hughes, Paralegal
Federal Public Defender's Office

DEFENSE SENTENCING MEMORANDUM
(Abu Khalid Abdul-Latif;  CR11-228LR)              - 31 -

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington  98101**
**(206) 553-1100**