**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**IN SEATTLE**

_____

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )  No. CR11-228JLR
                               )
          vs.                  )
                               )
ABU KHALID ABDUL-LATIF,        )
                               )
                Defendant.     )
_____


**SENTENCING**

_____



**BEFORE THE HONORABLE JAMES L. ROBART**
**UNITED STATES DISTRICT COURT JUDGE**


**March 25, 2013**



**APPEARANCES:**

**Todd Greenberg**
**Michael Dion**
**Assistant United States Attorney**
**Representing the Plaintiff**


**Jennifer Wellman**
**Erik Levin**
**Public Defender's Office**
**Federal Representing the Defendant**

    1           THE CLERK:  Case CR11-228, United States versus

    2   Abdul-Latif.  Counsel, please make your appearance.

    3           MR. GREENBERG:  Your Honor, Todd Greenberg and

    4   Michael Dion for the United States.

    5           MS. WELLMAN:  Good morning, your Honor.  Jennifer

    6   Wellman and Erik Levin on behalf of Abu Latif, who is with

    7   us at counsel table.  Also present at counsel table is

    8   Patricia Stordeur, a paralegal at our office.

    9           THE COURT:  Thank you.  Counsel, let me give you

   10   some preliminary comments so that you can sharpen your

   11   presentations this morning.  In preparation for today I've

   12   gone back and read the plea agreement, which is unusual in

   13   that it is a Criminal Rule 11(c)(1)(C) agreement, which at

   14   the time that I accepted Mr. Abdul-Latif's plea of guilty

   15   obligates me to rule within a certain range.  If I don't

   16   rule within that range, it is my understanding of

   17   11(c)(1)(C) that either side has the ability to then void

   18   that guilty plea.

   19      Mr. Abdul-Latif has written me and suggested that he

   20   has a different understanding of that rule, so someone

   21   needs to address that particular question.

   22      I have reviewed the government's memo and the material

   23   that they have submitted.  I have reviewed the defense

   24   memo, the letters that came along with it, and have been

   25   submitted along the way, the exhibits and the CD of

1    examinations that were conducted.  And, finally, I have

2    reviewed the presentence report.  The one that I have used

3    is revised as of March 18, 2013.

4        Ms. Wellman, have you and Mr. Abdul-Latif had an

5    opportunity to review that?

6            MS. WELLMAN:  We have, your Honor.

7            THE COURT:  There is not a disagreement in a

8    factual sense that this would be a base level 33.  Because

9    of the nature of the victims, it would be a six-level

10   enhancement.  Because of fitting the definition of

11   terrorism, it would be a 12-level enhancement.  And

12   because of Mr. Abdul-Latif's letter to me, I am going to

13   give him acceptance of responsibility.  I must say the

14   briefing in this case would argue strongly that there is

15   not acceptance, but the letter from Mr. Abdul-Latif is

16   what I'm going to go by.

17       That gives us then a total offense level of 48.  The

18   criminal history category would be 3, except, once again,

19   for the definition of terrorism, which under the

20   guidelines it says that it needs to be a mandatory 6.  So

21   that would be a total offense level of 48, criminal

22   history category of 6, which under the guideline range is

23   a life sentence.

24       Paragraph 9 of the plea agreement specifies that the

25   sentence is to be between 204 and 228 months.  Not

 1   surprisingly, the government comes in at 228 and the

 2   defense comes in at 204.

 3        There is also a disagreement on the period of

 4   supervised release that should be imposed.

 5        Finally, the judgment should read that the defense

 6   requests placement at, and then there is a rather long

 7   list of places that have things that would benefit

 8   Mr. Abdul-Latif.  And I would like those included.

 9        The other thing that you all should know is, there are

10   three major defenses or arguments put forward by

11   Mr. Abdul-Latif.  One has to do with saying that he was

12   entrapped, and, secondly, as part of that, that the court

13   should not believe anything that the confidential

14   informant says.  A great deal of the briefing is dedicated

15   towards that.

16        I don't think that, having accepted the guilty plea in

17   this matter, goes to the question of conviction.  I think

18   that is established.  And so I have treated those

19   arguments as falling under the rubric of Factor One under

20   18 U.S. 3553(a), which is the nature and circumstances of

21   the offense.

22        The third argument has to do with various personal

23   considerations to Mr. Abdul-Latif, including his

24   upbringing and his medical history.  That seems to me,

25   once again, since it doesn't go to the question of guilt

or innocence, I have treated those under the second factor

of 3553(a), which is the history and characteristics of

the defendant.

    If someone disagrees with that as the proper approach

to this, then I would like to hear it as part of the

argument.

    Counsel, are you ready to proceed?

        MR. GREENBERG:  Yes, your Honor.  May it please

the court.  Your Honor, standing before you today is a

defendant who agreed to and planned to kill United States

military officers and employees; a defendant who agreed to

kill high school age kids who were being recruited into

the military.  He agreed to do this during an attack at

the MEPS Center, at the Federal Center South building here

in Seattle, an attack that would have had a devastating

effect and would have killed hundreds of people.

    Now, the defense describes the defendant's attack plan

in a variety of ways.  They use terms like phony,

manufactured, pure fantasy and bravado, and fantasy much

like paint ball or role playing.

    Well, this wasn't a fantasy, and this defendant was

not playing a role, and the machine guns he purchased to

use during this attack weren't for paint ball.  This was a

real attack plot, a real criminal conspiracy.  And you

don't have to take my words for that, you have the

1    defendant's words for that, under oath, as this court has

2    I believe alluded to this morning.  In the plea agreement,

3    in the plea colloquy before this court, this defendant

4    told you he agreed to this attack plan and agreed to kill

5    his intended victims.

6        If this was a fantasy, if this was role playing, it

7    wouldn't have been a crime, and he wouldn't have pled

8    guilty.

9        For this crime, your Honor, we recommend a lengthy

10   sentence of 19 years, and a term of supervised release for

11   life, which we submit is the fair and just sentence in

12   this case.

13       Now, we don't have to guess as to what the defendant's

14   motive was here.  Again, we have his words telling us what

15   it was.  He had a terrorism motive.  This was a crime of

16   terrorism.  And he had two real motivations that he

17   articulated himself; first, to send a message.

18       And the way he said that on one occasion of many was,

19   quote:  "We are not only just trying to kill people.  We

20   are trying to send a message.  We are trying to do

21   something that is going to be on CNN and all over the

22   world.  That's what we want, to say, look, the Muslims,

23   they are not going to allow this no more, for you to go to

24   their land and kill and slaughter their people."  That was

25   the message he was sending.

1    And he also wanted to inspire other attacks similar to

2  his here in the United States.  He said that on a number

3  of occasions.  Including on one occasion:  "Imagine how

4  many young Muslims after this, if we are successful at it,

5  will try to hit these kind of centers.  Imagine how

6  fearful America will be.  They will know they can't push

7  the Muslims around."

8    The defense portrays this as all the informant's idea,

9  that Abdul-Latif was pressured to participate in this

10  attack plot.  But this is easily disproven by the

11  evidence.  First, the YouTube evidence, the videos and the

12  comments.  And we have given the court some of the

13  quotations from that evidence, and I won't go through that

14  again.  But it is undisputed, for months and years before

15  this crime, the defendant was himself calling for violent

16  acts against the U.S. military and against its soldiers.

17    There was a clear trend in his commentary.  It was

18  increasing as time went on, in terms of its extremism and

19  its violent tone.  He had a preexisting motive long before

20  the informant came into this situation.

21    The recordings themselves, that we have provided the

22  transcripts for in our sentencing memo, also make very

23  clear whose idea this was.  The defendant himself told the

24  informant on June 10th, "This has been in discussion off

25  and on for a while," between him and his co-defendant

1    Mr. Mujahidh.  It is clear from the recordings that the

2    informant was the last one to join this plot.

3        In fact, the informant referred to -- on the

4    recordings, he said to Abdul-Latif, "When you first

5    brought this up," in one of their discussions.  And

6    notably, Mr. Abdul-Latif doesn't correct him, doesn't

7    rebut it.  In fact, nowhere on the countless hours of

8    recordings that we have in this investigation is there

9    ever a statement made by the defendant or anyone else that

10   it wasn't him who brought it up.  This was his idea.

11       We see that very pointedly as well in an e-mail

12   exchange that the defendant had in early May of 2011.

13   This is over three weeks before there was any contact

14   between the defendant and the informant.  And we

15   highlighted this in the sentencing memo, but I wanted to

16   quickly review it again.

