THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.  CR 11-228JLR |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S MOTION FOR |
| | ) | COMPASSIONATE RELEASE |
| vs. | ) | PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) |
| | ) | |
| ABU KHALID ABDUL-LATIF, | ) | **Oral argument requested** |
| | ) | |
| Defendant. | ) | **Note for consideration: September 4,** |
| | ) | **2020[1]** |
| | ) | |
| | ) | |
| | ) | |

## MOTION

Abu Khalid Abdul-Latif, through counsel, respectfully moves this Court to reduce the

sentence imposed to time served pursuant to 18 U.S.C. § 3582(c)(1)(A), which provides this

Court with authority to reduce a sentence if "extraordinary and compelling reasons warrant such

---

[1] The government intends to file a motion to set a briefing schedule for its response to September 9, 2020, with an optional reply brief due on September 18, 2020. The defense has no objection to the request for additional time and re-noting the motion to September 18, 2020, if the motion is granted by the Court.

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 1
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

a reduction." As stated herein, the COVID-19 pandemic and high risks posed to Mr. Abdul-Latif, who is a medically compromised individual and is incarcerated where there are active COVID-19 cases, is an extraordinary event and relief is in keeping with U.S.S.G. §§ 1B1.13, cmt. n. 1(A)(ii) and/or 1(D). Mr. Abdul-Latif is not a danger to the community if his sentence is reduced to time served as provided in 18 U.S.C. § 3142(g), and a reduction of the sentence to time served is in keeping with all relevant 18 U.S.C. § 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A).

Nevertheless, if granted relief, Mr. Abdul-Latif has no objection to 60 months of federal supervision in addition to his 10-year term of supervised release, in essence, the equivalent of the remaining period of his custodial sentence, as well as a reasonable term of compliance with the location monitoring system, home detention, if recommended by the U.S. Probation Office and deemed appropriate by the Court.

## MEMORANDUM OF LAW

### I.  BACKGROUND

On March 25, 2013, following Mr. Abdul-Latif's conviction for conspiracy to murder officers and employees of the United States in violation of 18 U.S.C. §§ 1114(1) and 1117, and conspiracy to use weapons of mass destruction in violation of 18 U.S.C. §§ 2332a(2)(C) and 2332a(a)(3), Mr. Abdul-Latif was sentenced to 216 months, followed by 10 years of federal supervision. (Dkt. 220). Mr. Abdul-Latif is currently serving the sentence imposed at FCI Big Spring. *See* www.bop.govt/inmateloc/. He is projected to complete the term of imprisonment imposed on October 22, 2026, with an early release presumably in October 2025 pursuant to 18 U.S.C. § 3621(e) and BOP Program Statement 5331.02. *Id.*; *see also, e.g.,* Individualized

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 2
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Reentry Plan – Program Review (Inmate Copy) attached as Ex. 1 (noting release date and fact that halfway house or home confinement will be "discussed 17-19 months prior to release").

When initially housed at FDC SeaTac, Mr. Abdul-Latif was housed in the Special Housing Unit due to the nature of the charges; not for any conduct or misconduct by Mr. Abdul-Latif. After his sentencing and transfer, Mr. Abdul-Latif paid the special assessment fees and engaged in all programming available to him over the course of the last nine years.[2] Ex. 1 at pp. 1-2;  *see also* Individualized Needs Plan – Program Statement (Inmate Copy) dated 8/11/2020 attached as Ex. 2.  Mr. Abdul-Latif has been diligently working to learn from the mistakes of his past by engaging in that programming, and having a better or more accurate understanding of the Muslim faith than he had at the time he engaged in the plot with the Informant.[3] *See, e.g.,* March 31, 2020 Letter by Abdul-Latif to the Court attached as Ex. 3. He is steadfast in his intent to help other Muslims with the basics of the faith so they too have a correct understanding of Islam and do not repeat his mistakes. In doing so, he has been a positive role model in his role as an Imam (community leader) and Sharif (Imam's assistant) in a way that he wishes he had been for his community and family before the offense conduct, but intends to be from here on out. *Id.*

Since 2017, he has been recommended for placement in a low facility. Ex. 1 at pp. 1-2; *see also* Male Custody Classification Form attached as Ex. 4.  And on August 4, 2020, the Bureau

---

[2] Abdul-Latif was arrested in June 2011.  Presentence Report, ¶ 3.

[3] Abdul-Latif converted to Islam in 2002 when he was 25 years old, while undergoing a competency evaluation in a mental health hospital. (Dkt. 212 at 6-7). Once released, he felt alienated from the Muslim community so turned to YouTube for guidance. *Id.*

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 3
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

of Prisons' risk assessment tool concluded he is a "low" risk. Male PATTERN Risk Scoring

attached as Ex. 5.[4]

In addition, as of October 2019, due to a seizure disorder, Mr. Abdul-Latif is classified

as requiring Care Level 2, and restricted to a lower bunk. Ex. 1 at 1. Care Level 2 is defined by

the BOP as follows:

- Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months.

- Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring;

- Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time.