17       On May 4th the defendant says, "Osama Bin Laden is a

18   pioneer of jihad."  And he says, "I am one of the real

19   Muslims.  I will give my life to Allah."  He is saying,

20   "Let me know" -- he is writing this to another person,

21   "Let me know what I can do."

22       The other person responds and essentially tries to

23   talk him out of this.  He says, "Are you really willing to

24   die?  What about your family?  What about your children?"

25   Here is the defendant in response on May 6th, 24 days

1   before he talks to the informant, "If you know a way that

2   I can do this that you can't explain except in person, let

3   me know and I will come to you and discuss this on my

4   dollar."  He was seeking out on his own a way to violent

5   jihad.

6       The most that can be said on the defendant's behalf in

7   this regard is that the government's investigation gave

8   him his first real opportunity to pursue his violent

9   jihad.  There is nothing wrong with the government's

10  investigation providing this opportunity.  The court knows

11  that it is black letter law that providing an opportunity

12  to a defendant to commit a crime is not entrapment.  It is

13  nothing of the sort.  In fact, the FBI and the Seattle

14  Police Department did exactly what we would want them to

15  do in this situation, where the defendant brought his plot

16  to a citizen who was not an informant at the time, and who

17  fortunately brought the plot to law enforcement to

18  investigate.  But for the grace of God, that's the way

19  this went.

20      Because if the defendant took his idea to someone

21  else, who either didn't turn it into law enforcement or

22  was sympathetic to the defendant, and had access to

23  weapons, this would have been a lot different.

24      The defense describes Mr. Abdul-Latif as, quote, "A

25  passive contributor to this plot," "someone who is not

 1    capable of planning," "someone who took no independent

 2    action to move this scheme forward."  But the evidence

 3    shows otherwise.  The defendant directed major aspects of

 4    this plot, he engaged in extensive planning and logical

 5    thought about his attack.

 6        I want to highlight three aspects of the evidence that

 7    show this, because this really is critical to the issues

 8    before the court.  I would like to do that by playing some

 9    brief audio clips.  We have provided the court with

10    transcripts, which are in the order that I intend to play

11    them.  The number of the exhibits are not in numerical

12    order, but I will walk the court through these.  The

13    portions of the transcript that we will be playing have

14    the highlights next to them.

15        So three things here that I want to highlight.  First,

16    the defendant chose the MEPS as the target.  This is

17    undisputed.  It is caught on tape the very moment that he

18    came up with this idea.  You will hear that the informant

19    had no clue, as many of us didn't, what a MEPS was.  And,

20    of course, the defendant did, because he processed through

21    a MEPS years ago.

22        The context for this audio clip is that the initial

23    plan, of course, was to attack Fort Lewis.  And

24    Mr. Abdul-Latif and the informant were discussing at this

25    moment that idea.  They were doing internet research.  And

1   it is dawning on the defendant that an attack on a

2   military base like Fort Lewis may be a little bit beyond

3   his capabilities.  And then he has the idea of the MEPS.

4   So if I could play this Exhibit 1, your Honor?

5          THE COURT:  Ms. Wellman, do you have a copy of

6   these?

7          MR. LEVIN:  Yes, we do.

8          THE COURT:  All right.  Please proceed.

9      (Audio played.)

10         MR. GREENBERG:  The defendant not only picked the

11  target, but he articulated why it was a good target, it is

12  a soft target, there aren't weapons there, they will be

13  able to get more targets, kill more people.

14    He followed up on this, too.  We detailed this in the

15  sentencing memorandum.  The defendant called the MEPS

16  office three times the night of this conversation.  Not

17  with the informant, on his own.  He located it.  He texted

18  the informant, unsolicited, about where the actual

19  location was.  Initially they thought it was on Third

20  Avenue, but in fact it was on East Marginal Way.  He found

21  that out.

22    He suggested they do physical surveillance at the

23  building, and then they did on June 8th.  He and the

24  informant went and did physical surveillance.

25    That gets me to my second point, showing that the

1   defendant was an active participant and leader of this

2   plot, which is the discussion he has with the informant,

3   that I want to play for the court in a moment, about

4   security video cameras at the building.  Because when they

5   went on June 8th to this building, one of the things the

6   defendant talked about right away is he saw the security

7   video cameras.  He thought through the problems that those

8   might pose for the attack.  And the following day, on

9   June 9th, he had this conversation with the informant.

10      If I may, your Honor?  And this is Exhibit 7, the next

11  transcript in order.

12      (Audio played.)

13          MR. GREENBERG:  This is lucid thought and planning

14  and problem solving, your Honor.  He is planning this

15  crime.

16      The third point on this level is the fact that the

17  defendant planned the actual attack.  He literally planned

18  the play-by-play, of where the attackers would go, where

19  they would throw grenades and the rest of it.  This

20  happened on many occasions during the investigation.  I

21  want to play two brief clips along these lines.

22      And these are times when the defendant and the

23  informant and Mr. Mujahidh, when he was in town, would sit

24  down with the hand-drawn map that the informant made at

25  the direction of the defendant of what this building and

1   the floor plan of the building looked like.  And then the

2   defendant would use the map to give this play-by-play.

3       If I could go to Exhibit 3, the first clip from that?

4       (Audio played.)

5           MR. GREENBERG:  Your Honor, the next clip is on

6   the very next page, a very short clip at the bottom.

7       (Audio played.)

8           MR. GREENBERG:  That's the day before the

9   defendant's arrest.  This is not a fantasy.  This is a

10  serious plan with serious thought and serious planning.

11      Now, the defense criticizes the government's

12  investigation.  And this is beyond me.  They say there

13  should have been multiple offers to back out.  They go so

14  far as to attach a 16-page article that says, quote, "If

15  you are doing a sting right, you offer the target multiple

16  chances to back out."  Well, that's exactly what happened

17  in this investigation.  The defendant repeatedly declined

18  the offers for him to back out.  He demonstrated that he

19  was serious about this plot.  And this happened on

20  multiple occasions.

21      I will review two briefly.  One was on June 7th.  And

22  these are attached to our sentencing memo.  When the

23  informant said to the defendant, "I want to make sure that

24  you -- this is what you are down for.  Do you want to go

25  in here?  Do you want to do this as you were saying?  Or

1  do you want to call it off?  I'm not going to hold it

2  against you."  And the defendant's response:  "I'm ready

3  for this.  Let's proceed as planned."  And the only caveat

4  he gave was, "Unless we find out that the FBI is watching

5  us."  He didn't want to back out.

6      The day before his arrest another very clear

7  opportunity for him to pull out of this was presented.

8  And this is Exhibit 6, your Honor.  I want to play a brief

9  clip so the court can hear the response from the

10  defendant.

11      (Audio played.)

12          MR. GREENBERG:  And then the rest of that page,

13  which I'm not playing the clip, the defendant not only

14  says, "No, I'm in, let's go forward," but he talks about

15  what to do if they get caught by law enforcement, that no

16  one should talk, no one should rat out.  He didn't want to

17  back out of this thing, even though he had clear

18  opportunities to do so.

19      Yet, the defense continues to say this was fantasy,

20  all talk.  The defendant was desperate to delay this and

21  get out of it.  He never would have taken any actual

22  action.  But the evidence, again, shows something very

23  different.  The defendant was preparing for this attack.

24      And there are three things I want to highlight for the

25  court.  Number one, he recruited Walli Mujahidh into this

1     plot.  No one else did that.  That is undisputed.  This is

2     his best friend.  He helped pay for Mr. Mujahidh's bus

3     ticket.  He brought him from LA to Seattle to do this

4     attack.  Why would you do that if this wasn't a real

5     attack?  You simply wouldn't.

6         Number two, and this is very important, his financial

7     commitment to this plot.  I know that there are two things

8     the parties will agree on here.  Number one, the defendant

9     was pretty much broke, he didn't have much money.  Number

10    two, his religious beliefs and observation of his religion

11    was very important to the defendant.  And these two things

12    go hand in hand on this point here.  Because even though

13    he had virtually no money, he scraped together $800 cash

14    to buy machine guns.

15        And where did he get that money?  He took it back from

16    a travel agent who had it on layaway for him to make a

17    religious pilgrimage to the Hajj.  Well, it must have been

18    one of the most important things for this defendant to

19    look forward to.  He literally chose his attack plot over

20    his religious observation.

21        If he thought this was fake and life was going to

22    continue on normally, as the defense would have you

23    believe, why would he deny himself the opportunity to go

24    to the Hajj in exchange for buying machine guns that he

25    was never going to use, according to him?  That makes no

 1   sense.