*See* Federal BOP, Clinical Guidance, *Care Level Classification for Medical and Mental Health

Conditions or Disabilities* (May 2019) at p. 3, attached hereto as Ex. 6;[5] *id.* at 4 (examples

include medication-controlled diabetes and epilepsy). Mr. Abdul-Latif's history of epilepsy and

---

[4] PATTERN is a Bureau of Prisons risk assessment tool now utilized to give "priority treatment" to inmates who score as "minimum" risk to release on home confinement in keeping with Attorney General William Barr's directive to reduce inmate populations to address the spread of COVID-19 among incarcerated persons. However, PATTERN was "created for an entirely different purpose," and "is still an incomplete tool." Press Release, H. Comm. On Judiciary, *Nadler & Bass Renew Call for DOJ to Take Action*, at 4. Further, there are concerns about "possible racial/ethnic and gender bias" associated with the tool. Apparently, the only publicly reported data on the demographic impact of PATTERN confirms that its use will have a racially disparate impact on black males, like Mr. Abdul-Latif. Specifically, the Department of Justice's data shows that black males are far less likely than white males to have a PATTERN score that puts them in the "minimum" category: only 7% of black men score as minimum risk, compared with 30% -- almost one third – of white men. *See* U.S. Dept. of Just., *The First Step Act of 2018: Risk and Needs Assessment System* 62, tbl. 8 (2019) (reporting 29.7% of white males in the developmental sample fall in the minimum risk category while only 7% of black males fall in that same category).

[5] Also available at https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 4
(*Abu Khalid Abdul-Latif*; CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

seizures was documented in the Presentence Report and verified by medical records. Presentence Report at ¶ 73. As described by Jeffrey Loeb, M.D., Ph.D., Mr. Abdul-Latif's records reflect two to three seizures per year since the age of 18 and is diagnosed with "partial complex seizure disorder." Dr. Loeb Declaration attached as Ex. 7 at ¶¶ 3 & 9. *See also* Dr. Loeb's Curriculum Vitae attached as Ex. 8, and BOP medical records (filed under seal) as Ex. 9.

As this Court knows, we are in the midst of an unprecedented and deadly pandemic that has swept the planet, killing over 800,000 people worldwide, 200,000 of which were in the United States, and governments throughout the world struggle to contain its spread through the use of emergency measures that have grinded public life to a halt. On March 19, 2020, as stated in *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020), the House Judiciary Committee urged that all existing authority be utilized to reduce the number of people in federal prisons, especially those over 65 or who have health conditions putting them at high risk from COVID-19, and noted, federal prisoners are particularly vulnerable to COVID-19. Indeed, federal prisons are among the worst places in the country, and possibly the world, for an individual to be infected by the coronavirus.

For example, some seventy percent of those tested in BOP facilities have tested positive for coronavirus, and at the time of writing, 116 inmates and one staff member have died. *See* COVID-19 Cases, US BOP, https://www.bop.gov/coronavirus (last visited August 21, 2020); *see also* ACLU & UCLA School of Law Prison Policy & Law Program, *Death by Incarceration: Remembering Those Lost to COVID-19*, https://tinyurl.com/ycp6ep95. How dangerous federal conditions are for those vulnerable to the pandemic and how inadequate the BOP's COVID-19

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 5
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

response was emphasized in a March 30, 2020 letter by the House Judiciary Committee. *Letter of House Judiciary Committee,* March 30, 2020 attached as Ex. 10. The letter cites considerable medical shortages at federal prisons even before the coronavirus, notes the close quarter housing in federal prisons that make adequate distancing between prisoners "impossible" and notes that the lack of hygiene in BOP facilities is "no secret." *Id.* The letter also expressed concern that the BOP is discouraging the release of inmates who are at high risk for contracting COVID-19 based on the seriousness of the offense without an adequate method to prevent such inmates from contracting the virus. The letter concludes, "For all these reasons, the best way to ensure that our prisons do not become epicenters of this incredibly virulent, contagious, and deadly disease is to release as many people as possible." *Id.*

Conditions have unfortunately not improved since March. At the current time, BOP facilities remain incredibly unsafe for individuals, particularly those vulnerable to serious complications from COVID-19, such as Mr. Abdul-Latif. [6] For instance, despite BOP measures implemented with hopes of protecting staff and inmates alike, the rate of infection has spiked considerably over time. *See, e.g.,* Walter Pavlo, *Federal Bureau of Prisons Institutions Not*

---

[6] *See,* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, https://doi.org/10.1086/521910. *See also* Brendan Saloner, PhD & Kalind Parish, MA & Julie A. Ward, MN, RN, et al, *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA Network, July 8, 2020 (available at: https://jamanetwork.com/journals/jama/article-abstract/2768249) (study found "the adjusted death rate in the prison population was 3.0 times higher than would be expected if the age and sex distributions of the US and prison populations were equal)

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 6
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

*Showing Any Sign of Flattening Curve*, FORBES (April 15, 2020).[7] As of July 10, 2020, COVID-19 infected over 80,000 inmates across the country, double the reported amount from May;[8] at least 585 inmates had died from the virus at that point.[9] Many of those infected, and, as noted above, 116 of those who have now died, were inmates in BOP custody. And the numbers are "almost certainly an undercount," as many facilities are less than forthcoming with complete information.[10] Or they simply aren't testing aggressively enough to appreciate the scope of COVID-19's spread. Nor is the BOP maximizing its tools to reduce population density in its facilities, which, as noted above, is essential to managing the crisis.[11] Accordingly, courts are in a unique position to ensure that federal prisoners are safe by ensuring compassionate release where it is necessary to prevent infection for individuals who would suffer serious complications, such as in this case.