 2       Third, the fact that he acquired and took possession

 3   of machine guns is really the death knell here for the

 4   defense argument.  Why would he take possession of three

 5   machine guns if he wasn't going to go forward with this?

 6       That alone is a serious crime, possessing machine

 7   guns, especially for a convicted felon.  And he knew that.

 8   On one of the recordings he said, "I could do five years

 9   just for holding this."  He knew that was serious

10   business.

11       He had the easiest out in the world.  He could have

12   said, "You know what, guys, I'm broke, I don't have money,

13   we are going to have to kick this can down the road for

14   another time."  But he didn't do that.  He was eager to

15   get the machine guns.

16       He told Robert Childs --  And this is a clip I think

17   in the interest of time I will skip playing.  But I

18   provided this to the court in the sentencing memo.  He

19   told Robert Childs, "As soon as you get those guns, call

20   me.  Don't get gas, don't go to the store, call me

21   immediately."  He wanted those guns.

22       Your Honor, here is a photograph of what he did with

23   those guns when he got them.  They were delivered to

24   Abdul-Latif and Mr. Mujahidh, and they practiced with the

25   guns, they tried to learn how to use them.  They talked

1    about using them.  They were very excited.

2        And then moments before the arrest, the defendant

3    there with the blue bag slung over his shoulder, he had

4    all three of those machine guns, and he was going to take

5    them to hold onto for training.  He never would have been

6    in this situation right here if he didn't intend to go

7    forward.

8        And there was talk on the recordings of delaying the

9    attack.  And that wasn't because the defendant was trying

10   to kibosh this thing.  It was reasonable and realistic to

11   delay this plan.  They had to get the guns, they had to

12   get together in Seattle, they had to train and practice

13   together.  Anyone who wanted to make this a successful

14   attack would have delayed this for some period of time

15   until they were ready.

16       I would be remiss, your Honor, if I didn't comment for

17   a moment on the would-be victims of this attack.  The

18   court knows from the briefing that the defendant planned

19   to do this on a Monday or Tuesday.  That's the day when

20   the most recruits are at the MEPS.  There is an average of

21   60 employees and officers at the MEPS on a given day.  On

22   a Monday or Tuesday, an average of 82 recruits, many of

23   whom have family members with them for that special

24   occasion.  And there are countless other federal employees

25   that work at a variety of agencies and offices in that

1  same Federal Center South building that undoubtedly would

2  have been killed in this attack.

3      And then the childcare center.  I know this is

4  difficult to stomach for everyone in this courtroom, and

5  probably even for Mr. Latif, but the reality here is many

6  children would have died if this attack went forward.  The

7  childcare center in that building is located immediately

8  adjacent to the MEPS.  And this is a building floor plan

9  with the MEPS office space highlighted in green, or

10  bordered in green, and the childcare center bordered in

11  red.  They are literally right next to each other.

12      And in this corner here, your Honor, the lower

13  right-hand corner of the MEPS office that I'm outlining,

14  is the battalion commander's office, essentially the

15  highlight of the defendant's planned attack.  He talked

16  about it all the time.

17      And here is a view of the interior of the commander's

18  office.  You can see right outside of the window is the

19  playground for this childcare center.  Here is an exterior

20  look of the commander's office and the playground.

21      An attack on that office, especially one with machine

22  guns or grenades, would simply have been devastating.

23      Now, the defendant says that he didn't intend for

24  children to die.  And he did say that on the tapes.  And

25  he probably didn't intend for children to die.  But he

1   knew this playground was there because he saw it and he

2   commented on it in one of the recordings.

3      When you undertake a plan like his, you know there is

4   going to be unforeseen fatalities.  It is just not enough

5   to say I didn't intend for that to happen.

6      One of the reasons behind the government's sentencing

7   recommendation is that we view this defendant as a future

8   danger to the community.  Obviously this attack plan was

9   heavily influenced and inspired by the radical ideologies

10   of Osama Bin Laden and the like.  The defendant has not at

11   all renounced those ideologies that inspired his planned

12   attack.  In fact, in his letter to the court there is

13   really no significant expression of remorse.  There is no

14   acknowledgment of the would-be victims and how they must

15   have felt when they learned about this plot.  There is

16   nothing of this sort.

17      What he does say is that he was, quote, "emotionally

18   driven," quote, "not thinking with my head, but from my

19   heart."  These ideologies are what is in his heart.  And

20   that's why we view him as very dangerous upon his release

21   from prison.

22      The mental health evidence here is a double-edged

23   sword, because the defense paints him as a follower,

24   easily influenced.  We have every reason to believe he

25   will continue to be under the spell of these ideologies

    1    when he gets out of jail.  He will be just as dangerous

    2    then as he is now, which is also why we ask the court to

    3    impose a lifetime term of supervised release.

    4        The defense asks for a 17-year sentence, and they

    5    point to evidence they say is mitigating:  Mental health,

    6    his difficult upbringing, this is a sting case, he has

    7    been in solitary confinement.

    8        The bottom line, your Honor, as to this evidence, to

    9    the extent the court views any of it as mitigating, I

   10    would submit that the plea agreement that the parties

   11    entered into has already built in that mitigation.  A

   12    19-year sentence is already sufficiently mitigated.  The

   13    guidelines call for a life sentence.  There was a 30-year

   14    mandatory minimum here.  I would submit that a 19-year

   15    sentence gives the defendant full credit for any

   16    mitigation, to the extent it is deserved.

   17        Your Honor, we recommend what we believe is a fair and

   18    just sentence in this case, a 19-year prison term, and a

   19    lifetime term of supervised release.

   20            THE COURT:  Thank you.

   21            MS. WELLMAN:  Good morning, your Honor.

   22            THE COURT:  Good morning.

   23            MS. WELLMAN:  I would like to begin with just a

   24    couple of, for lack of a better word, housekeeping

   25    matters.  One, I wanted your Honor to know that Ms. Binta

1   Moussa-Davis is in the courtroom on behalf of

2   Mr. Abdul-Latif, as she has been for all hearings.

3        Two, we have moved to seal all exhibits that were

4   attached to our sentencing memorandum.  And I realized in

5   hindsight that really there is only a justification for

6   the defense expert report, that goes from Page 1 through

7   110.  We have no objection to your Honor unsealing the

8   remainder of the exhibits, including Abdul-Latif's letter

9   to the court.  I am happy to provide a revised copy of

10  that after this morning.

11       The third thing is, although Abdul-Latif is not

12  comfortable speaking before your Honor today, you do have

13  his letter.  It is important, given your Honor's comments,

14  that despite his note to your Honor that he dreams of

15  being able to see his young son walk out of high school

16  from anywhere but the confines of his cell, he stands by

17  the plea agreement, as do Mr. Levin and I, and support it.

18  I believe it is fair and just.

19            THE COURT:  Ms. Wellman, let me stop you there.

20  What Mr. Abdul-Latif wrote, at least the way I read his

21  remarks, was that I had the ability to sentence below,

22  which I do, but that there would be no consequence to

23  that, and it was something that he urged me to consider.

24  The point I want to make is, my understanding of

25  11(c)(1)(C), should I sentence outside the range that is

 1   specified there, either side has the opportunity at that
 2   point to withdraw from the plea agreement.  That seemed to
 3   me to be somewhat inconsistent to the advice that
 4   Mr. Abdul-Latif understood.  That was the point I was
 5   trying to make.
 6           MS. WELLMAN:  Thank you, your Honor, for
 7   clarifying.  I believe Mr. Abdul-Latif does understand
 8   that, your Honor.  I think it was more indicative of his
 9   hope and what is driving him in terms of the significant
10   penalty that he has agreed to endure.
11       The third thing is, despite our disappointment in how
12   this investigation unfolded, I do believe that -- we
13   appreciate that Mr. Dion and Mr. Greenberg ultimately
14   exercised some restraint and reason and responsibility to
15   resolve the case in a fashion that also benefits the
16   co-defendant Walli Mujahidh.
17       We, of course, do not agree in terms of the
18   appropriate sentence, but they were respectful of and
19   listened to our concerns that by virtue of their agent's
20   misconduct in this case we had little means of achieving a
21   fair trial no matter what rulings your Honor did make.
22       And when we struggled with the Bureau of Prisons over
23   the course of the last two years with respect to his
24   isolation, they did listen and try to help us in that
25   regard.  And for that we thank them.

1      We, nevertheless, do disagree that an additional two

2   years, and a lifetime of supervision, somehow better

3   serves any legitimate goal of sentencing than the 17 years

4   that we have asked for.