To that end, on March 30, 2020, Mr. Abdul-Latif filed a request for relief with the warden pursuant to BOP Statement 5050.50. *See* 3/30/2020 Letter to Warden Marques attached as Ex.

---

[7] *See also* Timothy Williams & Rebecca Griesbach, *San Quentin Prison Was Free of the Virus. One Decision Fueled an Outbreak*, The New York Times, June 30, 2020 (available at: https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html).

[8] *See*, Timothy Williams & Rebecca Griesbach, *San Quentin Prison Was Free of the Virus. One Decision Fueled an Outbreak*, The New York Times, June 30, 2020 (available at: https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html).

[9] *A State-by-State Look at Coronavirus in* Prisons, The Marshall Project, Updated Jun. 25, 2020 (available at: https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons)

[10] *Id.*

[11] "*Lower inmate density means less spread. Therefore, population reduction is essential to managing this crisis.*" John Wentzel, *What We've Learned About COVID-19 in Prisons*, Real Clear Politics, May 3, 2020 (available at: https://www.realclearpolitics.com/articles/2020/05/03/what_we've_learned_about_COVID-19_in_prisons.html).

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 7
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

11. At the time, his release plan was to return home to his wife and son. *Id.* On April 29, 2020, the warden denied the request, stating "[y]our medical condition do [sic] not prevent you from accomplishing your daily living activities nor limit your ability to function in a correctional facility." *See* Warden decision attached as Ex. 12.

Mr. Abdul-Latif appealed that decision via the administrative process (i.e., a BP10). On June 23, 2020, Mr. Abdul-Latif received notice from the Regional Office that nearly a month before, on May 29, 2020, it had rejected his appeal. *See* Rejection Notice – Admin. Remedy attached as Ex. 14. The Regional Office rejected the request stating, Mr. Abdul-Latif must first file a BP-9, even though, as noted above, he did file an informal resolution request in March 2020 and the warden rejected it, in writing. Ex. 11 & Ex. 12. Mr. Abdul-Latif immediately appealed the decision via a BP11. Declaration of Counsel attached as Ex. 15. On July 23, 2020, staff at the institution informed Mr. Abdul-Latif that the BP11 was rejected for the same reason the BP10 was rejected. *See* Inmate Request to Staff re: BP11 attached as Ex. 20.

Meanwhile, the defense learned that Mr. Abdul-Latif's family lived in Section 8 housing and therefore, he cannot live in the residence with his wife and son until granted permission to do so. In addition, by mid-July, FCI Big Spring reported six staff had tested positive for COVID-19.[12] It further reported that of the 1,068 total inmate population, only 73 tests in total had been administered.[13] Accordingly, on July 14, 2020, due to changed circumstances – both in regards

---

[12] https://www.bop.gov/coronavirus/ (visited 7/14/2020).
[13] *Id.* (noting 56 inmate tests had been processed and another 17 tests were pending as of July 14, 2020); *see also* https://www.bop.gov/locations/institutions/big/ (inmate population). It should be noted that the

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 8
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

to the release plan as well as the active COVID-19 cases discovered at FCI Big Spring, -- Mr. Abdul-Latif, by counsel, as is permitted under the First Step Act, submitted a new request for compassionate release for the Warden's consideration. *See* Email to Warden attached as Ex. 13; *see also* BOP Program Statement 5050.60 (Jan. 17, 2019) at § 571.61(b) ("The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request.")  That request included Mr. Abdul-Latif's proposed release plan to reside at the House of Mercy in Washington until such time as his family can either add Mr. Abdul-Latif to his wife and child's Section 8 housing, or have the financial means to move, as well as how he intends to pay for necessary medical treatment. Ex. 13.

Mr. Abdul-Latif submitted his application to the House of Mercy on or about July 10, 2020. Ex. 15. Thereafter, Mr. Abdul-Latif spoke with the Director of the House of Mercy and the Director accepted Mr. Abdul-Latif's application. The release plan and the Director's contact information was provided to the U.S. Probation Office, for review. Their review is pending. *Id.*

As of this writing, the warden has failed to respond to counsel's July 14 informal resolution request. *Id.*  On August 20, 2020, the BOP reported three inmates at FCI Big Spring tested positive for COVID-19 in addition to the six staff from the month before, with no one deemed "recovered." The next day, the BOP reported four inmates at FCI Big Spring are now positive for Covid-19. www.bopgov/coronavirus/. In that environment, Mr. Abdul-Latif is compliant with his medications but remains medically vulnerable:

---

BOP data does not necessarily mean 73 individuals have been tested as many persons are tested at least twice.

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 9
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

> With respect to Mr. Abdul-Latif's partial complex seizure disorder, it is my opinion, based on my review of Mr. Abdul-Latif's Bureau of Prisons medical records, that Mr. Abdul-Latif has an increased risk of seizures should he contract a systemic viral infection such as COVID-19.

Ex. 7, at ¶ 5.