5           THE COURT:  I am going to interrupt you just to

6   add one more point for you to cover.  Mr. Greenberg said

7   something that I have in my notes, which is, I find a

8   tension between your five-year period of supervised

9   release and the material you presented in terms of the

10   continuing nature of Mr. Abdul-Latif's situation.  I would

11   like you to cover that as part of this.

12           MS. WELLMAN:  Thank you, your Honor.  The

13   five-year term of supervision, we basically deferred to

14   the Probation Department, which not only has better

15   knowledge of their resources and responsibilities, but

16   also their mission.  It also is in keeping with the other

17   cases of this nature, with the kinds of supervised release

18   terms that were imposed in cases that did not go to trial,

19   but instead were resolved by plea.  They seem to vary

20   between five years and ten years.  But, for the most part,

21   five years.

22      Our contention with the government in that regard is

23   they seem to be saying -- well, they did in their

24   memorandum, that life is necessary, quote, "It is a

25   mechanism in place to always monitor Abdul-Latif's

1      activities," end quote.  First, that is not the Probation

2      Department's role.  Their role is to help a defendant

3      transition back into the community and to, quote, "bring

4      about long-term positive change in this individual under

5      supervision."  If this case teaches us anything, it is

6      that the government is hardly lacking in their ability to

7      otherwise monitor or target people who engage in rhetoric

8      against the United States.

9          Mr. Abdul-Latif does not require monitoring for the

10     rest of his life.  Again, it was in their memorandum, as

11     well as repeated here today, that it seems to stem from

12     the idea or assumption that Mr. Abdul-Latif has not

13     disavowed the radical ideology, nor expressed meaningful

14     remorse for his conduct to the Probation Department, the

15     court or the experts.  In that regard, they are simply

16     asking your Honor to ignore his letter to the court, as

17     well as the fact that he pled guilty.

18         Second, none of the experts were asked to address his

19     feelings now.  All were trying to assess his psychological

20     makeup leading up to and at the time of the offense.

21     There was no reason for that topic to be broached.

22         And, third, yes, he is still a Muslim.  But you can be

23     a practicing Muslim and not be a radical terrorist.  To

24     assume otherwise invites the kind of discrimination and

25     hostile attitude that is rightly so criticized for many

1    reasons.   The court should not condone that kind of

2    unfairness.

3        What the government left out in quoting Abdul-Latif's

4    letter to your Honor is the fact that he also said I have

5    seen the error of my ways.   His wife echoes those exact

6    same sentiments.   So a lifetime of supervision really

7    serves no legitimate purpose.

8        In terms of the gravity of the offense, no doubt it

9    makes it very difficult for anyone, most importantly the

10   government and the Probation Department, to look at any

11   other facts in the case, including the offender before the

12   court.   But we cannot be so appalled by the offense that

13   we lose sight of the offender.

14       Our point is that a fair assessment of the case asks

15   this court to look at the man, who from a very early age

16   did not have a chance.

17       We also ask your Honor to, in understanding the

18   offense conduct, and understanding Abdul-Latif's role in

19   the offense, that your Honor should consider the

20   informant, his actions and the misconduct of all of the

21   government agents.   Those facts do inform the nature and

22   circumstances of the offense, and they do inform

23   Mr. Abdul-Latif's role.

24       In looking at the seriousness, the government really

25   almost entirely ignores both of these considerations, and

 1    as argued today, rests largely on the idea that

 2    Abdul-Latif -- this was all Abdul-Latif's idea, he

 3    recruited Walli, and the notion that he engaged in

 4    detailed planning as a mastermind, if you will.  That's

 5    what we are saying:  He is not.  He did embrace the plot.

 6    He did participate in it.  That's why we are before the

 7    court.  But they are layering a sophistication to

 8    Abdul-Latif that, with all due respect, is simply not

 9    there.

10        In terms of Walli, as noted by the Probation Office,

11    there is insufficient evidence to suggest that Abdul-Latif

12    recruited Walli and directed him as a subordinate.  The

13    government didn't object to that conclusion during the

14    presentencing process.

15        The evidence really just showed two friends that may

16    have been talking about the documented atrocities

17    overseas, but there was only talk before Childs came onto

18    the scene.

19        Abdul-Latif --  There is evidence in the recordings

20    that Childs manipulated and groomed Walli.  I think that

21    is best addressed by his own attorneys when he appears

22    before the court for sentencing.

23        When the government notes that Abdul-Latif is waffling

24    around June 10th, June 11th, they say we have got to push

25    this Walli thing.  So I think it is unfair and incorrect

to suggest that Abdul-Latif is more egregious, or is
somehow a leader because Walli came on board.

     In terms of the notion of planning and developing the
plan, there is two main categories.  Again, really the
government wants this court to ignore the facts about the
informant, and simply trust his words about the inception
of the plan.

     It also asks your Honor to basically ignore
Abdul-Latif's life and limitations, and how the
investigation was orchestrated and manipulated by the
government.

     In fact, there is only two lines mentioned in their
entire memorandum with respect to the informant.  They
say, "The use of an informant does not mitigate against
culpability."  And, of course, the informant inevitably
had to be a part of the planning.  The use of an informant
is not what insults the defense in this case.  What
insults us is that they used a manipulative, narcissistic,
incredibly heavily paid informant, and then allowed that
person to -- and his handler to destroy evidence that was
critical to our entrapment defense and a fair trial.

     The informant, self-described as a barracuda, is not
an honest man.  I am not going to repeat all of the
information set forth in our memorandum.  I trust your
Honor read it.  But I would like to highlight a portion of

1    the transcripts that from our perspective really

2    demonstrates how Childs operates, and was allowed to

3    operate, given the blind reliance on his word and

4    entrusting him with evidence.

5        His excuse for destroying the evidence was that he

6    didn't want to get in trouble with his CCO officer.  The

7    chrono reports, however, show that he met with his CCO

8    during the sting operation, and one can only assume she

9    was doing her job right.  At one point she does comment

10   that she should have been more strict with him, in terms

11   of penalizing him when he messed up.  But there is no

12   mention in the chronos of any sexting or inappropriate

13   internet activity before she looked at the phone on

14   September 12th.  He had destroyed it before July 1st,

15   2011.

16       By the time the federal authorities finally asked him

17   about it, which is eight months later, he had already been

18   in trouble five months before for the September sexting

19   and using the internet and possession of pornography.  So

20   what it tells me is that it is a transparent excuse that

21   is repeated by the government, it is convenient.

22       What is interesting, in terms of understanding this

23   man's mentality, is that he doesn't admit the violations

24   when questioned until his CCO then says, well, then let me

25   see the phone.  Then, oh, here is more information.  Even

1    then he tries to manipulate the facts.

2        I would like to play for your Honor a clip from one of

3    the transcripts provided.  This is CCO Jackson describing

4    what the informant has done and how she found out about

5    it.

6        (Audio played.)

7            THE COURT:  Can we start over?

8            MS. WELLMAN:  Sure.

9        (Audio played.)

10           MS. WELLMAN:  I would note, your Honor, we were

11   not provided with this information from the government.

12   We had to secure it ourselves.

13       What is also telling is that when he is asked to

14   explain the violation, he has an answer for everything,

15   until he is confronted with the facts, where he changes

16   the answer, and then again repeats that he doesn't want to

17   make any excuse, but he has justification.

18       I would like to play a portion of that.

19       (Audio played.)

20           MS. WELLMAN:  This is the man we are supposed to

21   trust about the inception of the plot.

22       In terms of the notion of once Abdul-Latif does

23   embrace the plot, and our point is that he is manipulated

24   along the way, the government really ignores the

25   manipulation within the entire plot.  I am not going to

1 repeat what we noted about the June 6th recording.  I

2 think excerpts were played this morning, and you can see

3 it is in the infancy, in that Abdul-Latif and Childs are

4 really talking about it for the first time.

5  Thereafter, we do believe there are plenty of excerpts

6 that show the informant is manipulating Abdul-Latif, as is

7 the informant's handler, to keep Abdul-Latif on course.

8  For instance, Childs gave Abdul-Latif a map of the

9 MEPS that didn't have the childcare center.  Abdul-Latif

10 has repeatedly said throughout all of the recordings his

11 concern about women and children.  On June 10th Childs

12 assures Abdul-Latif that there are no civilians at the

13 MEPS.  Childs later asked, was I right, did I get that

14 right, that it is only military?  DeJesus says no, he

15 wasn't, but it didn't matter.  Well, it does matter.

16 Because, here again, we have a moment where we don't know

17 what would have happened if they had not manipulated the

18 facts.  The emir examples in our memorandum, I won't

19 repeat that.