## II.   DISCUSSION

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), a court may reduce an incarcerated person's sentence upon motion of the Director of the BOP, or upon motion of the defense. The defense may initiate a request for relief under § 3582(c)(1)(A) when "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on his behalf" or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Mr. Abdul-Latif filed a BP10 and BP11, appealing the warden's April 29 decision, to which the BOP incorrectly concluded he had not filed a BP9 or informal resolution before appealing the warden's decision. Exhibits 11, 12, 14 & 20. Nevertheless, a new request was filed July 14 and yet, the warden has failed to act upon the request for relief. Ex. 13 & Ex. 15. Mr. Abdul-Latif has exhausted administrative remedies and this matter is ripe for this Court's review. *See, e.g.*, *United States v. Garcia*, 13-71-JLR, Dkt. 194 at 9-10 (W.D. Wash. July 8, 2020).

Next, for the Court to reduce a person's sentence under § 3582(c)(1)(A), "extraordinary and compelling reasons" must warrant such a reduction and the "reduction [must be] consistent with applicable policy statements by the Sentencing Commission." U.S.S.G. § 1B1.13 sets forth a list of examples of extraordinary and compelling reasons for a sentence reduction. However,

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 10
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   the Sentencing Commission has not amended U.S.S.G. § 1B1.13 since the enactment of the First

2   Step Act and consequently, portions of the old guideline run afoul of § 3582(c)(1)(A) as

3   amended. *United States v. McPherson*, 3:94-cr-05708-RJB, -- F.Supp.3d --, 2020 WL 1862596

4   (W.D. Wash. April 14, 2020).[14] Accordingly, the old policy statement may provide helpful

5   guidance to this Court, but is not dispositive. *Id.* at *4 ("The listing of things the Court should

6   consider hardly sets the criteria for a finding of extraordinary and compelling reasons for a

7   sentence reduction, leaving it to the Court to determine what qualifies, after appropriate

8   analysis."); *see also United States v. Cosgrove*, No. CR 15-230-RSM, 2020 WL 1875509, at *5

9   (W.D. Wash. Apr. 15, 2020) ("the Court may determine that 'extraordinary and compelling'

10  reasons may exist beyond those delineated by the commentary to USSG § 1B1.13.") (Quoting

11  *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *4 (D. Conn. Apr. 1,

12  2020)). In short, "'[e]xtraordinary and compelling' means 'extraordinary and compelling.'"

13  *McPherson*, 2020 WL 1862596, at *4.[15]

---

[14] The Sentencing Commission's policies are unlikely to be updated any time soon because there are currently an insufficient number of appointed commissioners. *See, e.g., United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051, at * 2 n. 1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners."); *see also About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commisioners (last visited June 26, 2020) (stating that only two commissioners are presently in place).

[15] The burden of proof for demonstrating eligibility for a sentence reduction under U.S.S.G. § 3582(c)(1)(A) is by a preponderance of the evidence. *See United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998) (determining burden of proof for sentence reduction motions under the analogous sentence reduction provision 18 U.S.C. § 3582(c)(2)).

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 11
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Here, Mr. Abdul-Latif's particular circumstances in light of the COVID-19 pandemic, including, but not limited to the BOP's inability – regardless of best intentions – to contain the infectious disease, and his increased risk of illness or death given that environment, his medical condition (i.e., seizure disorder and obesity) and race, are, in combination, extraordinary and compelling reasons to grant relief and in keeping with U.S.S.G. §§ 1B1.13, cmt. n. 1(A)(ii) and cmt. n. 1(D).

**A.  U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)**

The relevant commentary to U.S.S.G. § 1B1.13 provides:

> 1. **Extraordinary and Compelling Reasons.** – Provided the defendant meets the requirements of subdivision (2),[16] extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
>> (A) **Medical Condition of the Defendant. –**
>>
>> * * *
>>
>> (ii) The defendant is –
>>
>>> (I)     suffering from a serious physical or medical condition,
>>>
>>> * * *
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

---

[16] Subsection 2 of the commentary provides: "For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement."

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 12
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii). Here, Mr. Abdul-Latif suffers from a serious, chronic medical condition. Ex. 7. Second, while Mr. Abdul-Latif is medically treated for the seizure disorder, he has had the partial complex seizure disorder since he was young and he is "not expected to recover." U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii).

Third, although true Mr. Abdul-Latif can perform his daily activities, his ability to provide self-care is substantially diminished within the correctional facility because he cannot isolate himself or take other proactive steps to protect himself from COVID-19 as recommended by the Center for Disease Control and Prevention. *See United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. March 26 2020) ("[I]t is not possible for a medically vulnerable inmate. . . to isolate himself in [an] institutional setting as recommended by the CDC."). *See also* Op, Editorial Board, *The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars*, N.Y. Times,  June 25, 2020 ("Federal officials recognized the danger of the spread of coronavirus in prisons early, but have dragged their feet releasing at-risk inmates;" "The situation inside the nation's jails and prisons amid the COVID-19 pandemic has become the stuff of nightmares.").[17]

All inmates are vulnerable due to crowding, "the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful 'social distancing' that is needed to effectively

---

[17]   available at:   https://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html?referringSource=articleShare. *See also Coronavirus Disease 2019 (COVID-19): How to Protect Yourself*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Mar. 29, 2020).