20  But I also think the no way out is also an example of

21 the manipulation here, although the government reads it

22 differently.  I did not hear the government say it

23 disagrees with the fact that if you are doing a sting

24 right, you offer multiple chances to back out.  There are

25 only two occasions in this case where that topic was

1    broached by the informant.  June 6th, the informant is

2    questioning Abdul-Latif, does he want to go through with

3    it.  Abdul-Latif ultimately responds, if something major

4    happens, like FBI watching, for example, then we will call

5    it off.

6        Then June 21st, during a lunch with the informant and

7    Walli, the informant says, hey, you both can back out; I

8    wouldn't hold it against you.  This falls far short of the

9    multiple chances to back out, particularly when you look

10   at the facts between those two days.

11       On June 6th, and I believe the government played it

12   for the court today, Abdul-Latif is really raising a

13   number of items about -- concerns about the attack that

14   are causing him pause.  If you hear it, Childs has an

15   answer for every single concern.

16       Abdul-Latif earlier on is saying, "I am getting off

17   work, I am tired, I want to go watch the NBA finals," and

18   then he starts rambling about there's no element of

19   surprise, where is the door, the concrete barrier.  Each

20   time Childs has something to say, no problem, it is easy,

21   this is an easy solution.  It is against that dialogue

22   where he says, by the way, you can back out if you want.

23       On June 8th, at Disk 520, Abdul-Latif is looking to go

24   abroad.  Childs directs him back to the plot.  He says,

25   quote, "You've got something chosen.  Let's just stick

1  with that now.  Let's not move around different, you know,

2  because when you start doing that, you are going to start

3  losing focus.  It gets easy to be scatterbrained."

4      On June 10th Childs tells Abdul-Latif repeatedly to,

5  quote, "Stick with the plan."  He later admits to the

6  authorities that what he was trying to do is, quote,

7  "Bring him back to just one plan."

8      By this point, June 10th, June 11th, law enforcement

9  has notice that there has been a lot of talking -- just

10 talking, and the fact that Childs is more aggressive than

11 normal, he is jabbering.  Detective DeJesus tells the

12 informant, you did good, but you did too good.

13     And when he gets in trouble for introducing a fourth

14 person to the plot, the informant says no problem, it is

15 super easy for me to just tell Abdul-Latif they won't use

16 a fourth.

17     The agents then have to explain to Childs basically an

18 entrapment defense, that if he is the one introducing the

19 fourth person, then it is the informant's idea, it is not

20 Abdul-Latif's.  And Childs simply responds, well, I am

21 just getting comfortable in my role.  DeJesus responds,

22 that's the thing we don't want.  We don't want you to lead

23 the attack.  He is instructed, the more you talk, the less

24 he, meaning Abdul-Latif, can't talk.

25     They also notice that Abdul-Latif is waffling.  Again,

1   this is June 10th, June 11th.  According to DeJesus, he

2   specifically says, Abdul-Latif -- it is hee and haw a lot.

3   They note with curiosity that this is no longer a suicide

4   mission, that there is some idea that these guys will get

5   out alive.

6       Detective DeJesus comments, quote, "I think he is

7   thinking about some more -- his family.  And then the

8   combination of that and your coming in, you know, a little

9   more aggressive than normally, I think has got everybody

10  mixed up."  So the plan on the 10th and 11th is,

11  quote-unquote, "Step back a little bit," and "let things

12  simmer."  These are the instructions of the handler.

13          THE COURT:  Ms. Wellman, I'm sorry to make you

14  backtrack.  But I am confused on one point.  I understand

15  that the origination of the MEPS location came from

16  Mr. Abdul-Latif.  That's the implication that I have taken

17  from the tape that has been played previously and that I

18  have read in the transcript.  Are you now telling me that

19  you challenge that assertion?

20          MS. WELLMAN:  That I challenge on June 6th

21  Abdul-Latif and Childs discussed --

22          THE COURT:  Who originated the first mention of

23  the entrance processing station?

24          MS. WELLMAN:  I believe that was Abdul-Latif

25  during the conversation on June 6th, including Childs.

```
 1                THE COURT:  Is there anything in the record that

 2    is inconsistent with that?

 3                MS. WELLMAN:  On June 6th?

 4                THE COURT:  That that's not the first time it has

 5    come up, and that Mr. Abdul-Latif is the one who

 6    originated it?

 7                MS. WELLMAN:  No, your Honor.  There are no

 8    recordings before that time because of the choices made by

 9    the government and then the misconduct of the informant

10    and Detective DeJesus.

11                THE COURT:  I understand that.  I am very aware of

12    it.  The question I have is, you certainly have not been

13    hesitant to call out other facts that you say came from

14    Childs, and that they didn't originate.  And I have not

15    heard you make that argument --  I want to make sure I

16    understand where you are on that now.  Are you telling me,

17    yes, it did originate, or you don't want to take an

18    opinion on it, or do you contend that it was originated by

19    Childs?

20                MS. WELLMAN:  I do not contest the recordings from

21    June 6th.  It is a conversation, and it related to the

22    MEPS.  And that is Abdul-Latif's voice saying, "How about

23    the MEPS?"  I do not contest that fact.  I contest sort of

24    the environment in which that conversation was

25    orchestrated.
```

1          So getting back to basically where we were, in an

2      off-camera moment between the informant and the detective,

3      they are saying, let's step back a little bit.  The

4      informant is specifically told, let Abdul-Latif call you.

5      That doesn't happen, actually.  The informant calls

6      Abdul-Latif at 1:00 the next day.  It looks like from the

7      text message traffic between DeJesus and Childs that the

8      informant is essentially operating with DeJesus

9      essentially at his side.  The text messages between

10     DeJesus and the informant start at 9:12 in the morning on

11     June 12th, and they go back and forth before and after the

12     informant calls Abdul-Latif at 1:00.  And all told there

13     was about 40 text messages exchanged.  And, of course,

14     those were destroyed, so we don't know the content.  But

15     clearly they are moving forward as planned.

16          They also didn't leave Abdul-Latif alone.  Again, they

17     were supposed to simmer a bit, in the words of the agents.

18     But instead, they immediately start saying we need to,

19     quote, "Push the Walli thing and get him up to Seattle."

20     And, "We also need to push the weapons."

21          Again, if there was no reluctance on the behalf of

22     Abdul-Latif, why the push, why the rush?

23          As instructed, the informant does continue to push.

24     He tells Abdul-Latif the dealer was questioning why he was

25     going back and forth and hadn't decided yet on what

1    weapons he wanted.  He even tells them -- the informant

2    tells Abdul-Latif that they have to be sure because there

3    is no way once we decide, hey, we don't need these

4    anymore.  He then surprises Abdul-Latif with a

5    show-and-tell that Abdul-Latif had no knowledge of before

6    it happened, on the heels of which the informant pressures

7    Abdul-Latif for money.  "You have seen them, now you have

8    to pay."  Quote, "He just wants to make sure we are

9    serious, so that's why we have to give him this in good

10   faith."

11        Abdul-Latif on the recordings complains about the

12   pressure, noting that the informant has called him three

13   or four times during the days to get him to get the money.

14   So Abdul-Latif gave in.  But like Childs' victims, he

15   groomed and manipulated Abdul-Latif, who was all talk

16   before the informant came along.  You agree to do this,

17   you stick with the plan.  I show you the weapons, you have

18   to pay.  You've paid, now look how serious you are.  The

19   government's recommendation completely ignores these

20   facts, but your Honor should not.

21        Our recommendation for 17 years is really informed by

22   five different areas:  One, the mitigating facts about the

23   offense itself that I have just discussed, none of which

24   change, of course, the fact that Abdul-Latif embraced the

25   idea of attacking MEPS as set forth in our plea agreement.

1    For that, Abdul-Latif is remorseful, and he must be

2    penalized.  But 17 years in prison is hardly a slap on the

3    wrist, and is enough to capture the offense conduct.

4    Whereas, here the informant and the government really did

5    provide the plot, the means and the opportunity,

6    manipulating Abdul-Latif along the way with the helping

7    hand of the government.

8         Second, the government's intentional destruction of

9    evidence should inform the court's decision.  I am not

10   sure what more to say because, as your Honor noted, you

11   are very aware of the facts.

12        I will say this, despite this being an orchestrated

13   operation that is supposed to be gathering evidence, the

14   informant's role from the inception of the conspiracy

15   really remains undocumented.  Law enforcement made that

16   decision.  Law enforcement decided not to record the early

17   communications between Abdul-Latif and the informant.  The

18   informant destroyed all communications, including text

19   messages that were exchanged with the other SPD paid

20   informant who orchestrated and brokered the original deal.