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 13
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

prevent the spread of COVID-19.'"[18] *United States v. Rodriguez*, No. 2:03-cr-00271-AB01, 2020 WL 1627331, *8 (E.D. Penn. Apr. 1, 2020) (citing declaration of Joseph J. Amon, epidemiologist and Drexel Dornsife School Director of Global Health and Clinical Professor).[19] FCI Big Spring is no exception. In fact, as noted above, none of the modest steps FCI Big Spring is taking to mitigate against contagion have been successful or will do so in the long term. Nor will the steps taken transform it into a healthcare facility capable of responding to this crisis, or keep inmates, staff, and their respective families and the community healthy if its population is not reduced.[20] Certainly that fact is exemplified by the numbers that increase exponentially every day.

---

[18] The BOP, unfairly starved of resources and staff, has struggled to provide adequate medical care even in the best of times. *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); *Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer, Director, Fed. Bureau of Prisons).

[19] As one court observed: "Social distancing in a pretrial facility is nearly impossible for anyone who enters its doors, especially detainees. The inability to practice social distancing in jails makes transmission of COVID-19 more likely." *United States v. Davis*, No. 1:20-cr-00009-ELH, 2020 WL 1529158 at *4 (D. Md. Mar. 30, 2020) (internal quotation marks and citation omitted). *See also United States v. Barkman*, No. 19-cr-52-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628, at *3 (D. Nev. Mar. 17, 2020) ("Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.").

[20] *See Davis*, 2020 WL 1529158 at *5 n.7 (rejecting government's argument that pretrial detention facilities are equipped to handle the situation, stating that while the institutional efforts made are "important[,]" "they do not prevent the virus from entering the facilities, and they do not enable social distancing"). *See also United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real.").

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 14
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

In short, careful hygiene and social distancing measures necessary to avoid the infection are at best, minimally available to Mr. Abdul-Latif. And his risk of infection, the potential repercussions of which are potentially fatal, is certainly real:

> Currently there is no means of predicting whether a person who is infected with Covid-19 will endure a mild case or suffer a more serious infection. A more serious infection would be more likely to exacerbate his seizures. For Mr. Abdul-Latif, a mild case of Covid-19 with continued compliance on his seizure medications would likely be a low risk to worsening his seizures. However, even a mild viral infection can reduce seizure threshold, meaning his seizure activity could increase in frequency and/or intensity.

> Mr. Abdul-Latif has suffered approximately 2-3 seizures per year since age 18. Currently, while on medication, Mr. Abdul-Latif's seizures have been relatively benign with starring and confusion, but could become more significant, that is convulsions or status epilepticus (uncontrolled continuous seizures), with a severe viral illness and the metabolic and other changes that can occur as a result of that level of infection.  These types of seizures, if they occurred could be life threatening.

Ex. 7, at ¶ 4, 8-9. "The COVID-19 pandemic [and] the conditions of incarceration that diminish [Mr. Abdul-Latif's] ability to protect himself from exposure" and his serious, chronic medical condition should give rise to "extraordinary and compelling reasons" for reducing his sentence in keeping with U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii). *United States v. El-Hanafi*, 1:10-cr-00162-KMW, 2020 WL 2538384, *5 (S.D.N.Y. May 19, 2020) (granting relief for prisoner serving 180-month sentence for providing and attempting to provide material support and resources to Al Qaeda and housed in Butner).

/ / /

/ / /

/ / /

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 15
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**B.  U.S.S.G. § 1B1.13, cmt. n.1(D)**

Even if the Court concludes that the facts of this case do not fall squarely within U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii), Mr. Abdul-Latif qualifies for compassionate relief under the catch all provision of U.S.S.G. § 1B1.13. U.S.S.G. § 1B1.13, which provides, in relevant part:

> 1. **Extraordinary and Compelling Reasons.** – Provided the defendant meets the requirements of subdivision (2),[21] extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> > (A) **Other Reasons. –** * * * there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13, cmt. n. 1(D); *see also McPherson*, 2020 WL 1862596, at *4; *El-Hanafi*, 2020 WL 2538384, at *3 ("the mutually reinforcing risks of Defendant's living environment and his severe underlying health conditions give rise to extraordinary and compelling reasons for his release.")  In essence, even if Mr. Abdul-Latif is currently stable and the medical care adequate because his seizure disorder is properly cared for by medication compliance, he is still at a high risk of illness or death so long as he remains incarcerated, an outcome not intended by this Court at sentencing.

First, COVID-19 has continued to spread at FCI Big Spring and the experience of other institutions "shows how quickly and insidiously the virus spreads among a tightly quartered prison population." *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, *2 (N.D. Ohio Apr. 22, 2020), vacated on other grounds, *Williams v. Wilson*, 961 F.3d 829 (6th Cir. 2020).[22]

---

[21] *See* n. 16, *supra*.

[22] On appeal, the Sixth Circuit in *Williams v. Wilson* vacated the preliminary injunction concluding, habeas jurisdiction existed for medically-vulnerable prisoners' claims, but medically-vulnerable prisoners were not likely to succeed on merits of subjective prong for deliberate indifference claim.