21        And then the informant lied to law enforcement about

22   its destruction.

23        Our investigation disclosed, in addition to the

24   informant's actions, that the detective himself had

25   destroyed approximately 400 text messages between him and

1    the informant during this 20-day investigation.

2        The handler, like the informant, lied, lied to the

3    government, regarding that destruction, by omission of

4    fact, until confronted with the defense evidence.

5        It is not surprising when the actual facts about his

6    employment history were uncovered.  You know, looking at

7    the reprimand back in the '90s, he understood even the

8    loss of a wallet was enough to compromise the prosecutor's

9    case.  And yet, here we are again, having him do the same

10   thing, only in a much more vast case.  Instead of being

11   sanctioned for that destruction, the informant is paid

12   over -- nearly $100,000, although I don't know the exact

13   figure today because no additional information has been

14   brought by the government.  But, also, the detective is

15   made detective of the year.  The government strangely

16   makes no apologies for this conduct, and makes no mention

17   of it in its sentencing recommendation.

18       Interestingly, and I believe he was addressing a

19   different moment, but said today SPD and FBI did exactly

20   what we wanted them to do.  I don't think this is what

21   they wanted them to do, but they did not take the steps

22   necessary to make sure it didn't happen.  A reasonable

23   sentence should take into account the intentional acts

24   that directly impacted Abdul-Latif's ability to go to

25   trial and have a complete defense.

1   The third factor is Abdul-Latif's life and history.

2   I'm not going to try to better summarize that history than

3   our experts, but I will address some of the comments by

4   the government in their memorandum.

5   I disagree that the 19 years somehow calculates the

6   history and the mitigators of Abdul-Latif's life.  I think

7   that 19-year cap, if anything, reflects the seriousness of

8   the offense when no other factors are considered.

9   Abdul-Latif's life cannot be ignored.  The Probation

10  Department summed it up by saying he was raised with

11  little to no parenting and lacked guidance as a youth.

12  As reflected in the reports of our experts and the

13  documents that back those reports up, that barely scrapes

14  the surface of the kind of neglect and abandonment that he

15  suffered throughout his life.  It absolutely fails to

16  encompass the cognitive functioning and limitations of

17  Abdul-Latif.  I believe that the cognitive deficits are

18  best explained by Dr. Adler, which is at Page 46 of our

19  exhibits, and how that plays out.  All of those facts are

20  mitigating factors that made Abdul-Latif the perfect

21  target for someone like the informant.

22  The government takes issue also with Dr. Salusky's

23  report, stating he took everything Abdul-Latif said as

24  true.  That really ignores the fact that Dr. Salusky not

25  only read all of the historical documents, and to the

1   extent it is humanly possible, made note of those

2   documents in his summary of the facts.  But it also said

3   Abdul-Latif is a poor historian.  It also ignores the fact

4   that a psychologist needs to listen to what their client

5   is saying.  It doesn't mean they take it at face value.

6   It means they now have an understanding of what is true to

7   the client, not what is necessarily true from a

8   psychological standpoint.

9        There is no battle of experts here, because even

10   Dr. Muscatel noted that Abdul-Latif is passive,

11   unassuming, seeks the approval of others, is socially

12   alienated, and prefers to avoid conflict so as to avoid

13   assertion.

14        The government's other two experts also agree there is

15   a documented history of grand mal seizures, and there is

16   significant impairment on neuropsychological testing.

17   These facts should inform the court's decision.

18        The fourth category is that he has been punished, and

19   the collateral consequences of his decision.  Seventeen

20   years, again, is not a slap on the wrist.  He has spent

21   the last two years, two years, in isolation.  Only by

22   virtue of our litigation did the circumstances -- the

23   conditions of that confinement improve.

24        The collateral consequences include the impact on his

25   family as well.  And I think that his wife Binta, in her

 1    letter to your Honor, best describes the heartache there.

 2    Those two inform the defense recommendation.

 3        The final factor that informs our recommendation, your

 4    Honor, is the need to avoid unwarranted disparities.  I

 5    agree with the government that it is very difficult to

 6    find any particular case directly on point with the same

 7    facts to dictate or inform your Honor's decision here.

 8    But it, nevertheless, is an important 3553 factor, and it

 9    is one that should be informed by the facts, not simply a

10    list of cases and bottom-line sentences.

11        The government named a number of cases, including

12    El-Khalifi, Finton, Martinez, Cromite, to name a few, to

13    support the notion that, quote, "The majority of sentences

14    fall somewhere between 20 and 30 years."  Well, that might

15    be true for someone who engages in an actual and

16    unsolicited act of terrorism, or those found guilty after

17    trial, but is not true for cases orchestrated like this

18    one.

19        Cromite, the defendants there went to trial.  The

20    court had no choice.  Although she could have imposed

21    life, she went with a mandatory minimum of 25 years.

22        El-Khalifi, that was an immigrant in the country

23    illegally.  He tried to detonate a bomb in a suicide

24    attack at the U.S. Capitol building.  It involved an FBI

25    agent as the undercover, who posed as an armed extremist

group.  The client was taken into custody as he began to

walk towards the capitol carrying a Mac-10 automatic

weapon, and wearing a vest containing what he believed to

be a functioning bomb.

Finton, an American convert to Islam, attempted to

bomb a federal building and a congressman's office.  After

receiving money from someone in Saudi Arabia, he then flew

to Saudi Arabia and spent a month there.  When he returned

he somehow came in contact with an FBI agent who posed as

an al Qaeda operative.  They put the plan in motion.

Finton drove a truck filled with what he believed were a

ton of explosives to the location, and then with the FBI

agent, drove away, and then tried to detonate the

explosives from his cell phone.

Both Finton and El-Khalifi involved far more

significant steps, and in the case of Finton, an actual

terrorist organization.

The same is true for Martinez, Smadi and Ahmed.  The

difference from all of these cases, though, is none of

these cases involve --  These cases involved an FBI

informant, skilled at making sure people have the means to

get out, making sure that they are not leading the attack,

and hardly the same as the kind of manipulative, deceitful

informant we have in this case.

None of these cases include the intentional

```
1   destruction of evidence.  The two cases that we do share
2   in common in our briefs is Amawi and Ferdaus.  The
3   government cites Amawi and simply notes a 20-year term was
4   imposed.  As we set out in our defense memorandum, Amawi
5   was the only defendant in that case who received 20 years;
6   the others received 13 and a half and eight, respectively.
7   More importantly, the 20 years was imposed post-trial.
8        That leaves Ferdaus.  Ferdaus was arrested around the
9   same time as Abdul-Latif, and it included a mentally
10  vulnerable target, Ferdaus, and a dirty informant.  It did
11  not, to counsel's knowledge, include the destruction of
12  evidence.  Ferdaus received 17 years.
13       Can the court impose 19?  You can.  But the question
14  is, should you?  And our position is humanity, common
15  sense and justice says no.  An additional two years does
16  not better serve any legitimate goal of sentencing.
17       Thank you, your Honor.
18           THE COURT:  Mr. Abdul-Latif, I understand that you
19  may not wish to address the court, but I need to alert you
20  you have that opportunity.  I draw no inference one way or
21  the other.  We do this every Monday, you don't.  If you do
22  wish to address the court, you can just slide the
23  microphone over and speak from where you are.  That choice
24  is entirely up to you, sir.  But I do need to advise you
25  that you have the right if you wish to do so.
```

          MR. LEVIN:  Your Honor, Mr. Abdul-Latif stands by

his letter.  He doesn't wish to address the court.

          THE COURT:  All right.  Counsel, I have lived with

this case for a while, and I think I have a good

understanding of it.  It has taken a number of unusual

twists and turns as we have proceeded.

     The current sentencing regime in the Ninth Circuit

advises me at this point that I am to state my conclusions

regarding total offense level, criminal history category

and guideline range, and that I am to take that as my

starting point and to remain cognizant of it throughout

the process.

     Having established those criteria, I don't think that

there is any real dispute that this would be a total

offense level of 48, a criminal history category of 6 and

a guideline range sentence of life imprisonment.

     As I explained at the beginning, however, the court

accepted the Criminal Rule 11(c)(1)(C) plea in this

matter.  As a part of that acceptance I obligated myself

to sentence between 17 years and 19 years, unless I wish

to set aside the guilty plea, or give the parties the

opportunity to set aside the guilty plea.

     What I understand my role to be is that, even in the

use of an 11(c)(1)(C) plea, I am to look to 18 U.S.C.