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 16
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Despite best of intentions to protect the inmates and staff alike, prisons remain the ideal breeding ground for the coronavirus, where viral outbreaks regularly occur. Indeed, on August 20, 2020, 109 (out of 122) BOP facilities had confirmed active COVID-19 cases and the very next day the BOP reported that number jumped to 111 facilities. www.bop.coronavirus (visited Aug. 21. 2020). In the last month alone, four inmates at FCI Big Spring have tested positive in addition to the six staff members reported the month before, and no one has reportedly "recovered." *Id.*

It is also true that current numbers at all facilities would likely be much higher if the BOP tested everyone but they do not. *Wilson v. Williams*, 2020 WL 1940882, at *2 (ordered BOP to transfer from FCI Elkton all individuals identified by the CDC as being at higher risk from COVID-19, noting "it is unlikely that the[] figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates."). In fact, last Friday (August 21, 2020), the CDC said mass testing in prisons is necessary, noting, "Broad-based testing can provide a more accurate assessment of prevalence and generate data to help control transmission." https://www.cdc.gov/mmwr/volumes/69/wr/mm6933a3.htm.   And yet, as of August 21, 2020, FCI Big Spring had only administered 192 tests out of 944 inmates. Accordingly, little comfort should be garnered from the numbers reported. *Accord Wilson v. Williams*, 2020 WL 1940882, at *1-2.

Instead, given these facts, as well as the nature of COVID-19's spread and the nature of prisons, "[w]ith the shockingly limited available testing and the inability to distance inmates, COVID-19 is going to continue to spread, not only among the inmate population, but also among the staff." *Id.* at *1. And "[g]iven the steadily growing death toll [in prisons] and the apparent continued spread of the disease at [FCI Big Spring], COVID-19 creates an 'extraordinary and

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

compelling reason' potentially warranting a reduced sentence." *United States v. Kelly*, No. 3:13-cr-00059-CWR-LRA, Dkt. 145 at 13 (S.D. Miss. May 1, 2020) (despite youth and no health issues, Kelly granted compassionate release from Oakdale I because "it has become increasingly apparent that BOP has failed to control the outbreak at Oakdale I. Despite the BOP's efforts, COVID-19 has continued to spread at the facility and more prisoners have died.").

Second, the effect of COVID-19 on Mr. Abdul-Latif should he be infected is particularly worrisome should he contract something other than a mild form of COVID-19 because of his chronic seizure disorder Ex. 7 at ¶ 8. Further increasing the risk to Mr. Abdul-Latif should he contract the infectious disease is the fact that, at 5 foot six inches and approximately 194 pounds, his BMI is 31.31, which according to the CDC, puts him at increased risk of serious illness should he contract COVID-19. Ex. 9 at 166 (on April 14, 2020, weighed 194 pounds); *see also* Ex. 7 at ¶ 7 (noting at sentencing Abdul-Latif weighed 200 pounds which yields a BMI of 32). Obesity is among the top COVID-19 comorbidities. *See News: Hypertension, obesity, diabetes are top COVID-19 comorbidities, HER Data says*, Association of Clinical Documentation Integrity Specialists Newsletter, Vol. 14, Issue 18 (April 30, 2020), available at https://acdis.org/articles/news-hypertension-obesity-diabetes-are-top-covid-19-comorbidites-ehr-data-says (last visited June 11, 2020).

Moreover, even if the novel coronavirus does not prove fatal given his BMI and/or seizure disorder, it may expose Mr. Abdul-Latif to serious complications simply because he is a person of color. Specifically, the CDC has noted that hospitalization and death rates for African-Americans are "substantially higher" than that for white persons:

> The effects of COVID-19 on the health of racial and ethnic minority groups is still emerging; however, current data suggest a disproportionate burden of illness and death among racial and ethnic minority groups. [The] data suggest an

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 18
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

overrepresentation of blacks among hospitalized patients. Among COVID-19 deaths for which race and ethnicity data were available [in New York] death rates among Black/African American persons . . . were substantially higher than that of white . . . persons [more than double]. Studies are underway to confirm these data and understand and potentially reduce the impact of COVID-19 on the health of racial and ethnic minorities.

*See* "COVID-19 in Racial and Ethnic Minority Groups" (a listing under "People Who Need Extra Precautions – Others at Risk, CDC."[23] While much is to be learned, "[t]hese circumstances, combined with Mr. [Abdul-Latif's] … medical condition[], certainly give[s] this Court ample reason to factor in the disproportionate effect upon African Americans and the societal observations noted by the CDC in analyzing Mr. [Abdul-Latif's] compassionate release request." *United States v. Anello*, No. 2:12-cr-00131-RAJ, 2020 WL 3971399, at *5 (W.D. Wash. July 14, 2020).

       All of these facts, in combination with the fact that Mr. Abdul-Latif has served over 60% of the sentence imposed, and has an exemplary institutional history, equate to extraordinary and compelling circumstances that qualify Mr. Abdul-Latif for relief. *United States v. Maumau*, No. 2:08-CR-00758, 2020 WL 806121, at *5-8 (C.D. Utah Feb. 18, 2020). Multiple courts have granted relief under similar circumstances, with the pandemic in mind and understanding that a person's age or compromised health, or both, create a heightened risk for the person and demand immediate relief. *See, e.g., United States v. Huneeus*, No. 1:19-cr-10117-IT-7, Dkt. No. 642 (D. Mass. Mar. 17, 2020) (granting compassionate release "in light of the national state of emergency due to the global COVID-19 pandemic and Huneeus's unique health circumstances"); *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) (compassionate release granted – the "benefits of keeping [Perez] in prison for the remainder of