3553(a), with a touchstone of a sentence which is

1    sufficient but not greater than necessary to acknowledge

2    the considerations that are set out in that statute.  So

3    in helping me decide between 17 to 19 years, I am going to

4    conduct the traditional 18 U.S.C. 3553(a) analysis, which

5    is the format that each of the briefs that were submitted

6    in this matter the arguments are set out in.

7        The first of those factors is the nature and

8    circumstances of the offense.  Parenthetically, I would

9    note that this is an unusual case, one that this court has

10   not had before, in that certain of the evidence presented

11   came to the court under the Classified Information

12   Procedures Act.  Because of the nature of that material or

13   the processes used to collect it, it is not made available

14   to the defendant.  It is, however, made available to the

15   court.  The court is assigned the duty of making sure that

16   things that could serve as exculpatory evidence are

17   provided to the defendant.

18       I can say that most, if not all, very close to all of

19   the information that I have used in this is available to

20   all of the parties, and I have largely used the statement

21   of facts found in the plea agreement in arriving at my

22   decision.

23       Turning then to the first of those factors, the nature

24   and circumstances of the offense.  Mr. Abdul-Latif pled

25   guilty to conspiracy to murder officers and employees of

1  the United States, and guilty to conspiracy to use weapons

2  of mass destruction.

3       As I have gone through my notes from all of the

4  hearings held in this matter, of which there have been a

5  number, I believe that it is a fair statement of the case

6  that there was a conspiracy to kill United States military

7  personnel in retribution for perceived wrongs committed by

8  the United States in the Middle East, and that that

9  conspiracy planned an attack on a military entrance

10 processing station here in Seattle.

11      The evidence fairly read is that Mr. Abdul-Latif held

12 meetings to organize this, that he conducted surveillance

13 of the location, that he ordered and purchased weapons to

14 carry out the attack, that the location was his idea,

15 evidencing some familiarity with military service.  That

16 included planning the attack on a day when recruits being

17 processed would be present, with a stated intention of

18 killing the mostly young people who would be there, and

19 not just the older guards.  And, sadly, which

20 Mr. Abdul-Latif now regrets, and I accept that, that

21 killing these young people would appear on various news

22 outlets and inspire others to commit similar acts.

23      Based on that, I find that the motivation for this

24 attack was terrorism, and that the idea of an attack was

25 the defendant's, an activity which he described at one

```
 1    point as a violent jihad.
 2        In response to those arguments the defense makes a
 3    number of counter arguments.  What Ms. Wellman just
 4    described as the mitigating facts regarding the
 5    activities, or more precisely the entrapment activities, a
 6    broadside attack on the veracity of the confidential
 7    informant used by the Seattle police, a broadside attack
 8    on the, at best, sloppy and alleged to be intentional
 9    destruction of evidence, not only by the confidential
10    informant but by the Seattle police officer who supervised
11    him, those would all fall under the nature and
12    circumstances of the offense.
13        I will restate again, as there is a plea agreement in
14    this matter, and there has been a plea of guilty, I don't
15    intend to revisit entrapment as it regards guilt, but I do
16    consider it as part of Factor One in the 3553(a) analysis.
17        I disagree with the assertion that the offense did not
18    involve any real threats or loss of lives.  It is true
19    that it did not take place, and mercifully we did not have
20    any loss of lives.
21        I think that is something that all of us, including
22    Mr. Abdul-Latif, are thankful for.
23        I disagree, however, that the plot was manufactured by
24    a deceitful, manipulative, paid informant.  The government
25    did not provide the instigation of this plot.  I go back
```

1  to the YouTube videos which begin long before the

2  involvement with the confidential informant, in which

3  Mr. Abdul-Latif speaks in the language of violence, and

4  wishes harm to those people who he feels are acting badly

5  in foreign affairs.

6      There are a lot of transcripts of conversations in

7  which I hear Mr. Abdul-Latif in his own words saying

8  things that make it clear that he was an active

9  participant in this conspiracy.

10     There is nothing in my remarks today which should be

11 taken as expressing approval of the confidential informant

12 or of the handling of the evidence in this matter, which

13 had reached a point where the government's case was going

14 to be impacted, and which both sides wisely viewed as a

15 good time to reach a resolution of this.

16     But in regards to that first factor, nature and

17 circumstances of the offense, I believe the government,

18 the defense and the court are all of the view that these

19 crimes are indeed serious crimes.  Were this matter

20 treated as a starting point, it would be a sentence of

21 remarkable length, in which Mr. Abdul-Latif would be

22 removed from society.

23     I turn then to the second consideration, the history

24 and characteristics of the defendant.  Mr. Abdul-Latif is,

25 I believe, still 35 years old.  He is a father.  He has a

1    five-year-old son.  He has a wife who has been supportive,

2    attended all of these hearings.  He came from a very

3    difficult childhood, in which he lacked guidance and

4    upbringing, and was largely ignored by his parents when he

5    was younger.

6        It also is clear from all of the evidence that is

7    before the court that the defendant believed in the

8    teachings of certain individuals, and that the views that

9    he held would be considered radical political views that

10   endorsed a violent ideology.  I would stress that I said

11   "radical political views," and not radical Islamic views,

12   because there is a wide variety of views inside of Islam.

13   Mr. Abdul-Latif chose to become affiliated or follow a

14   particular political view espoused by some people that,

15   unfortunately, endorsed violence as an ideology.

16       The remainder of my comments in regards to the history

17   and characteristics of Mr. Abdul-Latif are somewhat

18   compromised by the fact that the parties during the course

19   of this litigation stipulated that during mental exams no

20   questions about the offense conduct would be permitted due

21   to issues of self-incrimination.  The defendant has now

22   introduced extensive reports by various medical personnel.

23   I have reviewed those.  Some of them I believe there is no

24   controversy about.  Others of them, the government and the

25   defense are of different points of view.  Frankly, some of

1    the conclusions reached by the defense medical team are

2    inconsistent with what I see as the conduct in this case.

3        But I have considered Mr. Abdul-Latif's life and

4    history.  I have considered the partial fetal alcohol

5    syndrome contention, the alcohol-related neurodevelopment

6    disorder, the dependent personality disorder, the

7    post-traumatic stress disorder, all of which are urged by

8    the defense.  I have treated them as relevant to the

9    history and characteristics of the defendant.  So that our

10   record is complete, those include my review of Dr. Adler's

11   forensic evaluation and his supplemental forensic

12   examination; Dr. Connor's graphic charting, that was

13   interesting, and his supplemental report; Dr. Breen's

14   forensic neurological examination; and the psychological

15   examination of Dr. Salusky.

16       What ultimately I draw from this is that

17   Mr. Abdul-Latif had a difficult upbringing, that he has

18   both physical and mental issues, that he became a disciple

19   of a radical ideology, and that he meaningfully

20   participated in the conspiracy to carry out those radical

21   and violent views.  Therefore, there is both factors that

22   favor Mr. Abdul-Latif and factors that do not favor him in

23   his history and characteristics.

24       The question that the court has struggled with is the

25   one of looking at the range of sentences in this matter.

 1    They are all well above the circumstances that the

 2    11(c)(1)(C) plea -- let me say the range of sentences that

 3    the 11(c)(1)(C) contemplates.  I think that the range is a

 4    recognition of the history and characteristics of the

 5    defendant.

 6         The third consideration or group of considerations is

 7    the seriousness of the offense, the need to promote

 8    respect for the law, and to provide just punishment.  Of

 9    those, just punishment is the one that really encapsulates

10    the other two, the seriousness of the offense and the need

11    to promote respect for the law.

12         The guidelines in this matter would require me to

13    impose a life sentence, or would recommend a life

14    sentence.  I have not pursued the question of a mandatory

15    minimum, but there is discussion in the pleadings that it

16    would be a 30-year mandatory minimum.

17         Instead, the plea that the court has accepted limits

18    the range to 204 to 228 months.  I believe that a sentence

19    in that range reflects the seriousness of the offense,

20    which the court has previously indicated it finds to be

21    very serious, as well as the unique evidentiary situation

22    that was created by the conduct of the investigation, and

23    plays into the question of what is just punishment.

24         The fourth 3553(a) factor is deterrence to criminal

25    conduct such as this by others.  Normally that is not one

     1    of the higher factors in the court's consideration.  In

     2    this, however, Mr. Abdul-Latif made it so because of his

     3    view at that time that this crime was intended to motivate

     4    others.  He spoke approvingly of other individuals who

     5    have committed mass shootings, and hoped that his actions

     6    would motivate others to emulate him.  Therefore, this

     7    sentence does need to deter this type of criminal conduct

     8    by others.