---

[23] Available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 19
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

1  his sentence are minimal, and the potential consequences of doing so are extraordinarily grave.");

2  *United States v. Hassoun*, 1:10-CR-00773, -- F.Supp.3d -- , 2020 WL 418791, *1 (N.D. Illinois

3  July 3, 2020) (granting relief to prisoner sentenced to 25 years for the attempted use of weapon

4  of mass destruction and malicious attempt to destroy or damage a building using explosive

5  device because immunocompromised by Familial Mediterranean Fever and heightened risk

6  should he contract COVID-19, noting the spread throughout penal institutions even though not

7  yet where prisoner housed); *El-Hanifi*, 2020 WL 2538384, *3 (granting relief for prisoner serving

8  180 month sentence given heightened risks due to chronic health conditions including

9  hypertension and stage 3 kidney failure). Here too, extraordinary and compelling circumstances

10  justify this Court's review of the sentence imposed, and as argued below, relief should be

11  granted.

12  **C. Safety of Others**

13  Having concluded that extraordinary and compelling reasons exist to grant relief, the

14  Court turns next to whether Mr. Abdul-Latif presents a danger to the safety of any other person

15  or to the community. *See* U.S.S.G. § 1B1.13(2). In making that determination, despite the

16  seriousness of Mr. Abdul-Latif's underlying offense, neither the nature and circumstances of the

17  offense, nor his history and characteristics suggest he would pose a danger to any person or to

18  the community.  18 U.S.C. § 3142(g).

19  The offense committed now over nine years ago, was unquestionably serious but it was

20  also manufactured and orchestrated by a deceitful, manipulative and generously paid government

21  Informant who targeted a susceptible individual. The Informant is now in jail, facing a sentence

22  of life for yet another rape. *See* Information and docket attached as Ex. 16. In contrast, as

23  described at the sentencing, Mr. Abdul-Latif's bravado masked a childhood marked by physical

24
25
26

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 20
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

and psychological abuse, neglect, abandonment, suicide attempts and psychiatric hospitalizations. (Dkt. 212). That childhood trauma combined with his significant cognitive and memory impairments stemming from prenatal alcohol exposure, made Mr. Abdul-Latif particular susceptible to the influence of others. In 2002, Mr. Abdul-Latif converted to Islam. Religion gave him the structure and community that he lacked and craved throughout his early life. Unfortunately, with only a misguided understanding of the Muslim faith, the Informant had a pathway to insinuate himself into Mr. Abdul-Latif's life for his own personal gain. *Id.* Yet, most importantly for these proceedings, Mr. Abdul-Latif, now 46 years old, has since disavowed his thinking errors in not only his words, but actions.

For example, sometime after the San Bernardino bombing investigation, he was approached by federal agents. He answered questions and he offered his insight as to his own thinking errors, with hopes similar tragedies can be avoided in the future. Similarly, when his wife told him she was approached by a strange woman at the masjid, his immediate reaction was to tell her to not engage further and instead, speak with her attorney and the authorities, which she did. Ex. 15.

Mr. Abdul-Latif has also engaged in numerous classes including, but not limited to, "FCI Thinking for a Change," parenting counseling and a victim impact counselor group. *See, e.g.,* BOP Education Data Transcript attached as Ex. 17. By virtue of his work and education, he has been an Imam and a Sharif with hopes that he will be a positive role model for others and his son, with a correct understanding of Islam, so others are not misled, as he was long ago – the kind of role model he knows he should have been, has been over the course of his incarceration and intends to be moving forward. In addition, to counsel's knowledge, he has had minimal disciplinary issues while in custody. BOP Discipline Report attached as Ex. 18. In all these ways,

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 21
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Abdul-Latif has demonstrated his sincere remorse and rehabilitation. *Accord El-Hanifi*, 2020 WL2538384, *5.

Mr. Abdul-Latif's age and health also lend further support to the conclusion that upon release he will present minimal danger to any person or to the community. So too does the fact that, the BOP's own risk assessment tool concluded he is a "low" risk. Ex. 5. Furthermore, Mr. Abdul-Latif has a strong support system available upon release, including his wife and now 13-year old son. *See* letters attached as Ex. 19.

Although his wife and son reside in Section 8 housing, they welcome him back into their lives. *Id.* If released, they know that Mr. Abdul-Latif will have to self-quarantine and live elsewhere until approved to live in the same apartment or have the means to move to another apartment near their home, but Ms. Davis believes employment opportunities are available to Mr. Abdul-Latif and will support him in that pursuit. They also appreciate that Mr. Abdul-Latif will be required to comply with the directives of a United States Probation Officer. His family does not see any of these facts as a hindrance; rather it is an opportunity for Mr. Abdul-Latif to transition back into the community and their life in a healthy manner, with the support and guidance of a professional. Even in the face of the pandemic, the United States Probation Office is able to effectively supervise individuals and "the potentially dire consequences to [Mr. Abdul-Latif'] health if he violates the conditions of supervised release and is returned to custody will motivate him to be compliant and cooperative." *United States v. Grubbs*, No. CR 16-228TSZ, 2020 WL 3839619, at *3 (W.D. Wash. July 8, 2020).