     9        In regards to the need to protect the public from

    10    further crimes by Mr. Abdul-Latif, I am going to count on

    11    my old friend of age and experience as our best defense

    12    from future crimes.  I intend to impose a period of

    13    supervised release of ten years, because I am comfortable

    14    that after a period of incarceration, and a period of

    15    supervised release, that whatever issues pertain to

    16    susceptibility to future crimes, capacity to commit future

    17    crimes, will have largely passed, and that consideration

    18    will have been met.

    19        Finally, the sixth consideration to the court is the

    20    need to provide the defendant with appropriate services.

    21    That's why I am asking that the defense recommendations be

    22    made clear in the judgment.  Some of those involve further

    23    education, an opportunity to learn vocations that would

    24    make him employable.  I certainly endorse those.

    25        The other part of the sixth factor is the need to

1   avoid unwarranted sentence disparity.  That's an argument

2   that is often made in this court.  It is a difficult one.

3   The answer for consistency in sentencing in the view of

4   the United States Congress is the guidelines.  They were

5   intended, as they were originally authored, to prevent

6   disparity and encourage consistency.

7       The regime that I am asked to implement is one that

8   asks me to look at each defendant individually and make a

9   determination as to how those 3553(a) factors are best

10  applied.  By that very task it promotes lack of

11  consistency because sentences need to be tailored.  I

12  would only note in this matter that each case is unique.

13  If we had gone to trial, and Mr. Abdul-Latif had been

14  convicted, the recommended sentence would have been life.

15      The cases that are argued to the court are strongly

16  influenced by the location of the forum.  And I won't

17  highlight which two states seem to favor longer sentences

18  and those that have adopted lesser sentences.

19      But I will say that one reason why unwarranted

20  sentence disparity is somewhat a lesser factor in this,

21  besides each case being unique, is the fact that the

22  parties have recommended to the court, and the court has

23  accepted a range, which by its very nature makes those

24  other sentences to be somewhat less persuasive.

25      Finally, I would say that the court is well aware of

1    the unique circumstances of the time that Mr. Abdul-Latif

2    has been incarcerated, and the difficulty of that

3    incarceration.  It is something that I have intervened in,

4    with calls to the Bureau of Prisons, both in regard to

5    Mr. Abdul-Latif's treatment and also the accommodation of

6    his wife.  It is certainly a situation where it is

7    mentioned many times in the cases that I have read, the

8    terrorism cases I have read, where it is noted that the

9    very difficult circumstances that terror suspects are

10   placed in is a punishment different from mere

11   incarceration.

12       I am hopeful that, although I have no control over

13   this, that the Bureau of Prisons as it evaluates

14   Mr. Abdul-Latif is able to place him in a location where

15   he is not subject to as harsh of conditions as someone who

16   faces a community of people who would have been greatly

17   impacted had the plot gone forward and faced with the

18   potential loss of young people's lives.

19       The last argument made by the defense in this case has

20   to do with the intentional, as they described it,

21   destruction of evidence.  I think that is well

22   acknowledged by the fact that they ended up with an

23   11(c)(1)(C) plea, at less than the goal they started with.

24   And, secondly, my consideration of those evidentiary

25   questions as a 3553(a) factor for the nature and

 1     circumstances of the offense.

 2         And, finally, as I have already noted, it is my

 3     intention then to do ten years of supervised release.

 4         Having done the most thorough job that I can in this

 5     matter, I am left then with the question of what is the

 6     appropriate sentence.  I believe that the most appropriate

 7     sentence in this matter is one that is not recommended by

 8     any of the parties, and that is a sentence of 18 years.

 9         I do that, having started with the guideline range,

10     controlled by the 11(c)(1)(C) plea in this matter, with

11     full acknowledgment of the incredible harm that would have

12     been done had this gone forward, and balanced against the

13     3553(a) factors, trying to treat Mr. Abdul-Latif as an

14     individual and not simply as a face of terrorism.

15         Therefore, as to Counts 1 and 2, the defendant shall

16     be committed to the custody of the United States Bureau of

17     Prisons for a term of 18 years.  Upon release from

18     imprisonment, the defendant shall serve a ten-year term of

19     supervised release, subject to the standard conditions, as

20     well as the special conditions that are set out in the

21     sentencing recommendation, and are to be incorporated into

22     the judgment.

23         The court finds the defendant does not have the

24     ability to pay a fine, and the defendant shall pay a

25     special assessment in the amount of $200 for Counts 1 and

1    2, which shall be due immediately.

2        As I understand it, the defendant requests

3    consideration of placement in either Oxford, Wisconsin or

4    in FCI Berkeley, which is located in Beaver, West

5    Virginia, because of their college programs.  If those are

6    unavailable, he requests consideration of Manchester,

7    Kentucky, because of family connections.

8        Mr. Abdul-Latif, I think you know that I can't control

9    what the Bureau of Prisons does in terms of your

10   placement, and I don't know how they will evaluate you in

11   terms of their various categories of incarceration, but

12   that will be the materials contained in your judgment, as

13   those are your requests.

14       I will ask each counsel if they have anything further

15   to argue that they have previously not argued.

16   Mr. Greenberg.

17           MR. GREENBERG:  I don't, your Honor.  I have one

18   question on the recommendation to BOP at the appropriate

19   time.

20           THE COURT:  This would be a good time.

21           MR. GREENBERG:  The defendant, it appears to me,

22   was also asking in the first instance to be housed at a

23   Washington state correctional facility.  I don't know if

24   the court intended to address that.

25           THE COURT:  I am told, because of the nature of

1  the charges, that is not going to be a consideration.  We

2  can include it, but it is my understanding that is not

3  going to happen.

4          MR. GREENBERG:  Shall I include the language, your

5  Honor?

6          THE COURT:  Sure.  Ms. Wellman.

7          MS. WELLMAN:  That was going to be my only

8  question.  I appreciate that you are going to include it

9  in the judgment.  Mr. Abdul-Latif understands it is not

10  binding, and may not be possible.

11          THE COURT:  There seems to be a range of charges

12  where the government doesn't designate to state

13  facilities.  I understand this is within that group.  It

14  is up to the Bureau of Prisons.

15          MS. WELLMAN:  I understand.

16          THE COURT:  Having heard from counsel, that will

17  be the judgment of the court.

18     Mr. Abdul-Latif, as part of your plea agreement, you

19  entered into an agreement which waives your rights to

20  appeal, including the sentence itself.  Such waivers are

21  generally enforceable, but if you believe that the waiver

22  is unenforceable, you can present that theory to the

23  appellate court.

24     If you wish to do so, you have a right to file

25  in forma pauperis, and the clerk of the court could

1    prepare and file a notice of appeal at your request.  You

2    should be aware, with few exceptions, any notice of appeal

3    must be filed within ten days of the entry of judgment,

4    which will likely occur today.  And I request that a full

5    copy of the presentence report and the judgment be

6    provided to the Bureau of Prisons, and also to the U.S.

7    Sentencing Commission.

8              MS. WELLMAN:  Your Honor, I have had an

9    opportunity to review the judgment.  I believe it reflects

10   your Honor's order.  May I approach?

11             THE COURT:  You may.

12             MS. WELLMAN:  Your Honor, my wise boss just

13   reminded me, it is helpful in these kind of cases,

14   particularly given your Honor's comments, to say recommend

15   no solitary confinement.  Is that something your Honor

16   would be willing to do?

17             THE COURT:  Sure.  I have never seen that done,

18   but I will take your word for it.

19             MS. WELLMAN:  Thank you, your Honor.  May I

20   approach?

21             THE COURT:  You may.  Mr. Greenberg, you should be

22   giving handwriting lessons to your fellow U.S. Attorneys.

23   I can actually read your name.

24      I have signed the judgment in a criminal case, dated

25   it March 25, 2013, and am returning it to the clerk for

1     filing at this time.

2         Anything further from the government?

3             MR. GREENBERG:  No, your Honor.

4             MS. WELLMAN:  No, your Honor.  Thank you.

5             THE COURT:  Mr. Levin, I understand you are not

6     with us anymore.  Nice to see you again.

7         Mr. Abdul-Latif, it has been an interesting experience

8     for the court.  I appreciate the fact that you have put up

9     with a lot from me.  The defense will tell you that they

10    have put up with a lot from me.  The government can tell

11    you they have put up with a lot from me.  I hope that what

12    we have done today represents justice.  We will be in

13    recess.

14                        (Adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8

9          I, Barry L. Fanning, Official Court Reporter, do hereby
certify that the foregoing transcript is true and correct.

10

11                                    S/Barry L. Fanning

12                                    _____

13                                    Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25