Finally, releasing Mr. Abdul-Latif approximately five years early from an 18-year sentence in order to protect his life and health during an unprecedented global pandemic will not undermine general deterrence." *El-Hanifi*, 2020 WL2538384, *5 (released prisoner 33 months

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 22
(*Abu Khalid Abdul-Latif*; CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

early from 180-month sentence). *See also, e.g.,* U.S. Sentencing Commission Report, "Retroactivity and Recidivism. The Drug Minus Two Amendment," July 2020 (concluding there was no statistically significant difference in the recidivism rates of offenders released early pursuant to retroactive application of the Drugs Minus Two Amendment and a comparable group of offenders who served their full sentences).[24]

For all these reasons, Mr. Abdul-Latif is not a danger to the community or any person if released.

**D.  18 U.S.C. § 3553(a) Factors**

In determining whether to grant Mr. Abdul-Latif compassionate release under 18 U.S.C. § 3582(c)(1)(A), the Court must also consider any relevant factors set forth under 18 U.S.C. § 3553(a). These factors include the nature and circumstances of the underlying offense, the need for the sentence imposed, the kinds of sentences available, the applicable sentencing range, pertinent policy statements, avoidance of sentencing disparities, and the need to provide victims with restitution. 18 U.S.C. 3553(a). As noted above, Mr. Abdul-Latif was, of course, convicted of a particularly serious offense by plea of guilty.  But the time he has served to date – over 60% of the original sentence imposed -- reflects that seriousness, promotes respect for the law and provides just punishment.

Under the extraordinary circumstances of this pandemic, confinement in BOP is punishment of a different order of magnitude than at the time the Court imposed Mr. Abdul-Latif's sentence. Indeed, under present conditions, an "ordinary" sentence of imprisonment can (and has for at least 116 BOP inmates across the country) become a death sentence. This is a

---

[24] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200708_Recidivism-Drugs-Minus-Two.pdf

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 23
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1  reality that has been recognized by numerous other courts. For instance, in *El-Hanifi,* the district

2  court acknowledged the "exceptionally serious" nature of the offense but concluded the

3  "previously imposed sentence is no longer just punishment where there is a real risk that it could

4  be transformed into a death sentence." 2020 WL2538384, *5 (released 33 months early from

5  180-month sentence). *See also United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *2

6  (E.D. Mich. May 21, 2020) (quoting *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL

7  1659880, at *6 (S.D.N.Y. Apr. 3, 2020) ("Although the sentence imposed on Defendant was just

8  . . . 'the Court did not intend for that sentence to 'include incurring a great and unforeseen risk

9  of severe illness or death' brought on by a global pandemic.'")

10       Releasing a medically vulnerable man who has served over 60% of the original sentence

11  under these circumstances is also in keeping with the fact that reducing the inmate population is

12  at the epicenter of thwarting the spread of COVID-19. Put differently, as articulated by another

13  court in this district in an unrelated case, the risk to Mr. Abdul-Latif's life "outweighs the

14  deterrent and retributive benefits that would be gained" by further incarceration. *See United*

15  *States v. Pippin*, CR16-266JCC, Dkt. 122, 2020 WL 2602140, at *6 (W.D. Wash. May 20, 2020).

16  Moreover, as the Honorable John C. Coughenour did in *Pippin*, and as the Honorable Benjamin

17  H. Settle did in *United States v. Young*, CR19-5055BHS, Dkt. 44, (W.D. Wash. May 22, 2020),

18  the Court can impose additional punishment with restrictive conditions such as home or halfway

19  house confinement and increase the 10-year term of supervision. In short, adequate punishment

20  for this medically-vulnerable man does not require the Court to gamble on whether he ends up

21  dying in prison in the coming years.

22       Mr. Abdul-Latif, who before the instant offense had never served more than a couple of

23  years in custody, but now has served not only two years of pretrial detention in solitary

24  
25  

26  

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 24
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

confinement, but also nine years behind bars, the last four months of which in legitimate fear of death due to the pandemic, has, without question, served a substantial sentence, during which he has conducted himself admirably. Extraordinary and compelling reasons exist such that compassionate release is warranted and the applicable factors set forth in § 3553(a) warrant relief.

### E.  Consistency with Policy Statement(s).

Finally, the Court must determine whether Mr. Abdul-Latif's compassionate release would be consistent with any relevant policy statement. 18 U.S.C. § 3582(c)(1)(A). To the extent U.S.S.G. § 1B1.13 is relevant even though it has yet to reflect changes made by the First Step Act, as set forth above, extraordinary and compelling reasons exist to warrant relief, Mr. Abdul-Latif does not pose a danger to any person or the community if released and the relevant factors set forth by § 3553(a) favor release. Accordingly, Mr. Abdul-Latif's compassionate release is consistent with any applicable guidelines.

## III.   CONCLUSION

For the foregoing reasons, Mr. Abdul-Latif's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) should be granted, his sentence reduced to time served, and the BOP directed to release him within 24 hours of this Court's order, where he will immediately begin the 10-year term of supervised release previously imposed.

DATED this 25th day August, 2020.

Respectfully submitted,

s/ *Jennifer E. Wellman*
Attorney for Abu Khalid Abdul-Latif
Office of the Federal Public Defender

DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE- 25
(*Abu Khalid Abdul-Latif;* CR11-228JLR)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**